GIRARDI | KEESE
THOMAS V. GIRARDI, State Bar No. 36603
tgirardi@girardikeese.com
ROBERT W. FINNERTY, State Bar No. 119775
rfinnerty@girardikeese.com
1126 Wilshire Boulevard
Los Angeles, California 90017
Telephone: (213) 977-0211
Facsimile: (213) 481-1554

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KIMBERLY ARCHIE, as survivor of decedent Paul Bright Jr.; JO CORNELL, as survivor of decedent Tyler Cornell, on behalf of themselves and all others similarly situated; JO CORNELL, an individual, on behalf of herself and all others similarly situated; DEBRA MCCRAE, on behalf of Richard Caldwell, on behalf of themselves and all others similarly situated; SHANNON BARNES, guardian ad litem for CHASE BARNES; SHANNON BARNES, guardian ad litem for DREW BARNES; SHANNON BARNES, guardian ad litem for CADE BARNES; <br><br> Plaintiffs, <br><br> v. <br><br> POP WARNER LITTLE SCHOLARS, INC.; a nonprofit corporation; SPARKS NEVADA POP WARNER FOOTBALL LEAGUE, INC., a non-profit corporation; PALOMAR POP WARNER FOOTBALL CONFERENCE, INC., a California corporation; MIDVALLEY POP WARNER FOOTBALL & CHEER, INC., a non-profit corporation; ALBANY POP WARNER, a non-profit corporation; NATIONAL | Case No. 2:16-cv-6603-PSG-PLA <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> The Hon. Philip Gutierrez |

OPERATING COMMITTEE ON
STANDARDS ATHLETIC
EQUIPMENT, a nonprofit
organization; and DOES 1-100,

                    Defendants.

## SECOND AMENDED CLASS ACTION COMPLAINT

Kimberly Archie, as survivor of decedent Paul Bright Jr., and Jo Cornell, as survivor of decedent Tyler Cornell, on behalf of themselves and all others similarly situated (hereinafter "Wrongful Death Plaintiffs and Class Members"), Jo Cornell, an individual, on behalf of herself and all others similarly situated, (hereinafter "Adult Plaintiffs and the Class Members"), Debra McCrae, on behalf of Richard Caldwell, on behalf of themselves and all others similarly situated (hereinafter "Personal Injury Plaintiffs and Class Members"), Shannon Barnes, guardian ad litem for Chase Barnes, Drew Barnes and Cade Barnes, on behalf of themselves and all others similarly situated (hereinafter "Medical Monitoring Plaintiffs and the Class Members"), (collectively referred to as "Plaintiffs and the Class Members") bring this class action complaint and allege the following against Defendants Pop Warner Little Scholars, Inc., Palomar Pop Warner Football Conference, Inc., Sparks Nevada Pop Warner Football League, Inc., Midvalley Pop Warner Football & Cheer, Inc., Albany Pop Warner, National Operating Committee on Standards Athletic Equipment, and DOES 1-100 (collectively "Defendants") and each of them as follows:

## I.

## PARTIES

A.   **Plaintiffs:**

1.     Plaintiff, Kimberly Archie, as survivor of decedent Paul Bright Jr., is the biological mother of decedent Paul Bright, and is a resident of the City of North Hollywood, County of Los Angeles, in the State of California. Plaintiff Archie's son, Paul Bright Jr., participated in Defendants Pop Warner's program from 1997 through

2004. In particular, Paul Bright Jr. was a member of the Sparks Pop Warner Steelers in Sparks, Nevada. As a result of Defendants' actions and omissions, as further described below, Paul sustained various injuries, including, but not limited to, injuries to his brain. In 2008, Paul Bright Jr. began experiencing behavioral issues acting unpredictably, recklessly and without care for the consequences. Paul had ongoing issues with concentrating, sleep disturbances, managing his emotions and decision making that escalated from his senior year of high school until his death. On September 1, 2014, Paul Bright Jr.'s erratic and reckless behavior ultimately lead to his untimely death. On April 9, 2015 it was discovered that Paul Bright Jr. suffered from Chronic Traumatic Encephalopathy. Plaintiff Kimberly Archie could not have discovered that her son, Paul Bright Jr. suffered from CTE before April 9, 2015 because Paul's CTE was discovered after a thorough study, by Boston University, of Paul's brain after he passed away. Plaintiff Kimberly Archie received the results of the study on or around April 9, 2015.  Plaintiff Kimberly Archie could not have received the diagnosis during Paul's life because CTE is diagnosed postmortem.

2.      Plaintiff, Jo Cornell, is a resident of the City of San Diego, in the State of California. Her son, Decedent Tyler Cornell, participated in Defendants Pop Warner's program from 1997 through 2002. In particular, Tyler Cornell was a member of the Wescon Region, Palomar Pop Warner Conference, Rancho Bernardo Association, in San Diego, California. As a result of  Defendants' actions and omissions, as further described below, Tyler sustained various injuries, including but not limited to injuries to his brain.  After playing Pop Warner, Tyler began experiencing behavioral issues and was diagnosed with depression. On April 3, 2014 Tyler Cornell took his own life. On January 16, 2015 it was discovered that Tyler Cornell suffered from Chronic Traumatic Encephalopathy.  Plaintiff Jo Cornell could not have discovered Decedent Tyler Cornell's CTE diagnosis before January 16, 2015 because Decedent Tyler Cornell's CTE was discovered after a thorough study, by Boston University, of Tyler Cornell's brain after he passed away.  Plaintiff Jo Cornell received the results of the study on

1  January 16, 2015.  Plaintiff Jo Cornell could not have received the diagnosis during

2  Tyler's life because CTE is diagnosed postmortem. Based on the forgoing, Ms.

3  Cornell's could not have reasonably discovered facts as to Tyler's clinical diagnosis of

4  Chronic Traumatic Encephalopathy that supports the cause of action of negligence and

5  wrongful death against named defendants until January 16, 2015.

6         3.     Plaintiff, Debra McCrae, on behalf of Richard Caldwell, is a resident of

7  the City of San Diego, in the State of California. Plaintiff Debra McCrae is Richard

8  Caldwell's biological mother. Richard Caldwell participated in Defendants' Pop Warner

9  program from 1996 through 2003. In particular, Richard Caldwell was a member of the

10 Wescon Region, Palomar Pop Warner Conference, Raptors Pop Warner team in

11 Rancho Bernardo, County of San Diego, in the State of California. Throughout

12 Richard's career as a participant in Defendants' Pop Warner program, Richard suffered

13 multiple concussions resulting in multiple trips to the emergency room. Sometime after

14 Richard Caldwell stopped playing in Defendants' Pop Warner program, Richard

15 displayed bouts of erratic behavior and was diagnosed with depression. In November of

16 2015, Richard's erratic behavior caused him to become involved in an auto versus

17 pedestrian accident which has rendered him incapacitated and bound by a wheelchair.

18 To date, Richard is housed in a facility away from his family where he receives care

19 twenty-four hours per day, seven days per week. Plaintiff Debra McCrae did not

20 become aware that Richard's participation in youth tackle football caused him to

21 develop chronic traumatic brain injuries until the issue was widely publicized in

22 December 2015. Plaintiff Debra McCrae could not have become aware before

23 December 2015 because Defendants actively concealed this information from the

24 public.

25        4.     Plaintiff, Shannon Barnes, guardian ad litem for her three minor children

26 Chase Barnes, Drew Barns and Cade Barnes, is a resident of the City of Albany in the

27 state of Oregon. All three of Shannon Barnes' children participated in the Midvalley

28 Pop Warner Conference, Albany association in the state of Oregon. Chase Barnes

played Pop Warner from 2009 through 2012 and again in 2015. Drew Barnes played Pop Warner from 2010 through 2015. Cade Barnes played Pop Warner in 2014. Plaintiffs are informed and believe and based thereon allege that as a result of Defendants' actions and omissions, as further described below, Chase, Drew and Cade Barnes have suffered repeated head trauma resulting in micro-concussions and sub-concussive hits to the head while wearing equipment inadequately designed and tested to protect their short term and long term health. In addition, Chase, Drew and Cade Barnes have been placed at an increased risk of chronic injury, that is substantially certain and impending, including but not limited to brain injury, damage, disease and CTE.

**B.   Defendants:**

5.     Defendant, Pop Warner Little Scholars, Inc. (hereinafter referred to as "Pop Warner") is a non-profit corporation incorporated and headquartered in Pennsylvania. Pop Warner Little Scholars, Inc. provides youth tackle football, cheerleading and dance programs for children ages 5 to 15 years old. Pop Warner Little Scholars, Inc. is a national nonprofit corporation that operates across forty-two states, including California, and throughout numerous countries worldwide.

6.     Defendant, Palomar Pop Warner Football Conference, Inc., (hereinafter referred to as "Palomar PW"), is a California corporation incorporated and headquartered in Temecula, California. Palomar Pop Warner Football Conference, Inc. is a youth tackle football and cheerleading conference affiliated with the national Pop Warner Little Scholars, Inc. organization.

7.     Defendant Sparks Nevada Pop Warner Football League, Inc., (hereinafter referred to as "Sparks PW"), was a non-profit corporation incorporated and headquartered in Sparks, Nevada. Sparks Nevada Pop Warner Football League, Inc. provided youth tackle football and cheerleading programs for children ages 5 to 14 years old. Sparks Nevada Pop Warner Football League, Inc. was a non-profit corporation affiliated with the national Pop Warner Little Scholars, Inc. organization

1  from at least October 24, 1988 until October 31, 2015.

2      8.    Defendant Midvalley Pop Warner Football & Cheer, Inc. (hereinafter

3  referred to as "Midvalley PW") is a non-profit corporation incorporated and

4  headquartered in Albany, Oregon. Defendant Midvalley Pop Warner Football & Cheer,

5  Inc. is a youth tackle football and cheerleading conference affiliated with the national

6  Pop Warner Little Scholars, Inc. organization from at least 2003 to the present.

7      9.    Defendant Albany Pop Warner (hereinafter referred to as "Albany PW") is

8  a non-profit corporation incorporated and headquartered in Albany, Oregon. Defendant

9  Albany Pop Warner is a youth tackle football association affiliated with the national

10 Pop Warner Little Scholars, Inc. organization from at least 2012 to the present.

11     10.    Defendant, National Operating Committee on Standards for Athletic

12 Equipment ("NOCSAE") is a nonprofit organization with its principal place of business

13 in Overland Park, Kansas. The NOCSAE organization sets the standards for athletic

14 equipment safety. The NOCSAE organization is comprised of representatives from a

15 number of national representative organizations that have a vested interest in athletic

16 equipment. These include manufacturers, re-conditioners, athletic trainers, coaches,

17 equipment managers, sports medicine and consumer organizations. NOCSAE is a self-

18 appointed standard setting body whose members' primary focus is to generate profits

19 (i.e. 50 cents on each football helmet baring a NOCSAE certification

20 sticker.). NOCSAE receives a royalty fee from every licensee who uses its name, logo,

21 seal, or other trademarked item when certifying or recertifying equipment, i.e. football

22 helmets in this case.

23     11.    The true names and/or capacities, whether individual, corporate, associate

24 or otherwise, of Defendants DOES 1 through 100, inclusive, and each of them, are

25 unknown to Plaintiffs and the Class Members, who therefore sue said Defendants by

26 such fictitious names. Plaintiffs and the Class Members are informed and believe, and

27 upon such information and belief allege, that each of the Defendants fictitiously named

28 herein as a DOE is legally responsible, negligently or in some other actionable manner,

1  for the events and happenings hereinafter referred to, and proximately caused the
2  injuries and damages to Plaintiffs and the Class Members hereinafter alleged.  Plaintiffs
3  and the Class Members will seek leave of Court to amend this Complaint to assert the
4  true names and/or capacities of such fictitiously named Defendants when the same have
5  been ascertained.

6      12.    Plaintiffs and the Class Members are informed and believe, and based
7  thereupon allege, that at all times mentioned herein, Defendants, and each of them,
8  including DOES 1 through 100, were the agents, servants, employees, alter-egos,
9  and/or joint venturers of their co-Defendants, and were, as such, acting within the
10  course, scope and authority of said agency, employment and/or joint venture, and that
11  each and every Defendants, as aforesaid, when acting as a principal, was negligent in
12  the selection and hiring of each and every Defendants as an agent, employee and/or
13  joint venturer.

**II.**

**GENERAL ALLEGATIONS**

16      13.    This action arises from Defendant Pop Warner Little Scholars, Inc.,
17  Palomar Pop Warner Football Conference, Inc., Sparks Nevada Pop Warner Football
18  League, Inc., Midvalley Pop Warner Football & Cheer, Inc., Albany Pop Warner, and
19  National Operating Committee on Standards Athletic Equipment failures to provide for
20  the safety and health of minor child participants of the Pop Warner tackle football
21  program.

22      14.    The Pop Warner Little Scholars program is a youth tackle football, cheer
23  and dance program founded in 1929. Pop Warner was incorporated as a national
24  nonprofit corporation  in 1959.

25      15.    Today, the Pop Warner program consists of eight regional conferences
26  across forty-two states and several countries. Each region consists of separate leagues,
27  associations and teams.

28      16.    Upon information and belief, over 400,000 children participate in the Pop

7

SECOND AMENDED CLASS ACTION COMPLAINT

Warner tackle football program per year. However, participation in youth tackle football has been in decline in recent years.

17.     Pop Warner Little Scholars, Inc., Palomar Pop Warner Football Conference, Inc., Sparks Nevada Pop Warner Football League, Inc., Midvalley Pop Warner Football & Cheer, Inc., Albany Pop Warner, National Operating Committee on Standards Athletic Equipment, and Does 1 through 100, and each of them, misrepresented material facts to Plaintiffs and the Class Members and the public at large regarding the safety of Pop Warner tackle football, including the safety of the equipment used by minor child participants.

18.     Upon information and belief, Defendant NOCSAE was created in 1969 to commission research to prevent injuries.  To this end, Defendant NOCSAE created standards for various athletic equipment, including football helmets.

19.     Every league, from Pop Warner to the NFL mandates that the helmets used Meets NOCSAE Standards.

20.     NOCSAE adopted the Severity Index (hereinafter "SI") as a failure criteria when testing football helmets and developing football equipment standards. The test involves dropping a football helmet from a range of heights, with a maximum height of 1.3 meters, onto a thick rubber pad to measure linear acceleration and the effect of the impact on various portions of the helmet. The test, through a series of mathematical calculations, reveals a SI that is assigned to the football helmet to determine whether it passes certification for use by tackle football participants.

21.     The original NOCSAE football helmet standard had a failure limit of 1500 SI, which was later reduced to 1200 SI. Defendant NOCSAE published its standards for football helmet safety in 1973.   Upon information and belief NOCSAE's standards are used by every level of football from Pop Warner to the National Football League.  Indeed, many of the Youth Football Leagues across the nation actually require that the football helmets meet NOCSAE standards.

22.     NOCSAE's position is that the actual SI number of a particular football

1  helmet test should not be referenced, only that it is above or below 1200. Indeed, SI

2  scores are not made available to the public.

3  　　　　23.　　NOCSAE, however, has known since at least November of 2000 that

4  football helmet impacts that result in a SI of 559 SI, well below the NOCSAE standard

5  of 1200, result in a 95% chance of concussion for the participant. As a result, a

6  concussion is almost certain to occur at SI levels half that of the current 1200 SI

7  NOCSAE standard used today.

8  　　　　24.　　NOCSAE has known this information since November 15, 2000, at the

9  latest and has failed to inform the consumers, including Plaintiffs. Instead, NOCSAE

10  licenses the use of its logo, i.e. that a specific helmet meets NOCSAE standards,

11  creating the false sense of security that the helmet has been tested for safety and

12  protection against injury. Indeed, in 2005 NOCSAE stated that it believes that every

13  helmet which has been certified to NOCSAE's standard does a remarkable job in

14  reducing head injuries and their severity, including concussions.

15  　　　　25.　　The NOCSAE organization is comprised of representatives from a number

16  of national representative organizations that have a vested interest in athletic

17  equipment. These include manufacturers, reconditioners, athletic trainers, coaches,

18  equipment managers, sports medicine and consumer organizations.

19  　　　　26.　　NOCSAE advertises that it is an "independent and nonprofit standard-

20  setting body that aims to enhance athletic safety through scientific research and the

21  creation of performance standards for protective equipment."[1]

22  　　　　27.　　**In reality, Defendant NOCSAE exists to shield helmet manufacturers**

23  **from liability.** Indeed, in an article published in 2010 in the New York Times,

24  NOCSAE Vice President Dr. Robert Cantu stated that the NOCSAE board "has become

25  as concerned about legal liability as about child safety."[2]

26  _____

27  [1] http://nocsae.org/wp-content/uploads/2014/05/NOCSAE-jan-24-release-final.pdf

28  [2] http://www.nytimes.com/2010/10/21/sports/football/21helmets.html?_r=1&pagewa

28.   NOCSAE creates the allure that football helmets are safe by allowing a sticker to be placed on the helmets that states "Meets NOCSAE Standards."

29.   All of Defendant Pop Warner's hard-shell helmets contain a sticker stating that the helmet "Meets NOCSAE standard". For virtually all parents, this sticker is equated with safety.

30.   However, NOCSAE notably concedes that there are no specific safety standards for youth sports. In other words, NOCSAE safety specifications fail to differentiate between adult tackle football participants and children tackle football participants, despite the drastic and varying differences between the two.

31.   As a result, NOCSAE's representation that the Pop Warner football helmets, including but not limited to hard-shell helmets, "Meets NOCSAE Standards" is misleading, creating a false sense of security for Pop Warner participants and the parents and/or guardians who enroll them.

32.   Defendants NOCSAE, Pop Warner, Palomar PW, Sparks PW, Midvalley PW, and Albany PW have approved the NOCSAE helmet standard labels that are used, and even mandated their use, knowing that they are misleading and will lead to injury for minor children.

33.   Defendant Pop Warner has similarly engaged in misleading representations regarding the safety of Pop Warner football.

34.   Tackle football with helmets is a violent game which exposes all who play it to risk of sprained and dislocated joints, broken bones, ruptured organs, paralysis, death and brain damage.  Defendant Pop Warner has knowingly exposed children to those risks for decades.

35.   Defendant Pop Warner advertises itself as a safety-first organization in which children play for coaches trained in proper tackling techniques, and that this technique makes youth tackle football safe for children as young as 5, who weigh as

nted=all&

1    little as 45 pounds.

2        36.    Defendant Pop Warner further creates the illusion that pop warner football

3    is safe by mandating the use of helmets that "Meets NOCSAE standards." Defendant

4    Pop Warner, however, knows that NOCSAE does not have a youth specific standard.

5        37.    The risk of Chronic Traumatic Encephalopathy ("CTE") in a collision

6    sport has been understood since 1928 when in the *Journal of American Medical*

7    *Association* article forensic pathologist Dr. Harris on Standford Martland, the chief

8    medical examiner of Essex County in Newark, New Jersey, noted tremors, slowed

9    movement, confusion, and speech problems typical of the condition in boxers.

10    Additionally, as early as 1936 scientists noted that "athletes entering into competitions

11    in which head injuries are frequent and knock-outs common should realize that they are

12    exposing themselves not only to immediate injury but also to remote and sinister

13    effects.

14        38.    CTE is the result of the cumulative toll of hundreds of traumatic impacts to

15    the brain.  Brain damage can occur without an identified concussion, from traumatic

16    forces that are seemingly routine in collision sports.  There may be multiple brain

17    damaging events in any one football game, but the injured individual may show no

18    overt signs of concussion.  CTE may also involve progressive degeneration of the brain

19    tissue.  **These changes in the brain can begin months, years, or even decades after**

20    **the last brain trauma or end of active athletic involvement.**

21        39.    There is both an early phase and late phase of CTE.  During the early

22    stages of CTE, relatively young people will suffer from primarily behavior and mood

23    symptoms.  In the later stages, CTE involves an early onset of severe cognitive and

24    motor decline.

25        40.    Additionally, in the early stages of CTE, severe depression and suicide are

26    among the most common features.  CTE creates a significant risk for suicide as it

27    synergistically combines depression, anxiety, paranoia, reduced impulse control,

28    behavioral extremes that can often be violent, and despair for those suffering with its

effects.

41.     The risk of head injury in football has been understood at least as long ago as the first football helmet, i.e. circa 1894.

42.     Children are more vulnerable to injury, particularly head, neck and brain injuries than adults.  The reasons for this additional vulnerability include the fact that children's brains and heads are disproportionately large compared to the rest of the body.  Additionally, children typically have weak necks compared to adults.  The extra size and weight of the head coupled with a child's weaker neck results in less ability to limit the degree to which the head will be subject to rotational forces in a collision. Rotational forces (which are the most dangerous inside the brain) will be greater for a child, proportional to the severity of the impact.

43.     The weight of the helmet adds additional weight to the issues of the head being disproportionately large.

44.     Additionally, a child's brain takes longer to recover from a concussion than an adult's brain.

45.     Children's brains have less myelin than adults' brains.  Myelin is a type of insulator to axonal fibers that connect the brain internally and throughout the nervous system.  Myelin serves to protect neurons from damage.  The less myelin, the more risk for damage.

46.     Key brain developments are occurring in children between the ages of 10 and 13.  Traumatic injury to the brain during such period will have a significant impact and lead to CTE.

47.     Neurons are the primary thinking and information transfer cell in the brain. The earlier a person becomes exposed to neural wasting activities (brain trauma), the greater the likelihood that the "neuronal reserve" of such person will be prematurely exhausted before normal aging.

48.     Each person has a certain number of functioning neurons, which exceed the number required to function as an adult.  Through the normal aging process a

person will lose a predictable number of neurons each decade of life. Clinically significant early brain function decline is substantially related to the number of neuron's left in a human brain, dipping below the number required for normal cognitive, behavioral, mood and physical function. Playing tackle football involves repetitive brain trauma, which kills brain cells. The younger a person starts playing tackle football, the longer they play tackle football, the more likely it is that their neuronal reserve will prematurely dip below the level needed for normal cognitive, mood, behavioral and physical function. Accelerating the pace of neuronal decline will accelerate the point in time at which a person becomes demented.

49.   The youth football helmet presents an unreasonable risk of harm to the user because the helmet was not designed for minors, there are known design defects, inadequate fitting instructions and inadequate adult manufacturing standards applied towards an even more vulnerable population, child athletes.

50.   Defendant Pop Warner knew, or should have known, about the dangers of playing football, especially without proper equipment and/or using improper techniques. Defendant Pop Warner, however, failed to warn Plaintiffs, and the putative class, about the dangers of using improper equipment and/or techniques.

51.   Defendants', Pop Warner's, false representations regarding the safety of youth tackle football misled parents and/or guardians into enrolling their children in the Pop Warner program.

52.   Defendant Pop Warner engages in false and misleading advertising regarding the level of training of their coaches and staff.

53.   For example, Pop Warner's website boasts:

> We have over 40,000 volunteers and coaches that are being trained every
>
> year to offer the best and safest programs for you and your
>
> children…The safety of our athletes is <u>always the top priority</u> and that is
>
> why we provide extensive training for all our football and cheer & dance

coaches.[3]

54.     However, upon information and belief, Jon Butler, executive director of Pop Warner Little Scholars, Inc., conceded in a deposition that the national Pop Warner office does not check whether coaches in fact receive such training.

55.     Moreover, Jon Butler further conceded in a deposition that Pop Warner does not employ personnel with a medical background, athletic training background, or physical education background.

56.     Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and Does 1 through 100, and each of them, continue to mislead Plaintiffs and the Class Members and the public at large regarding the safety of Pop Warner football, including the dramatic inadequacies of the equipment it provides. the equipment used, the techniques taught and the level of training of their coaches on the topic of child safety.

57.     Defendant Pop Warner failed to adequately ensure that their coaches were properly trained and educated on the topic of safety, and what techniques were reasonably safe to teach minor child participants based on child appropriate performer readiness.

58.     Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and Does 1 through 100, and each of them, failed to adequately ensure that the equipment used by Pop Warner participants was adequate to protect minor children against the risk of brain injuries.

59.     Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and Does 1 through 100, and each of them, each owe a duty of care to the minor children who participate in their Pop Warner program. An adult is required to exercise a greater degree of care towards children and anticipate their ordinary behavior. CACI 412. Furthermore, "A greater degree of care is generally owed to

---

[3] http://www.popwarner.com/about_us/benefits.htm

1    children because of their lack of capacity to appreciate risks and to avoid danger."

2    *McDaniel v. Sunset Manor Co.* (1990) 220 Cal.App.3d 1, 7, citing *Casas v. Maulhardt*

3    *Buick, Inc.* (1968) 258 Cal.App.2d 692, 697–700.

4        60.     Defendants', Pop Warner, Palomar PW, Sparks PW, Midvalley PW,

5    Albany PW, NOCSAE, and Does 1 through 100, fraudulent misrepresentations

6    regarding the safety of youth tackle football and their failure to meet their duty to

7    safeguard minor children, including Plaintiffs and the Class Members, against the

8    increased risk associated with youth tackle football including but not limited repetitive

9    head trauma coupled with the use of hard-shell helmets not adequately designed to

10   protect their unique vulnerabilities, a duty in which they voluntarily undertook, was

11   willful, wanton, egregious, reckless, and with a high degree of moral culpability.

12       61.     As a result of Pop Warner, Palomar PW, Sparks PW, Midvalley PW,

13   Albany PW, NOCSAE's, and Does 1 through 100, gross negligence and fraudulent

14   misrepresentations, Plaintiffs and the Class Members suffered repeated head trauma,

15   including multiple concussions, which has led to severe chronic brain injuries,

16   including but not limited to depression and Chronic Traumatic Encephalopathy

17   (hereinafter "CTE") as well as substantially certain risk for future injury.

### III.

### JURISDICTION AND VENUE

20       62.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (d), the Class Action

21   Fairness Act of 2005, because the proposed Class consists of more than 100 members;

22   the amount in controversy exceeds the jurisdictional requirement of $5,000,000

23   exclusive of costs and interest; and diversity exists. The Court may also exercise

24   supplemental jurisdiction over Plaintiff's and Class Member's state law claims pursuant

25   to 28 U.S.C. § 1367.

26       63.     This Court has personal jurisdiction over Defendants. Many of the acts and

27   omissions giving rise to this action occurred in California. Defendants have sufficient

28   minimum contacts in California and intentionally avail themselves of the laws and

1 | protections of California.

2 |      64.    Defendant Pop Warner operates and controls several Pop Warner leagues
3 | throughout California. Defendant Pop Warner's leagues across the state of California
4 | include the Orange Empire Pop Warner, Mount Baldy Pop Warner, San Diego Pop
5 | Warner, Palomar Pop Warner, Peninsula Pop Warner (Northern California), Los
6 | Angeles County Pop Warner, Imperial Valley Pop Warner, and Sagebrush Empire Pop
7 | Warner. Defendant Pop Warner plays an active role in creating Pop Warner leagues
8 | throughout the State of California. Moreover, Defendant Pop Warner regularly holds
9 | conferences in cities throughout California. Furthermore, Defendant Pop Warner has
10 | had substantial, continuous, and systematic other contacts with California.

11 |      65.    Plaintiffs are informed and believe and based thereon allege that
12 | Defendant Pop Warner has approximately 14,000 to 32,000 total tackle football
13 | participants in its California-based programs.

14 |      66.    Plaintiffs are informed and believe and based thereon allege that in order
15 | to start a local Pop Warner football league, the league representative must submit a
16 | league registration form to Defendant Pop Warner.

17 |      67.    If Defendant Pop Warner approves the local league, the local league must
18 | pay Defendant Pop Warner a league fee of $25 per team per year.

19 |      68.    Each of these local leagues has the option of obtaining insurance through
20 | Defendant Pop Warner. If the local leagues purchase insurance through Defendant Pop
21 | Warner, Defendant Pop Warner adds a 3% surcharge to the price of the insurance.

22 |      69.    Plaintiffs are informed and believe, and based thereon allege that various
23 | local leagues in California purchase their league insurance through Defendant Pop
24 | Warner.

25 |      70.    Once Defendant Pop Warner approves a league, Defendant Pop Warner
26 | continues to assert substantial control over the leagues. Indeed, Defendant Pop Warner's
27 | own website depicts the Pop Warner "Chain of Command" depicting Defendant Pop

28 |

Warner as having authority over the various local leagues.[4]

71.     Each year, Defendant Pop Warner requires each league to purchase Defendant Pop Warner's rule book.

72.     Defendant Pop Warner provides a full time executive support staff to support all the local leagues in assisting in policy creation.

73.     Defendant Pop Warner requires each local league team to submit a roster to Defendant Pop Warner verifying the participants' age and weight.

74.     This is required because Defendant Pop Warner has strict age and weight requirements for each of its divisions.

75.     If any of the local leagues want to vary from Defendant Pop Warner's strict weight requirements, the local league must submit that request to Defendant Pop Warner and Defendant Pop Warner determines whether or not to grant the variance.

76.     Defendant Pop Warner facilitates the local league's recruitment of coaches through Defendant Pop Warner's website.

77.     Defendant Pop Warner requires annual background checks from every volunteer in any Pop Warner association.

78.     Defendant Pop Warner also represents that it provides "extensive training for all of our football…coaches." It also represents that it has over 40,000 volunteers and coaches that are being trained every year to offer the best and safest programs for its participants.

79.     Defendant Pop Warner facilitates the required training for the coaches by providing the courses for sale, while also outlining the rules and deadlines for obtaining coaching certification.

80.     All participants in Pop Warner must abide by a Code of Conduct that is created by Defendant Pop Warner. If the rules in the Code of Conduct are broken,

---

[4] http://www.popwarner.com/Default.aspx?tabid=1463868

1  Defendant Pop Warner has the authority to impose a penalty.

2      81.    On Defendant Pop Warner's website, Defendant Pop Warner offers a

3  "National League Finder" to help consumers find their local leagues.

4      82.    Defendant Pop Warner provides uniform enrollment forms required to

5  register in any Pop Warner football program nationwide.  Defendant Pop Warner

6  requires each participant to wear a Pop Warner patch, which Defendant Pop Warner

7  sells to the local leagues.

8      83.    In addition to providing the youth participants with uniforms, Defendant

9  Pop Warner also provided the youth participants with their football helmets.

10      84.    Defendant Pop Warner's also sets a schedule for the local leagues.

11      85.    Indeed, Defendant Pop Warner's Calendar indicates that on September 16,

12  2016, all leagues are required to submit to Defendant Pop Warner all insurance, league

13  registrations forms, and league dues.  Additionally, Defendant Pop Warner's 2016

14  calendar stated that in July, Defendant Pop Warner would mail the annual rule book to

15  the local leagues, and that August 1, 2016 was the first day that the local leagues were

16  allowed to hold practices.

17      86.    Defendant Pop Warner's 2011 IRS form 990 states in part the following

18  description for Defendant Pop Warner's duties "Administrating leagues, scholastics…"

19      87.    The IRS form 990 is professionally prepared by a CPA, reviewed by

20  Defendant Pop Warner's Board of Directors and Executive Director John Butler.

21      88.    Indeed, Defendant Pop Warner's Mission Statement includes the objective

22  to provide a safe playing environment for the youth participants.  Examples of this,

23  according to its website, include (1) "Pop Warner provid[ing] Coaching Clinics and

24  Risk Management Training," "An enforced national rule book incorporate[ing] time-

25  tested rules," and (3) "A full-time executive support staff support[ing] all local

26  associations and assist[ing] in sound policy creation."

27      89.    Plaintiffs are informed and believe and based thereon allege that the "Santa

28  Cruz Stingrays" youth football team is a d/b/a of Pop Warner Little Scholars, Inc.

90.     Defendant Pop Warner organizes a youth football Super Bowl every year.

91.     Decedents Tyler Cornell and Paul Bright, and Plaintiff Richard McCrae all played in Defendant Pop Warner regional playoff games in hopes of earning a spot in Defendant Pop Warner's Super Bowl.  Decedent Paul Bright's playoff game took place in California.

92.     Defendant NOCSAE promotes equipment safety standards adopted by sports organizations and regulators operating throughout California. Defendant NOCSAE enters into licensing agreements with football helmet manufacturers who buy and sell goods throughout the state of California. Moreover, these same licensing agreements require helmet manufacturers to place NOCSAE's logo and/or trademark on equipment distributed to youth, high school, college and professional football programs throughout California.

93.     In 1973 Defendant NOCSAE introduced standard and licensing agreements with manufacturers that allowed manufacturers to affix a logo on their helmets stating "Meets NOCSAE Standards."  Defendant NOCSAE allowed helmet manufacturers to affix this logo on youth football helmets even though Defendant NOCSAE knew that it did not have a youth specific standard.

94.     Defendant NOCSAE knew that its standard only tested adult helmets for linear impact and did not take into account other critical factors, such as rotational forces, weight, or temperature.  The testing did not replicate live play, and did not test helmet to helmet contact nor did the test helmet contact to playing surface that the players played on.  Angular acceleration and angular velocity have long been known to be the primary causes of brain injury, particularly diffuse axonal injury.  Additionally, Defendant NOCSAE knew that adult helmets were manufactured with a poly carbon shell, when youth helmets are made with an ABS plastic shell.

95.     NOCSAE founding members claimed the need for create their own organization because ASTM was "too slow". Since 1973 the only change to the pass or fail severity index measurement of linear force used by NOCSAE was lowering the

SECOND AMENDED CLASS ACTION COMPLAINT

pass or fail threshold from 1500 to 1200 in 1997. Helmets with lower SI were grandfathered in and never removed from the market. There were no limits at that time for number of years helmet could be in circulation or adequate system for the average consumer to know what year the product had been made or purchased.

96.     Defendant NOCSAE has purposefully availed itself of the benefits and laws of California because organizations such as Defendant Pop Warner who operate leagues throughout California, incorporate a requirement that helmets worn by Pop Warner participants meet NOCSAE's standards. For example, Defendant Pop Warner Little Scholars 2014 official rule book states:

> Only helmets bearing the NOCSAE Seal of Certification may be worn.
> All helmets must bear the current NOCSAE approved "Warning Label"
> in a visible position on the outside of the helmet. This "Warning Label"
> is the same label that is furnished by all helmet manufacturers and
> quality reconditioners.[5]

97.     Defendant NOCSAE entered into various contractual agreements with California manufacturers and/or reconditioners to allow the manufacturers and/or reconditioners to use NOCSAE's name and the phrase "Meets NOCSAE Standards" on various pieces of athletic equipment.

98.     Pursuant to NOCSAE's licensing agreement, the Licensee is required to annually deliver to NOCSAE a list of all of the Licensee's products by name, model number or style, which bear the name of NOCSAE or the phrase "Meets NOCSAE Standards."

99.     When a Licensee of NOCSAE's trade mark sells and/or recertifies a football helmet that "Meets NOCSAE Standards," the Licensee has to pay a fee to NOCSAE for every helmet that bears NOCSAE's name or phrase.

100.    California law requires football helmets to be reconditioned yearly.

---

[5] http://files.leagueathletics.com/Images/Club/14311/2014_Rule_Book.pdf

101.   Plaintiffs are informed and believe, and based thereon allege that each time a football helmet is reconditioned and/or sold by a California reconditioner, Defendant NOCSAE receives a License fee from the Licensee.

102.   Plaintiffs are informed and believe, and based thereon allege that between 14,000 and 32,000 youth football participants play for California Pop Warner leagues.

103.   Plaintiffs are further informed and believe and based thereon allege that California high school football leagues also require the use of NOCSAE certified helmets.

104.   Plaintiffs are informed and believe and based thereon allege that Defendant NOCSAE receives tens of thousands, if not hundreds of thousands, of dollars in revenue per year from football helmets that are sold bearing the NOCSAE logo and/or phrase, or reconditioned and distributed to California football players per year.

105.   Plaintiffs are further informed and believe, and based thereon allege that Defendant NOCSAE has the ability to void certification that certain helmets "Meets NOCSAE Standards."  For example, in November of 2014, Defendant NOCSAE determined that the Cascade R and Warrior Regulator lacrosse helmets did not meet the NOCSAE standards and Defendant NOCSAE voided the manufacturer's certification that the helmets "Meets NOCSAE Standards."

106.   While NOCSAE does not certify helmets, it does have the authority to investigate helmets to ensure that the helmets do in fact meet NOCSAE standards.

107.   Additionally, up until 2015, Defendant NOCSAE allowed the individual helmet manufacturers to certify their own helmets.

108.   Moreover, NOCSAE's website specifically refers to California's law which requires helmet to be reconditioned and recertified yearly.[6] Additionally, NOCSAE has an interactive website that allows residents from California to apply for research

---

[6] http://nocsae.org/wp-content/uploads/2011/11/NOCSAE-e-newsletter-11-09.pdf

Case No. 2:16-cv-6603

SECOND AMENDED CLASS ACTION COMPLAINT

grants.[7] The grants funded by NOCSAE must be related to NOCSAE's "stated program interest."[8] NOCSAE has specifically funded one research where the research was performed in Santa Monica, California. Moreover, Defendant NOCSAE has had substantial, continuous, and systematic other contacts with California.

109.   Plaintiffs are informed and believe and based thereon allege that Defendant NOCSAE asserts significant control over helmet manufacturers and the various organizations that use football helmets.

110.   Plaintiffs are informed and believe and based thereon allege that beginning in 2011, the Federal Trade Commission ("FTC") opened an investigation into the business practices of Defendant NOCSAE because Defendant NOCSAE was impacting free market competition in the youth protective sports equipment market.

111.   Plaintiffs are informed and believe, and based thereon allege that the FTC began to investigate NOCSAE for  unlawful business practices because Defendant NOCSAE refused to allow youth participants to wear a Guardian Cap.

112.   The Guardian Cap is a helmet add on that is placed over the outside shell of a helmet. The Guardian Cap can absorb up to 33% of the impact in a collision.  A number of youth football organizations, including, on information and belief, pop warner leagues and high school teams, used the Guardian Cap in an attempt to reduce brain injuries.

113.   Defendant NOCSAE, however, issued a statement in July of 2013 that the use of such a helmet add on would void the certification of compliance with NOCSAE standards.

114.   All helmets used in Defendant Pop Warner football leagues must be NOCSAE certified.  As such, NOCSAE's statements prevented children from using equipment that have the ability to prevent the likelihood of a child suffering a

---

[7] http://nocsae.org/research/applying-for-funding/

[8] *Id.*

1  concussion.

2      115.  NOCSAE stated that the use of the Guardian Cap, or other add –on

3  product, voided NOCSAE certification because the NOCSAE standards have "defined a

4  helmet model as a helmet "intended to be identical in every way, expect for size."[9]

5      116.  This statement, however, is misleading because there is no approved

6  NOCSAE standards for youth football helmets.  The NOCSAE standards specifying

7  testing with an adult sized head, and not a youth sized head.  NOCSAE concealed from

8  the public the fact that youth sized helmets are not separately tested.

9      117.  As described herein, the actions and omissions of each Defendant in

10  California have caused harm in California to California residents, including minor

11  children, and will continue to do so unless enjoined. Plaintiffs, Tyler Cornell,  Richard

12  Caldwell, and several of the Class Members, sustained severe and significant injury

13  while participating in Defendant Pop Warner's California based youth tackle football

14  programs. Plaintiffs used helmets purportedly certified by Defendant NOCSAE which

15  increased the risk of harm and future injury while participating in Defendant Pop

16  Warner's California based youth tackle football programs. Moreover, Adult Plaintiffs

17  and the Class Members suffered pecuniary loss as a result Defendants actions in

18  California.

19      118.  Defendants wrongful actions and inactions which give rise to Plaintiffs'

20  and the Class Members' claims took place in California. Moreover, Plaintiffs and the

21  Class Members claims arise out of Defendants contacts with California, as described

22  above. Finally, the tragic deaths of Plaintiffs Tyler Cornell and Paul Bright Jr. occurred

23  in the State of California.

24      119.  Venue is proper in this District pursuant to 28 U.S.C.  § 1391(b)(3)

25  because all Defendants are subject to this Court's personal jurisdiction. Each Defendant

26

27  [9] http://nocsae.org/wp-content/uploads/2013/08/NOCSAE-Add-on-Fact-Statement-

28  8-7.pdf

Case No. 2:16-cv-6603
SECOND AMENDED CLASS ACTION COMPLAINT

has the requisite minimum contacts with California so as to be subject to both types of personal jurisdiction – general jurisdiction and specific jurisdiction.

120. Moreover venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial amount part of the events or omissions giving rise to the claim occurred in this District.

## IV.

## CLASS ACTION ALLEGATIONS

121. Plaintiffs, Kimberly Archie, as survivor of decedent Paul Bright Jr., Jo Cornell, as survivor of decedent Tyler Cornell, Debra McCrae, on behalf of Richard Caldwell, Jo Cornell, an individual, and Shannon Barnes, guardian ad litem for Chase Barnes, Drew Barnes and Cade Barnes, bring this action on behalf of themselves and all others similarly situated, pursuant to the Federal Rules of Civil Procedure Rule 23(a), (b)(2), and (b)(3) and on behalf of the following class(es) of persons:

**1.    The Personal Injury Class:**

All persons who participated in the Pop Warner youth tackle football program from 1997 to the present and are suffering or have suffered from brain injuries, damage or disease.

**2.    Wrongful Death Class:**

All deceased individuals (hereinafter "Decedents") who participated in the Pop Warner youth tackle football program from 1997 to the present for which the Complaint alleges the cause of death and/or contributing cause of death was due to, in whole or in part, injuries sustained from their participation in the Pop Warner youth tackle football program.

**3.    Medical Monitoring Class:**

All persons who played youth tackle football in the Pop Warner Little Scholars youth tackle football program from 1997 to the present.

SECOND AMENDED CLASS ACTION COMPLAINT

**4.   The Adult Class:**

All persons who enrolled their minor children in the Pop Warner tackle football program from 1997 to the present.

122.   Excluded from the Classes are: (1) the officers and directors of any of the Defendants; (2) any judge or judicial officer assigned to this matter and his or her immediate family and staff; and (3) any legal representatives, successor, or assigns of any excluded persons or entities.

123.   This action is properly maintained as a class action because Plaintiffs can prove the  elements of each claim on a class-wide basis, using the same evidence that Plaintiffs would use to maintain and prove and individual action. Thus, the action may be properly maintained on behalf of each of the proposed Classes pursuant to Fed. R. Civ. P.  23.

124.   The Members of each Class are so numerous that joinder of all members would be impracticable. The  precise number of Class Members is unknown at this time. However, based on information and belief, the members of the Personal Injury Class and Medical Monitoring class are made up of hundreds of thousands of members evidenced by the estimate that approximately 250,000 children enroll in Pop Warner tackle football across the country per year. Moreover, millions of minor children have participated in the program from 1997 to the present. In addition, based on information and belief, the members of the Adult Class are similarly made up of thousands of members evidenced by the estimate that approximately 250,000 children are enrolled by their parents and/or guardians in Pop Warner tackle football across the country per year. Moreover, millions of parents and/or guardians have enrolled their minor children in the program from 1997 to the present.

125.   Questions of law and fact common to the Class Members predominate over any questions affecting any individual member, and a class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

126.   Common questions of law and fact include but are not limited to:

a. Whether Defendants misrepresented the safety of its youth tackle football;

b. Whether Defendants misrepresented the safety of their equipment;

c. Whether Defendant Pop Warner's representations about the qualifications of its coaches and the safety of its programs was likely to deceive consumers into enrolling in their programs;

d. Whether Plaintiffs and the Class Members are entitled to compensatory damages, including punitive and other monetary relief; and

e. Whether Plaintiff and Classes are entitled to relief, including but not limited to equitable, injunctive, and restitution.

127. Plaintiffs' claims are typical of the Class Member's claims because the Class Members were comparably injured through Defendants' illegal and wrongful conduct as described herein.

128. Plaintiffs are adequate Class Representatives because Plaintiffs are committed to prosecuting the action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other Members of the Class and Plaintiffs have the same non-conflicting interests as the other Class Members. Plaintiffs and their counsel  would fairly and adequately represent the interests of the Class Members.

129. Class treatment is superior to any other available means of prosecution of fair and efficient adjudication of this controversy. There are no unusual difficulties that are likely to arise in the management of this action. The damages and other financial detriment suffered by Plaintiffs and Class Members are small compared to the burden and expense of prosecuting each action individually. Thus, it would be impracticable for Plaintiffs and Class Members to bring individual actions against Defendants for its wrongful and illegal conduct. Further, class treatment benefits the courts. Individualized litigation promises inconsistent or contradictory judgments, unnecessary

1  overlap of resources, and increases the delay and expense to all those accessing the

2  courts. Class treatment brings with it the benefit of a single adjudication, the

3  supervision of a single court, and the consolidation of the courts' and the parties'

4  resources.

5      130.   The prosecution of separate actions by individual Class Members would

6  create the risk of inconsistent or varying adjudications with respect to individual Class

7  Members which would establish incompatible standards of conduct for Defendants or

8  which would, as a practical matter, be dispositive of the interests of the other members

9  not parties to the adjudication or substantially impair or impede their ability to protect

10 their interests. Defendants have acted, or refused to act, on grounds generally applicable

11 to, and causing injury to the Class Members. Therefore, preliminary and final injunctive

12 relief and damages for Defendants' illegal conduct is appropriate.

13                                **V.**

14                    **FIRST CAUSE OF ACTION**

15   **INDIVIDUALLY AND ON BEHALF OF THE CLASS MEMBERS:**

16                         **NEGLIGENCE**

17              **(As Against All Defendants and Does)**

18     131.   Plaintiffs and the Class Members re-allege and incorporate by reference

19 each of the preceding allegations in this complaint as though fully set forth at length

20 herein.

21     132.   Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany

22 PW, NOCSAE, and DOES 1 through 100, and each of them, have violated Section 323

23 of the Restatement (Second) of Torts as adopted by the Courts in California, which

24 states that:

25          One who undertakes, gratuitously or for consideration, to render services

26          to another which he should recognize as necessary for the protection of

27          the other's person or things, is subject to liability to the other for physical

28          harm resulting from his failure to exercise reasonable care to perform his

undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

133.   Each Defendant voluntarily assumed a duty to protect the health and safety of minor participants of the Pop Warner youth tackle football league.

134.   Defendant Pop Warner voluntarily created a youth tackle football program for children ages five through sixteen. By and through this program, Defendant Pop Warner created an environment wherein children, under Defendant Pop Warner's supervision, engage in an activity that increases the risk to their health and safety. Moreover, Defendant Pop Warner develops rules and regulations governing Pop Warner players and coaches while engaged in Defendant's program.

135.   As early as 1992, Defendant Pop Warner voluntarily adopted safety standards, including equipment safety standards, and mandated that every Pop Warner participant, including Plaintiffs and the Class Members, abide by the adopted safety standards. Defendant Pop Warner, however, knew that Defendant NOCSAE's standards did not have a youth specific standard. Despite this knowledge, Defendant Pop Warner mandated the use of helmets that "Meets NOCSAE Standards." Defendant Pop Warner required the children to wear helmets that "Meets NOCSAE Standards" to create a false sense of security among parents, like Plaintiffs Kimberly Archie, Jo Cornell, and Debra McCrae, to enroll their children in Defendant Pop Warner's local football programs.

136.   Moreover, Defendant Pop Warner advertises that its coaches underwent training to ensure the safety of the participants. Upon information and belief, Defendant Pop Warner, however, did not in fact make sure that each coach underwent the training. This lead to untrained coaches teaching participants bad tackling habits that, coupled with the faulty equipment provided by Defendant Pop Warner, drastically increased the risk of harm and future injury to the participants, including Plaintiffs and the Class Members.

137.   Defendant NOCSAE voluntarily assumed a duty to protect youth tackle

football participants, including Plaintiffs and the Class Members, when it established equipment safety standards and offered them for adoption by various sports organizations and regulatory bodies, including Defendant Pop Warner. Moreover, NOCSAE allowed helmet manufacturers and reconditioners, including its board members John Riddle, Ken Nimmons, Byron Goldman and John Tucker, Jr., to certify that helmets used by children "Meets NOCSAE Standards". This certification was placed on youth football helmets as reassurance to parents across the country that the helmets were specially designed and tested despite the fact that NOCSAE failed to establish a safety standard geared toward youth participants. Indeed, helmet manufacturers, such as Riddle, used these certification to make parents think that the equipment Defendant Pop Warner provided to the youth participants are safe.

138.   Defendants repeatedly confirm their respective duties to take reasonable and prudent actions to protect the health and safety of Pop Warner players, including Plaintiffs and the Class Members, when known and foreseeable risks exist.

139.   Moreover, Defendants reaffirm their respective duties by and through their respective websites and other public statements wherein they proclaim that the safety and protection of football participants are their highest priority.

140.   For example, Defendant Pop Warner's website states "[t]he mission of Pop Warner Little Scholars is to enable young people to benefit from participation in team sports and activities in a safe and structured environment[10]…[t]he safety of our athletes is always the top priority and that is why we provide extensive training for all our football...coaches."

141.   Finally, Defendant NOCSAE's website states "[s]ince its inception in 1969, NOCSAE has been a leading force in the effort to improve athletic equipment, and to reduce injuries through robust standards for athletic equipment."[11] The website

---

[10] http://www.popwarner.com/about_us/mission.htm

[11] http://nocsae.org/about-nocsae/

goes on to state that NOCSAE "[r]ecogniz[es] its value to the safety and protection of athletes" and instructs viewers to "[e]nsure sports helmets meet NOCSAE safety standards".[12]

142.   Defendants breached their duty to youth tackle football participants, including Plaintiffs and the Class Members, to use ordinary care to protect their physical and mental health, and to prevent them from being exposed to unreasonable risk of injury, and thereby increasing Plaintiffs and the Class Members' risk of harm and future injury.

143.   Throughout the many years that Defendants have repeatedly established their duty to protect the health and safety of youth tackle football participants, including Plaintiffs and the Class Members, when known and foreseeable risks exist, Defendants Pop Warner failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer a brain injury during a practice or a game.

144.   Moreover, Defendants NOCSAE and Pop Warner have failed to establish and/or adopt equipment standards that are designed and serve to protect minor children who participate in Defendant Pop Warner's youth tackle football program, including Plaintiffs and the Class Members. In fact, Defendant NOCSAE knew that its safety standards were inadequate for youth participants, but failed to update the standards for fear of civil liability.

145.   It has been well established since 1928 that repeated blows to the head can lead to head trauma, including CTE, commonly known as "punch drunk syndrome." Punch Drunk Syndrome has been prevalent in boxers who have repeatedly suffered concussions.

146.   Despite the fact that other sporting associations have decades ago established standardized association-wide concussion management rules, Defendants

---

[12] http://nocsae.org/about-nocsae/history-and-purpose/

Pop Warner has failed to establish any guidelines or policies to protect the mental health and safety of its minor players.

147.   Moreover, Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, have failed to ensure that the safest equipment is used to protect minor participants, including Plaintiffs and the Class Members.

148.   An adult is required to exercise a greater degree of care towards children and anticipate their ordinary behavior. CACI 412. Furthermore, "A greater degree of care is generally owed to children because of their lack of capacity to appreciate risks and to avoid danger." *McDaniel v. Sunset Manor Co.* (1990) 220 Cal.App.3d 1, 7, citing *Casas v. Maulhardt Buick, Inc.* (1968) 258 Cal.App.2d 692, 697–700.

149.   Defendants failures to fulfill their  assumed duties to protect minor Pop Warner participants, including Plaintiffs and the Class Members, include, but is not limited to, the following failures:

**Defendant Pop Warner:**

a.   Failure to regulate and monitor practices, games, rules, equipment, coaches and medical care so as to minimize the long-term risks associated with brain injuries including repetitive sub-concussive hits suffered by Pop Warner participants, including Plaintiffs and the Class Members;

b.   Failure to require that an adequate brain injury history be taken of Pop Warner participants;

c.   Failure to ensure accurate diagnosis and recording of brain injury so the condition can be treated in an adequate and timely manner;

d.   Failure to license and approve the best equipment available that will reduce, not increase, the risk of brain injury to minor children who participate in the Pop Warner youth tackle football program;

e.   Failure to prevent the increased risk of injury to minor children

through repetitive head trauma coupled with the use of hard-shell helmets not adequately designed to protect children's unique features and vulnerabilities.

**Defendant NOCSAE:**

    a.    Failure to develop equipment standards that are designed to protect minor children who participate in Defendant Pop Warner's youth tackle football program, including Plaintiffs and the Class Members;

    b.    Failure to inform parents that its equipment standards were not tested to ensure the safety of minor participants, including Plaintiffs and the Class Members.

150.   Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, breached their assumed duties to protect the health and safety of youth tackle football participants, including Plaintiffs and the Class Members, by subjecting them to an increased risk of brain injury, damage or disease through the use of equipment, including hard shell helmets, that are inadequately designed to protect the physical and mental health of minor children, including Plaintiffs and the Class Members.

151.   Moreover, Defendants Pop Warner breached its assumed duty to protect the health and safety of youth tackle football participants, including Plaintiffs and the Class Members, by failing to ensure that coaches are adequately trained and educated on the risks to minors of developing brain injury, damage or disease.

152.   National organizations have a responsibility to enforce rules they promulgate at the community level.

153.   Defendants advertise themselves as a safety-first organization in which children play for coaches trained in proper tackling technique.

154.   Upon information and belief, Jon Butler, executive director of Defendant Pop Warner conceded in a deposition that the national office does not check whether

1    coaches in fact receive such training.

2        155.    Moreover, Jon Butler further conceded in a deposition that Pop Warner

3    does not employ personnel with a medical background, athletic training background, or

4    physical education background.

5        156.    Defendant Pop Warner failed to provide complete, current, and competent

6    information and directions to Pop Warner coaches and its participants, including

7    Plaintiffs and the Class Members, regarding brain injuries and its prevention,

8    symptoms, and treatment.

9        157.    If Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW,

10    Albany PW, NOCSAE, and Does 1 through 100, and each of them, would have taken

11    the necessary steps to oversee and protect Pop Warner participants, including Plaintiffs

12    and the Class Members, by (1) developing and implementing necessary safety

13    guidelines, policies, and procedures; (2) developing and adopting reasonably safe youth

14    tackle football helmet standards designed to protect the unique features and

15    vulnerabilities of minor children participants; (3) educating and training all persons

16    involved with the Pop Warner Teams, and confirming the completion of said education

17    and training, in the recognition, prevention, and treatment of brain injuries, then Pop

18    Warner participants, such as Plaintiffs and the Class Members, would not have suffered

19    from repeated head trauma or the effects of that condition, would have recovered more

20    rapidly, or would not have suffered or become at risk of suffering from long-term brain

21    damage, dementia, depression and CTE, as well as other long term brain injuries.

22        158.    The injuries sustained by the Plaintiffs would have been avoided had

23    Defendants not falsely represent that NOCSAE had a youth specific standard, when in

24    fact NOCSAE did not have a youth specific standard.

25        159.    Under all of the above circumstances, it was foreseeable that Defendants'

26    violations of their duties would cause or substantially contribute to the personal injuries

27    suffered by Plaintiffs and the Class Members.

28        160.    The aforementioned acts and omissions of the Defendants demonstrate that

each Defendant acted with callous indifference to the rights and duties owed to Plaintiffs, the Class Members and the public at large.

161.   Defendants acted willfully, wantonly, egregiously, with reckless abandon, and with a high degree of moral culpability.

162.   Defendants committed acts of omission and commission, which collectively and severally, constituted gross negligence.  Defendants' gross negligence was a proximate and producing cause of the personal injuries, death and other damages suffered by Plaintiffs and the Class Members.

163.   As a direct and proximate result of Defendants' gross negligence, Plaintiffs and the Class Members have suffered economic losses, including, but not limited to, loss of income, brain injury, damage and disease, emotional distress, medical monitoring, and death.

164.   As a direct and proximate result of Defendants' gross negligence, Plaintiffs and the Class Members are entitled to damages, as alleged herein or allowed by law, from Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum.

## VI.

## SECOND CAUSE OF ACTION

## INDIVIDUALLY AND ON BEHALF OF THE CLASS MEMBERS:

## FRAUD

## (As Against All Defendants and Does)

165.   Plaintiffs and the Class Members re-allege and incorporate by reference each of the preceding allegations in this complaint as though fully set forth at length herein.

166.   According to California Code of Civil Procedure §1709 "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." C.C.P. §1710 further states "A

deceit, within the meaning of the last section, is either:

        a.    The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

        b.    The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

        c.    The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

        d.    A promise, made without any intention of performing it."

167.   Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, made material misrepresentations to youth tackle football participants and the parents and/or guardians of said participants, including Plaintiffs and the Class Members, and the public at large regarding the safety of tackle football for minor children, the level of training and education received by the coaches of Pop Warner football and the adequacy of the equipment worn by Pop Warner participants.

168.   The material misrepresentations made by Defendant Pop Warner include, but are not limited to, remarks that all Pop Warner coaches are provided extensive training to ensure the safety of the minor children who participate in the Pop Warner program.

169.   In particular, Defendant Pop Warner's website states, "[t]he safety of our athletes is <u>always the top priority</u> and that is why we provide extensive training for all our football and cheer & dance coaches." The website goes on to state "[w]e have over 40,000 volunteers and coaches that are being trained every year to offer the best and safest programs for you and your children."

170.   In fact, the national Pop Warner office does not check whether coaches in fact receive such training.

171.   Moreover, Defendant Pop Warner misrepresented the safety of the

equipment used by Pop Warner participants. For example, Defendant Pop Warner's executive director wrote, "[a]t Pop Warner, safety is our number one priority when it comes to our young athletes. We emphasize teaching proper techniques, ***using the right equipment*** and making sure our members are educated about all potential injuries."[13] (emphasis added).

172.    In reality, Defendant Pop Warner mandates the use of NOCSAE certified equipment which does not include a youth specific safety standard. Defendant Pop Warner requires the use of NOCSAE certified equipment, including hard-shell helmets, despite the fact that said standards do not account for the unique features and vulnerabilities of minor children when it comes to concussion and head injury prevention.

173.    The material misrepresentations made by Defendant NOCSAE pertain to suggestions that youth tackle football helmets meet NOCSAE standards.

174.    Defendant NOCSAE's standards are misleading because NOCSAE does not maintain youth specific helmet safety standards.

175.    Defendant NOCSAE establishes tackle football helmet standards which fail to independently acknowledge the distinct behavioral and anatomical differences between youth tackle football participants and adults. Defendant NOCSAE disseminates these standards and licenses their logo to youth tackle football helmet manufacturers and youth tackle football programs with the knowledge that their standards are misleading and will lead to injury for minor children. Moreover, for years, Defendant NOCSAE knew that the standards that they did have were outdated, but failed to update the standards for fear of civil liability.

176.    Each Defendant knew that the material misrepresentations described above were false when they were made.

177.    The persons who made the misrepresentations as agents of Defendants and

---

[13] http://www.popwarner.com/fan_zone/executivedir_blog.htm

Defendants intended to defraud, among others, Plaintiffs and the Class Members, in order to encourage their participation in youth tackle football programs, including, but not limited to, Pop Warner Little Scholars.

178.   Plaintiffs and the Class Members, among others, justifiably relied on Defendant Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE's, and DOES 1 through 100, and each of them, misrepresentations to their detriment.

179.   Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, knew that Plaintiffs and the Class Members would rely on their respective misrepresentations.

180.   Plaintiffs and the Class Members, among others, were damaged by these misrepresentations.

181.   As a direct and proximate result of Defendants fraudulent conduct, Plaintiffs and the Class Members suffered economic losses, including, but not limited to, loss of income, brain injury, damage and disease, emotional distress, medical monitoring, and death.

182.   As a direct and proximate result of Defendants fraudulent conduct, Plaintiffs and the Class Members are entitled to damages, as alleged herein or allowed by law, from Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum.

## VII.

### THIRD CAUSE OF ACTION

### INDIVIDUALLY AND ON BEHALF OF THE CLASS MEMBERS:

### FRAUDULENT CONCEALMENT

### (As Against All Defendants and Does)

183.   Plaintiffs and the Class Members re-allege and incorporate by reference each of the preceding allegations in this complaint as though fully set forth at length herein.

184. According to C.C.P. §1709 "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." C.C.P. §1710 further states "A deceit, within the meaning of the last section, is either:

    a.   The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

    b.   The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

    c.   The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

    d.   A promise, made without any intention of performing it."

185. Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, concealed from Plaintiffs and the Class Members the risks and health consequences of minors who sustain repetitive sub-concussive hits and head injuries, and intentionally misrepresented to Plaintiffs and the Class Members that tackle football with hard-shell helmets is safe for minor children. Moreover, Defendants fraudulently concealed the fact that NOCSAE does not maintain equipment standards for youth tackle football participants. Instead, Defendants NOCSAE and Pop Warner misrepresented that (1) the standards promulgated by Defendant NOCSAE were sufficient to protect minor tackle football participants and (2) Pop Warner helmets meet NOCSAE's standards without disclosing that Defendant NOCSAE does not maintain equipment safety standards specific to youth participants.

186. Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, and NOCSAE have approved the NOCSAE helmet standard labels with the knowledge that they are misleading and will lead to brain injury for minor children.

187. Defendant Pop Warner also misrepresented the level of training and

SECOND AMENDED CLASS ACTION COMPLAINT

education received by Pop Warner coaches so as to instill a false sense of security in Plaintiffs and the Class Members, including the parents and/or guardians of the Pop Warner participants, regarding the safety of youth tackle football.

188.  Defendant Pop Warner, through misleading advertisements, public statements and published articles misrepresented the level of risk associated with youth tackle football and concealed the lack of adequate safety standards for youth football equipment.

189.  Defendants Pop Warner's advertisements have clearly created parent and player reliance.

190.  Defendant Pop Warner stated that:

> We have over 40,000 volunteers and coaches that are being trained every year to offer the best and safest programs for you and your children…The safety of our athletes is <u>always the top priority</u> and that is why we provide extensive training for all our football and cheer & dance coaches.

191.  Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, also misrepresented that youth tackle football helmets meet NOCSAE standards and are therefore safe. However, Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, intentionally omit that NOCSAE does not maintain youth specific safety standards for youth equipment.

192.  Defendants willfully concealed their omissions and false representations from Plaintiffs and the Class Members in order to prevent negative publicity and induce Plaintiffs and the Class Members to participate in the Pop Warner program.

193.  Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, knew that Plaintiffs and the Class Members would rely on the inaccurate information they provided.

194.  Plaintiffs and the Class Members relied on this inaccurate information

1 | during their enrollment in Defendant Pop Warner's programs.

2 |     195.  Plaintiffs and the Class Members had no way of knowing that Defendants

3 | representations were false and dangerously misleading.

4 |     196.  As a direct and proximate result of Defendants fraudulent conduct,

5 | Plaintiffs and the Class Members have suffered economic losses, including, but not

6 | limited to, loss of income, brain injury, damage and disease, emotional distress, medical

7 | monitoring, and death.

8 |     197.  As a direct and proximate result of Defendants fraudulent conduct,

9 | Plaintiffs and the Class Members are entitled to damages from Defendants in an amount

10 | reasonably anticipated to exceed the jurisdictional minimum.

11 | **VIII.**

12 | **FOURTH CAUSE OF ACTION**

13 | **INDIVIDUALLY AND ON BEHALF OF THE CLASS MEMBERS:**

14 | **NEGLIGENT MISREPRESENTATION**

15 | **(As Against All Defendants and Does)**

16 |     198.  Plaintiffs and the Class Members re-allege and incorporate by reference

17 | each of the preceding allegations in this complaint as though fully set forth at length

18 | herein.

19 |     199.  Defendant Pop Warner made multiple material misrepresentations to youth

20 | tackle football participants and the parents and/or guardians of said participants,

21 | including Plaintiffs and the Class Members, and the public at large through public

22 | statements, published articles and advertisements which it knew or should have known

23 | were misleading. These material misrepresentations involve: (1) the safety of tackle

24 | football for minor children; (2) the safety of their age of entry; (3) the level of training

25 | and education received by the coaches of Pop Warner football; and (4) the adequacy of

26 | the equipment worn by Pop Warner participants.

27 |     200.  The material misrepresentations made by Defendant Pop Warner include

28 | but are not limited to remarks that all Pop Warner coaches are provided extensive

1  training to ensure the safety of the minor children who participate in the Pop Warner
2  program.

3      201.   In particular, Defendant Pop Warner's website states, "[t]he safety of our
4  athletes is always the top priority and that is why we provide extensive training for all
5  our football and cheer & dance coaches." The website goes on to state "[w]e have over
6  40,000 volunteers and coaches that are being trained every year to offer the best and
7  safest programs for you and your children."

8      202.   In fact, the national Pop Warner office does not check whether coaches in
9  fact receive such training.

10     203.   Moreover, Defendant Pop Warner misrepresented the safety of the
11 equipment used by Pop Warner participants. For example, Defendant Pop Warner's
12 executive director wrote, "[a]t Pop Warner, safety is our number one priority when it
13 comes to our young athletes. We emphasize teaching proper techniques, **using the right**
14 **equipment** and making sure our members are educated about all potential injuries."
15 (emphasis added).

16     204.   In reality, Defendant Pop Warner mandates the use of NOCSAE certified
17 equipment which does not include a youth specific safety standard. Defendant Pop
18 Warner requires the use of NOCSAE certified equipment, including hard-shell helmets,
19 despite the fact that said standards do not account for the unique features and
20 vulnerabilities of minor children when it comes to concussion and head injury
21 prevention.

22     205.   The material misrepresentations made by Defendant NOCSAE pertain to
23 suggestions that all youth Pop Warner helmets meet NOCSAE standards.

24     206.   Defendant NOCSAE's standards are misleading because NOCSAE does
25 not maintain youth specific helmet safety standards.

26     207.   Defendant NOCSAE establishes tackle football helmet standards which
27 fail to independently acknowledge the distinct behavioral and anatomical differences
28 between youth tackle football participants and adults. Defendant NOCSAE

1  disseminates these standards to youth tackle football helmet manufacturers and youth

2  tackle football programs with the knowledge that said standards are misleading and will

3  lead to injury for minor children.

4       208.   Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany

5  PW, NOCSAE, and DOES 1 through 100, and each of them, made these

6  misrepresentations and actively concealed adverse information at a time when they

7  knew, or should have known, because of their superior position of knowledge, that the

8  statements and representations were not true.

9       209.   Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany

10  PW, NOCSAE, and DOES 1 through 100, and each of them, knew or should have

11  known of the misleading nature of these statements when they were made.

12       210.   Although Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley

13  PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, may have

14  honestly believed that their representations were true, they had no reasonable grounds

15  for believing that the representations were true when they made them.

16       211.   Plaintiffs and the Class Members, among others, reasonably relied on

17  Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW,

18  NOCSAE's, and DOES 1 through 100, and each of them, misrepresentations to their

19  detriment when deciding whether to participate and/or enroll their children in the Pop

20  Warner tackle football programs.

21       212.   Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany

22  PW, NOCSAE, and DOES 1 through 100, and each of them, knew, or should have

23  known, that Plaintiffs and the Class Members would rely on Defendants'

24  misrepresentations.

25       213.   Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany

26  PW, NOCSAE, and DOES 1 through 100, and each of them, made misrepresentations

27  and actively concealed information with the intention that Plaintiffs and the Class

28  Members would rely on the misrepresentations or omissions in selecting their course of

1  action.

2  214.   Plaintiffs and the Class Members, among others, were damaged by these

3  misrepresentations.

4  215.   As   a   direct   and   proximate   result   of   Defendants   negligent

5  misrepresentations, Plaintiffs and the Class Members have suffered economic losses,

6  including, but not limited to, loss of income, brain injury, damage and disease,

7  emotional distress, medical monitoring, and death.

8  216.   As a result of the negligent acts and omission of Defendants, Plaintiffs and

9  the Class Members are entitled to damages, as alleged herein or allowed by law, from

10  Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum.

11  **IX.**

12  **FIFTH CAUSE OF ACTION**

13  **WRONGFUL DEATH**

14  **(As Against All Defendants and Does)**

15  217.   Wrongful Death Plaintiffs and the Class Members hereby incorporate by

16  reference each and every allegation contained in the foregoing paragraphs, as though

17  each was fully set forth at length herein.

18  218.   As a direct and proximate result of Defendants wrongful and deceptive

19  conduct, as described herein, and the nature of Decedents' injuries, Wrongful Death

20  Plaintiffs and the Class Members did not and could not have discovered that

21  Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW,

22  NOCSAE, and Does 1 through 100, were the cause of each Decedent's death, within

23  two years of the filing of this complaint, and within the parameters set forth in Code of

24  Civil Procedure § 340.8. Wrongful Death Plaintiff, Jo Cornell, as survivor and mother

25  of Tyler Cornell, did not, and could not, discover that Tyler suffered from CTE until

26  January 16, 2015 when a posthumous test revealed his diagnosis.  Plaintiff Jo Cornell

27  could not have discovered Decedent Tyler Cornell's CTE diagnosis before January 16,

28  2015 because Decedent Tyler Cornell's CTE was discovered after a thorough study, by

Boston University, of Tyler Cornell's brain after he passed away. Plaintiff Jo Cornell received the results of the study on January 16, 2015. Plaintiff Jo Cornell could not have received the diagnosis during Tyler's life because CTE is diagnosed postmortem.

219. Wrongful Death Plaintiff, Kimberly Archie could not have discovered that her son, Paul Bright Jr. suffered from CTE before April 9, 2015 because Paul's CTE was discovered after a thorough study, by Boston University, of Paul's brain after he passed away. Plaintiff Kimberly Archie received the results of the study on or around April 9, 2015. Plaintiff Kimberly Archie could not have received the diagnosis during Paul's life because CTE is diagnosed postmortem.

220. As a further direct and proximate result of the Decedents' death, the Wrongful Death Plaintiffs and the Class Members have been permanently deprived of the Decedents' love, care, companionship, comfort, services, society, solace, contributions, financial support, physical assistance, affection and moral support, all to their damage in an amount in excess of the minimum subject matter jurisdiction of this court, and according to proof.

221. By reason of the conduct of the Defendants, and each of them, the Wrongful Death Plaintiffs and the Class Members have incurred funeral and burial expenses in such an amount as will be proven at the time of trial. The Wrongful Death Plaintiffs and the Class Members have lost the use of interest on money owed from the date of this incident until judgment as follows: on funeral and burial expenses; on loss of support; on the pecuniary value of the loss of love, care, companionship, comfort, services, society, solace and moral support.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**X.**

**SIXTH CAUSE OF ACTION**

**INDIVIDUALLY AND ON BEHALF OF THE CLASS MEMBERS:**

**VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200 et seq.;**

**DECEPTIVE BUSINESS PRACTICES**

**(As Against All Defendants and Does)**

222.    Plaintiffs and the Class Members re-allege and incorporate by reference each of the preceding allegations in this complaint as though fully set forth at length herein.

223.    The conduct of Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, with respect to the systematic marketing and deception of Pop Warner participants, both minor children and the parents and/or guardians of said children, including Plaintiffs and the Class Members, as more particularly described above is an unlawful or deceptive business practice within the meaning of California Business and Professions Code § 17200 prohibiting such practices.  Defendants' unlawful practices include Defendants misrepresentations through advertising that provided a safe environment for children. These statements were made despite Defendants' knowledge of the lack of safety precautions for children.

224.    Plaintiffs, on behalf of themselves, the Class Members, and the general public, seek an order requiring Defendants Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, to immediately cease such acts of unlawful, deceptive and misleading advertising and enjoining Defendants from continuing to violate Business & Professions Code § 17200 et seq.  Plaintiffs and the Class Members additionally request an order requiring Defendants to engage in a corrective advertising campaign.  Plaintiffs also request an order requiring Defendants to make restitution to Plaintiffs and to the Class Members of all monies wrongfully acquired by Defendants by means of their violations of Business

1  & Professions Code § 17200 et seq.

## XI.

## SEVENTH CAUSE OF ACTION

## INDIVIDUALLY AND ON BEHALF OF THE CLASS MEMBERS:

## VIOLATION OF BUSINESS & PROFESSIONS CODE

## SECTION 17500 et seq.

### (As Against All Defendants and Does)

225.   Plaintiffs and the Class Members re-allege and incorporate by reference each of the preceding allegations in this complaint as though fully set forth at length herein.

226.   Business & Professions Code § 17500 prohibits unfair, deceptive, untrue and misleading advertising.

227.   Defendants', Pop Warner, Palomar PW, Sparks PW, Midvalley PW, Albany PW, NOCSAE, and DOES 1 through 100, and each of them, use of various forms of media to advertise, call attention to, or give validity to the sale of services, which are not as represented in their advertising constitutes unfair, deceptive, untrue and/or misleading advertising within the meaning of Business & Professions Code § 17500 et seq.  Defendants' advertising conduct, including their misrepresentations and concealment of the true facts alleged above is likely to have deceived and continue to deceive Plaintiffs and the Class Members and the public at large.  Defendants reasonably should know and should have known that such advertisements were unfair, deceptive, untrue and/or misleading.  The misrepresentations and non-disclosures by Defendants of material facts detailed above constitute unfair, deceptive, untrue and misleading advertising and constitute a violation of Business & Professions Code § 17500, et seq.

228.   Plaintiffs and the Class Members request an order requiring Defendants to make restitution to Plaintiffs and the Class Members of all monies wrongfully acquired by Defendants by means of their violations of Business & Professions Code § 17535 et

1  seq. during the Class period.  Pursuant to Business & Professions Code § 17535 et seq.

2  Plaintiffs, on behalf of themselves, the Class Members, and the general public, also

3  seek an order requiring Defendants to immediately cease such acts of deceptive and

4  misleading advertising, including that youth tackle football is safe for minor children,

5  all coaches are adequately trained to offer the best and safest programs for youth

6  participants and that equipment meets NOCSAE regulatory standards, and enjoining

7  Defendants from continuing to violate Business & Professions Code § 17500 et seq.

8                                                    **XII.**

9                                     **PRAYER FOR RELIEF**

10           WHEREFORE, Plaintiffs, individually and on behalf of the Class Members

11  respectfully request that the Court enter judgment in their favor and against Defendants,

12  as follows:

13           A.       Certification of the proposed Classes; including appointment of Plaintiff's

14  as Class Counsel;

15           B.       An order temporarily and permanently enjoining Defendants from

16  continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in

17  this Complaint;

18

19           C.       For future medical monitoring costs, according to proof;

20           D.       An order requiring Defendants NOCSAE to provide warning labels on all

21  helmets including disclosure of the risk of exposure to CTE and other neurological

22  damage and disease;

23           E.       An order requiring Defendants NOCSAE to provide helmet safety and

24  design standards geared toward minor football participants;

25           F.       Costs, restitution, damages, including punitive damages, and disgorgement

26  in an amount to be determined at trial;

27           G.       An order requiring Defendants to pay both pre- and post-judgment interest

28  on any amounts awarded;

1    H.    An award of costs and attorneys' fees; and;

2    I.    Any other relief the Court may deem appropriate.

3

4    DATED:  June 12, 2017                GIRARDI | KEESE

5

6

7                                        By:    /s/ Robert W. Finnerty

8                                               ROBERT W. FINNERTY
                                                Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT

1

## <u>CERTIFICATE OF SERVICE</u>

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 1126 Wilshire Boulevard, Los Angeles, CA 90017-1904.

4

5

On June 12, 2017, I served true copies of the following document(s) described as **SECOND AMENDED CLASS ACTION COMPLAINT** on the interested parties in this action as follows:

6

7

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

8

9

10

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

11

12

Executed on June 12, 2017, at Los Angeles, California.

13

14

_____

TRACEY FAUST

15

16

17

18

19

20

21

22

23

24

25

26

27

28