Boris Treyzon, Esq. (SBN 188893)
btreyzon@actslaw.com
Slav Kasreliovich, Esq. *(SBN 256807)*
skasreliovich@actslaw.com
Joseph Finnerty, Esq. (SBN 298678)
jfinnerty@actslaw.com
Michael Patrick Kelly, Esq. (SBN 311045)
mkelly@actslaw.com
**ABIR COHEN TREYZON SALO, LLP**
16001 Ventura Blvd. Suite 200
Encino, California 91436
Telephone: (424) 288-4367 | Fax: (424) 288-4368

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KIMBERLY ARCHIE, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>POP WARNER LITTLE SCHOLARS, INC., a nonprofit corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 2:16-cv-06603-PSG-PLA<br><br>*Assigned to the Honorable Phillip S. Gutierrez*<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE OR LIMIT THE OPINONS OF PLAINTIFFS' EXPERT, STEPHEN T. CASPER Ph.D.; DECLARATION OF BORIS TREYZON**<br>*Trial Date: January 14, 2020* |

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................. 1

II.   UNDER DAUBERT, THE DISTRICT COURT ACTS AS A GATE KEEPER, NOT A FACT FINDER AND IS GIVEN BROAD LATITUDE IN DETERMINING THE RELIABILITY OF EXPERT TESTIMONY ........................................................................................ 2

III.  DR. CASPER'S KNOWLEDGE, SKILL, EXPERIENCE, TRAINING AND EDUCATION RENDERS HIM COMPETENT TO TESTIFY AS TO THE STATE OF KNOWLEDGE AS TO THE CONNECTION BETWEEN REPETITIVE HITS TO THE HEAD AND BRAIN INJURY PRIOR TO THE TIME THAT BRIGHT AND CORNELL PLAYED POP WARNER FOOTBALL ........................................... 4

IV.   DR. CASPER'S OPINIONS WILL ASSIST THE TRIER OF FACT ..................................................................................... ............................... 4

V.    PLAINTIFFS   WILL   INTRODUCE   RELIABLE   EVIDENCE RELATING TO THE CONNECTION BETWEEN REPETITIVE HITS AND CTE   ...................................................................................7

VI.   DR.   CASPER'S   OPINIONS   WERE   SUPPORTED   BY   HIS REASONABLE APPLICATION OF PRINCIPAL AND METHODS TO THE FACTS OF THIS CASE.............................................. ...........8

      A. **Pop Warner's Critiques of Dr. Casper's Methodology is Meritless** ................................................................... ............................... 8

      B. **Pop Warner's Critique that Dr. Casper's Opinions Are Not Based Upon on Reliable Data is Meritless** ....................................12

VII.  POP WARNER'S ADDITIONAL CRITIQUES OF DR. CASPER ARE UNPERSUASIVE AND DO NOT PROVIDE A GROUNDS FOR EXCLUSION ...............................................................................18

VIII. CONCLUSION .................................................................................. 19

# TABLE OF AUTHORITIES

## CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993)

509 U.S. 579, 596……………………………………………………2, 3, 6, 18, 19

*Kumho Tire Co. v. Carmichael(1999) 526 U.S. 137, 142* ……………………2

*Jahn v. Equine Services, PSC* (6th Cir. 2000) 233 F. 3d 382, 392………………..6

*Osburn v. Anchor Laboratories, Inc.* (5th Cir. 1987) 825. F. 2d 908, 915. ……..7

*Primiano v. Cook* (2010) 598 F.3d 558, 565-565 ……………………………….3

*U.S. v. Vallejo* (9th Cir.) 237 F.3d 1008………………………………………….2

*United States v. Morales* (9th Cir. 1997) 108 F.3d 1031, 1038 ……………..…….2

*United States v. 14.38 Acres of Land Situated in Leflore County, Missippi (5th Cir.*
*1996)* 80 F. 3d 1074,1078 …………………………………………………...3

*Viterbo v. Dow Chem*. (5th Cir. 1987) 826 F.2d 420, 422. ………….…………….3

*Walker v. Soo Line R.R. Co. (7th Cir. 2000) 208 F.3d 581, 590* …………………6

*Wendell v. GlaxoSmithKline LLC* (2017 9th Cir.) 858 F. 3d 1227…………..2, 18

## Rules

*Federal Rules of Evidence Rule* 702    …………………………………….2, 3

ii

1        Plaintiffs Kimberly Archie and Jo Cornell ("Plaintiffs") hereby submit the

2    following memorandum of points and authorities and declaration of Boris Treyzon

3    in opposition to Defendant Pop Warner Little Scholars, Inc's ("Pop Warner")

4    motion to exclude or limit the opinion of Plaintiffs' expert Dr. Stephen T. Casper,

5    Ph.D.:

6    **MEMORANDUM OF POINTS AND AUTHORITIES**

7    **I.    INTRODUCTION**

8        The dangers of repetitive hits to the head and brain injuries have been known

9    for centuries. Despite the voluminous evidence in the historical record, one of Pop

10   Warner's central defenses is that the link between repetitive hits to the head and

11   brain injury and/or trauma was unknown until recently. On this basis, Pop Warner's

12   claim that they have no responsibility for brain damage suffered by Bright and

13   Cornell as a result of their participation in Pop Warner football.

14       In order to show that Pop Warner's contention lacks merit, Plaintiffs have

15   designated Dr. Casper, a tenured Full Professor of History at Clarkson University

16   with a PhD in the history of medicine from University College London. He is a

17   highly recognized and highly trained medical historian. As set forth herein, he is

18   uniquely qualified among all experts in this matter to opine as to what was known

19   about the connection between repetitive hits and brain trauma prior to and during

20   the time that Bright and Cornell played Pop Warner football. His opinion testimony

21   is thoroughly supported by citations to medical literature and other resources

22   showing the development of medical knowledge beginning in the 1870's until the

23   present.

24       At trial, Pop Warner will be given the opportunity to challenge Dr. Casper's

25   conclusions. The moving papers, however, fail to set forth grounds to exclude his

26   testimony under *Federal Rules of Evidence, Rule* 702. This court should deny Pop

27   Warner's motion in its entirety.

28

1
2
3
4

## II.   UNDER *DAUBERT,* THE DISTRICT COURT ACTS AS A GATE KEEPER, NOT A FACT FINDER AND IS GIVEN BROAD LATITUDE IN DETERMINING THE RELIABILITY OF EXPERT TESTIMONY

5
6
7
8
9
10
11

*Federal Rules of Evidence Rule* 702 provides, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an **opinion** or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

12
13
14
15
16

To be admissible, expert testimony must (1) address an issue beyond the common knowledge of the average layman, (2) be presented by a witness having sufficient expertise, and (3) assert a reasonable opinion given the state of the pertinent art or scientific knowledge. *United States v. Morales (9ᵗʰ Cir. 1997) 108 F. 3d 1031,1038.*

17
18
19
20
21
22
23
24
25

In *U.S. v. Vallejo* (9ᵗʰ Cir.) 237 F.3d 1008, the 9ᵗʰ circuit explained, "Expert testimony must be both relevant and reliable. *Daubert v. Merrell Dow Pharms. Inc.* 509 U.S. 579, 597 (1993). To be admissible, expert testimony must (1) address an issue beyond the common knowledge of the average layman, (2) be presented by a witness having sufficient expertise, and (3) assert a reasonable opinion given the state of the pertinent art or scientific knowledge. *United States v. Morales, 108 F.3d 1031, 1038 (9ᵗʰ Cir. 1997).* The district court is accorded broad latitude in determining the reliability of expert testimony. *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142, (1999)."*

26
27
28

The 9th Circuit mandates that "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232

2

1  (9th Cir. 2017) citing *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193,

2  1196 (9th Cir. 2014).  "As a general rule, questions relating to the bases and sources

3  of an expert's opinion affect the weight to be assigned that opinion rather than its

4  admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem.*

5  826 F.2d 420, 422 (5th Cir. 1987). Vigorous cross-examination, presentation of

6  contrary evidence, and careful instruction on the burden of proof are the traditional

7  and appropriate means of attacking shaky but admissible evidence. *Daubert v.*

8  *Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 596 (1993).

9       When an expert meets the threshold established by Rule 702 as explained

10  in Daubert the expert may testify and the jury decides how much weight to give that

11  testimony. *Primiano v. Cook* 598 F.3d 558,565 (2010). "[T]he factors identified in

12  *Daubert* may or may not be pertinent in assessing reliability, depending on the

13  nature of the issue, the expert's particular expertise, and the subject of his testimony.

14  Reliable expert testimony need only be relevant and need not establish every

15  element that the plaintiff must prove, in order to be admissible." *Id.*

16       *Daubert* did not work a "seachange over federal evidence law," and "the trial

17  court's role as gatekeeper is not intended to serve as a replacement for the adversary

18  system." *United States v. 14.38 Acres of Land Situated in Leflore County, Missippi*

19  80 F. 3d 1074,1078 *(5th Cir. 1996).*

20       As set forth herein, Dr. Casper's opinion testimony is the product of reliable

21  expertise, principles, and methods as applied to the facts of this case and thus should

22  be admitted at the trial of this case.

23  / / /

24  / / /

25  / / /

26  / / /

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE OR LIMIT THE OPINONS OF PLAINTIFFS' EXPERT, STEPHEN T. CASPER PH.D.; DECLARATION
OF BORIS TREYZON

**III.   DR. CASPER'S KNOWLEDGE, SKILL, EXPERIENCE, TRAINING AND EDUCATION RENDERS HIM COMPETENT TO TESTIFY AS TO THE STATE OF KNOWLEDGE AS TO THE CONNECTION BETWEEN REPETITIVE HITS TO THE HEAD AND BRAIN INJURY PRIOR TO THE TIME THAT BRIGHT AND CORNELL PLAYED POP WARNER FOOTBALL**

Dr. Casper received his BSc degree in Neuroscience and Biochemistry from the University of Minnesota, Minneapolis and his PhD from University College London (UK) in the History of Medicine. He is a Full Professor in the Department of Humanities and Social Sciences at Clarkson University, and he is Associate Director of the Clarkson University's Honors Program.[1] He is the author of the peer-reviewed book *The Neurologists: A History of a Medical Specialty in Modern Britain, c. 1789-2000*. He has edited the peer-reviewed books *The History of the Brain and Mind Sciences: Technique, Technology and Therapy* and *The Neurological Patient in History* in which he has chapters.[2] For the last four years, he has been researching a book focused on the intellectual and cultural history of concussion in the Atlantic World.

Dr. Casper's most recently co-authored peer-reviewed journal article derives of that book project and is entitled:

- "The punch-drunk boxer and the battered wife: Gender and brain injury research" has just appeared (2019) in *Social Science & Medicine* and is a contribution to both the history of medicine and the sociology of medicine

---

[1] Exhibit D to the Moving Papers; Page 230
[2] Exhibit "D" to the Moving Papers; Page 231

Other relevant peer-reviewed publications pertinent to the larger history of brain injury and disease he is research and writing have appeared in the last two years and include:

- Casper, ST. (2018). "A History of the Locked-in-Syndrome: Ethics in the making of neurological consciousness, 1880-Present." *Neuroethics*. https://doi.org/10.1007/s12152-018-9374-7
- Casper, ST. (2018). "Concussion: A History of Science and Medicine, 1870-2005." *Headache*: *The Journal of Head and Face Pain.* DOI: 10.1111/head.13288
- Casper, ST. (2018). "How the 1950s changed our understanding of traumatic encephalopathy and its sequelae." *Canadian Medical Association Journal*. 190(5): E140-142.

He has also published many other peer-reviewed articles, peer-reviewed chapters, essays reviews, and he has been invited to write essays on the history of neurology and neuroscience for such prestigious scientific journals as *Science* and *Nature* (now in progress), indicating that his historical expertise is highly respected by scientists and clinicians across the world.

As set forth herein, Dr. Casper's academic and professional qualifications render him qualified to provide opinion testimony as to the following matters:

"To analyze the developments and scientific and medical knowledge concerning brain injury, damage, and disease and its association with repetitive hits to the head. Discuss: i) The origins of modern-day knowledge of brain injuries and their associated long-term neurological consequences and risks, (ii) The evolution of this brain injury knowledge overtime, and (iii) the ways brain injury, brain damage, and associated neurological diseases has been applied to contact sports by clinicians, scientists and

1     engineers from the past to the present."[3]

2          The moving papers incoherently argue that because Dr. Casper is not a
3     scientist, a medical doctor or an epidemiologist, he is unqualified to render an
4     opinion concerning the history of developments to modern day knowledge of brain
5     injuries.[4] Exactly the opposite is true – this is precisely what historians of medicine
6     do. A central issue presented in this case is whether Pop Warner was on notice that
7     repetitive hits sustained by child athletes resulted in brain trauma and increased risks
8     of developing brain damage and disease, prior to the time that Cornell and Bright
9     played Pop Warner football. While a scientist, a medical doctor or an epidemiologist
10    are unlikely to know the state of knowledge at the relevant time period, Dr. Casper's
11    unique training in Neuroscience, Biochemistry and the History of Medicine render
12    him especially qualified to render such an opinion. Indeed, it would be difficult to
13    find a more suitable academic background to opine on this issue. Pop Warner's
14    challenge to Dr. Casper's credentials is meritless.

15    **IV.    DR. CASPER'S OPINIONS WILL ASSIST THE TRIER OF FACT**

16         Expert opinion testimony is appropriate when the factual issue is one that the
17    trier of fact would not ordinarily be able to resolve without technical or specialized
18    assistance. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 US 579, 591 (1993).
19    An expert's testimony can assist the trier of fact even if it does not resolve an issue
20    with complete certainty. *Walker v. Soo Line R.R. Co. 208 F.3d 581, 590 (7th Cir.*
21    *2000).* [E]xperts are just witnesses, and they need not be purveyors of ultimate truth
22    in order to be allowed on the stand." *Jahn v. Equine Services, PSC* 233 F. 3d 382,
23    392 (6th Cir. 2000).

24         Here, Pop Warner has asserted that it was not on notice that cumulative
25    repetitive hits could result in brain trauma that may progress to brain disease prior

26

27    _____
      [3] Exhibit "D" to Moving Papers; Page 136
28    [4] Moving Papers 1:16-21                    6

and during to the time that Bright and Cornell played Pop Warner football. Dr. Casper's testimony will assist the trier of fact by attesting to what information was available to Pop Warner at the relevant time period.

## V.    PLAINTIFFS WILL INTRODUCE RELIABLE EVIDENCE RELATING TO THE CONNECTION BETWEEN REPETITIVE HITS AND BRAIN INJURY/BRAIN TRAUMA

The moving papers argue that the science relating to Chronic Traumatic Encephalopathy ("CTE") is "insufficiently advanced to draw any clinical-pathological conclusions, which would be admissible at trial."[5] The moving papers are missing the point. First, Dr. Casper's opinion is that the historical records shows that there was ample medical literature to show a link between repetitive subconcussive hits and brain injury/trauma and neurodegenerative disease. CTE is a included as a neurodegenerative disease, but both Bright and Cornell had brain damage, including CTE.

Moreover, "An expert's opinion need not be generally accepted in the scientific community before it can be sufficiently reliable and probative to support a jury finding.... What is necessary is that the expert arrived at his causation opinion by relying upon *methods* that other experts in his field would reasonably rely on in forming their own, possibly different opinions, about what caused the patient's disease. *Osburn v. Anchor Laboratories, Inc.* 825. F. 2d 908, 915 (5th Cir. 1987).

Pop Warner's citation to the testimony of Dr. Harris does not support the moving paper's apparent contention that the link between brain trauma and CTE is not sufficiently certain. In the cited testimony, Dr. Harris, a neuropathologist, repeatedly asserted that he did not know Cornell or Bright's histories and, as a neuropathologist, would not be in a position to opine as to the type of trauma that resulted in their deaths.

---

[5] Moving Papers p.5-6

Dr. Harris' charge, as confirmed by his expert opinion, was to determine whether Cornell and Bright's autopsies supported early chronic traumatic encephalopathy. In his opinion, Dr. Harris states, "there is sufficient diagnostic evidence to support early chronic traumatic encephalopathy as a neuropathological diagnosis for both of these cases. Acute trauma to the brain for both individuals was the immediate cause of death."[6] Thus, he determined that the autopsies of Cornell and Bright objectively confirmed evidence of CTE in these decedents. He was not designated as an expert in the state of science of CTE.

Further, Plaintiffs have designated Bennet Omalu M.D., as a rebuttal expert.[7] He is a well-recognized expert in forensic pathologist and neuropathologist who has published findings regarding brain damage, including CTE in American football players. He is the co-founder and director of the Brain Injury Research Institute and will opine as to the connection between Cornell and Bright's playing Pop Warner football, the resulting brain damage, including CTE and their early and violent deaths.

## VI.  DR. CASPER'S OPINIONS WERE SUPPORTED BY HIS REASONABLE APPLICATION OF PRINCIPAL AND METHODS TO THE FACTS OF THIS CASE

### A. Pop Warner's Critiques of Dr. Casper's Methodology is Meritless

Pop Warner attempts to misquote Dr. Casper to argue that Dr. Casper did not follow an accepted method in drafting his report. This argument lacks merit and is untrue. While Dr. Casper did testify that historians can utilize different approaches to historiography (the methods of history), his very next sentence states that he used the foundation approach to develop his understanding on the history of brain injuries. The resulting report is a distillation of his almost two decades of knowledge

---

[6] Exhibit "A" to Treyzon Declaration
[7] Exhibit "C" to the Treyzon Declaration[8]

and expertise as an historian of medicine and science and draws on his four years of research dedicated to the history of brain injury in the modern world.[8] In a practical sense, Dr. Casper's almost 100-page report, includes 227 footnotes primarily citing to ancient documents in the form of past peer-reviewed studies, articles, learned treatises and periodicals etc, as well as secondary sources that can place those primary sources into proper historic context. Any researcher, historian or not, can replicate his study: all they need do is read the documents he cites therein. In writing his report, Dr. Casper followed the guidelines of professional conduct published by the American Historical Association (AHA).[9] As detailed in his report, the AHA guidelines state that historians' methods include: (1) engaging in critical dialogue, (2) honoring the historical record, (3) protecting the integrity of primary sources, (4) draw upon appropriate secondary literature, (5) leave a clear trail for other others to follow through citation and bibliography, and (6) identify multiple and conflicting perspectives and truths in history. His report reflects these high methodological standards.

He describes, moreover, his methodology as follows,

"The primary resources used in this in this report are exclusively English-language sources published in the medical, scientific, or engineering literature in the English-speaking world between chiefly 1870 to 2012…As doctors in the past would have done, I drew upon medical dictionaries, medical encyclopedias, medical textbooks, and, most importantly, published medical indexes. These works appeared frequently between 1850 and the present. Using these standard reference sources, compiled by many editors and many authors, it was possible to identify terms as the actors (doctors, scientists, clinicians e.t.c.)
Over the last three years I closely read literature published in clinical, scientific, and academic journals. I examined articles, essays, letters to the editor, scholarly reviews, technical reports, and editorials. I also read or examined monographs, textbooks, and edited volumes. To access these sources, I relied on physical collections and digital search engines available at Harvard University, Cambridge University, Clarkson University, the British Library, and the Wellcome Library for the History of Medicine. I have also made extensive use of Google Books Advanced

---

[8] Exhibit D to Moving Papers; 138
[9] Exhibit D to Moving Papers;138                9

Search, as well as other library databases and search-engines that cut across sources on race, class and gender."[10]

As further explained by Dr. Casper during his deposition, he began searching canonical ancient documents for evolving conceptions or disease, disease classifications, and other actor specific categories: "...I was concerned – the history of medicine shows that nomenclature varies over time. And I was concerned that there might be changes in the nomenclature that I wanted to identify and I wanted to look at the nomenclature that actors at the time would have used; so it's actor specific vocabulary."[11] He further explained:

"I used primary sources that were indexes, dictionaries and encyclopedias, from the period and what I was looking for in those particular publications was how brain injury was represented by the authors who put those texts together....And then what I did having established what those key words were and having made note of the literature that was included in those indexes, I began to create a list. And then I proceed to go into the libraries and get those articles after I had selected---after I had selected many hundreds of them others, who began to appear through citation or titles so it—the sort of mass of articles was generated from those key words and then in between they began to fill in..."[12]

Dr. Casper's report and deposition testimony reflect sound methodology, in line with what the American Historical Association recommends as historical best practices. The moving papers also wrongly claim that Dr. Casper's report is not reproducible. Dr. Casper explained that in fact a knowledgeable historian would be able to could replicate his report as follows,

"Q. What I'm trying to figure out is this: If another medical historian wanted to come up with a paper about the history of concussion and what we know about concussion, how could they replicate what you did or could they?
A. Yes. Yea, they absolutely could. They could go right to the footnotes and go and get those papers themselves. They could go to the indexes, look themselves. I mean that is the kind of thing---I mean as a historian of

---

[10] Moving Papers; Ex. D p. 140
[11] Exhibit "B" to Treyzon Declaration; Casper depo. 27:20-28:8
[12] Exhibit "B" to Treyzon Declaration; Casper depo. 29:8-24

medicine we just know you should do that; so, like, there are—I mean there is a sort of set of expert practices that are part of the field and a trained historian of medicine would know to go to Index Medicus and look. They would know to go to the ICD, International Classification manuals and look. They would just know that.
Q. The indexes and books that you identified earlier?
A. In order to provide themselves with key words and then they could look at my citations. They could use those key words to find other sources and they could make a comparison, if they wish."[13]

Tellingly, Pop Warner does not proffer expert testimony challenging Dr. Casper's methodology or opinions and otherwise misstates both the analysis set forth in his report and testimony. Dr. Casper's report, replete with over 200 citations, fully supports the statements and conclusions set forth in his report. As discussed below, Dr. Casper comprehensively reviewed the medical literature and thoroughly discussed studies etc. from 1870 and afterword. The moving papers ignore these citations and conveniently rely on a few recent references rather than the vast majority.[14]

Essentially, Pop Warner's critique of Dr. Casper's methodology is a criticism of the techniques and methodologies generally used by all historians of medicine and not a basis to challenge the soundness of Dr. Casper's specific methodology. Moreover, contrary to Pop Warner's criticisms, Dr. Casper repeatedly testified that as a historian, "he would treat all sources equally,: and explained, "Well, I do not rely on the medical hierarchy but if somebody who was an author of medical literature was, that would be something I would try to acknowledge." [15] If anything, this testimony demonstrates Dr. Casper's objectivity by considering information, whether it be scientific or otherwise, to reflect the knowledge base at a particular time period.   No doubt had Dr. Casper testified that he relied on a hierarchy of literature, Pop Warner would have accused him of bias on other grounds. In any event, Dr. Casper's report and testimony demonstrate adherence to the methods and

[13] Exhibit "B" to Treyzon Declaration; 49:22-50:18
[14] Moving Papers 9:9-18
[15] Exhibit "B" to Treyzon Declaration; 74:12-19(cited in Moving Papers at 11:16-19

11

1   techniques used commonly by historians of medicine generally and by Dr. Casper
2   in the case at bar.

3

4   **B. Pop Warner's Critique that Dr. Casper's Opinions Are Not Based**
5   **Upon on Reliable Data is Meritless**

6        Pop Warner claims that Dr. Casper was provided limited documents in
7   connection with his opinion testimony.[16] Pop Warner ignores the fact that Pop
8   Warner admits to having lost its own historical archive. In any case, the subject
9   matter of Dr. Casper's expert opinion was, to wit, about what was known about the
10  connection between repetitive hits sustained by child athletes and brain trauma prior
11  to and during the time that Bright and Cornell played Pop Warner football.  In
12  analyzing this issue, the relevant reliable data were ancient documents in the form
13  of peer-reviewed articles, peer-reviewed reviews, documents in learned periodicals
14  and learned treatises published prior to the relevant time period. For purposes of an
15  analysis of the relevant history, contemporary deposition testimony etc. was
16  immaterial to Dr. Casper's opinion testimony.

17        Dr. Casper testified that his on-going research has been far more extensive
18  than the sources cited in his report.[17]  The primary sourced references cited by Dr.
19  Casper pre-dating Bright and Cornell's participation in Pop Warner football and
20  cited  in the footnotes to his report include (but are not limited to) the following:
21  James Crichton Browne, "Cranial Injuries and Mental Diseases" 2 *The West Riding*
22  *Lunatic Asylum Reports* (**1872**);L.C. Lane, Concussion of the Brain *23 JAMA 2*
23  (**1894**); "Further Comments on Head Injury The Post-Concussion Syndrome." *34*
24  *New York State Journal of Medicine* 21 (**1934**);Neurobehavioral Consequences of
25  Closed Head Injury 6 (**1982**)H.S. Levin; W.J. Mickle, The Traumatic Factor in

26

27  [16] Moving Papers 12:18-:20
28  [17] Exhibit "B" to Treyzon Declaration;45:1 5-19

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE OR LIMIT THE OPINONS OF PLAINTIFFS' EXPERT, STEPHEN T. CASPER PH.D.; DECLARATION OF BORIS TREYZON

Mental Disease, *15 Brain 1* (**1892**);H.W. Page, "A Clinical Lecture on Some Cases of Head-Injury, including One in which There was Lesion of the Occipital Lobe" *The Lancet* (**1901**);"Clinical Lecture on a Case of Head Injury Followed by Hemiplegia and Dilated Pupil" *The Lancet* (**1892**);A Miles, "On the Mechanism of Brain Injuries," *15 Brain 2* (**1892**) E. Goodall, "Four Cases of Insanity After Injury to the Head, with Observations Relative Thereto," *152 The Lancet 3928*, (**1898**);The Anatomical Facts and Clinical Varieties of Traumatic Insanity," *60 American Journal of Psychiatry 3* (**1904**);A.B. Richardson, "The Symptomatology and Treatment of Traumatic Insanity," *60 American Journal of Psychiatry 1* (**1902**);T. C. English," Abstract of Hunterian Lecture on After-Effects of Head Injury: Lecture 1", *The Lancet* (**1904**);E. Mapother, "Mental Symptom Associated With Head Injury: The Psychiatric Aspect," *2 British Medical Journal 4012* (**1937**);J. Ruesch & K.M. Bowman, "Prolonged Posttraumatic Syndromes Following Head Injury," *102, American Journal of Psychiatry 2* (**1945**);M. Relander et. al. "Controlled Trial of Treatment for Cerebral Concussion," *4 British Medical Journal 5843*, (**1972**);J.T. Barth et. al., "Mild Head Injury in Sports: Neuropsychological Sequelae and Recovery of Function" in eds. Harvey S. Levin, Howard M. Eisenberg and Arthur L. Benton Mild Head Injury *(Oxford: Oxford University Press, 1989*);S.N. Macciocchi et. al. , "Neuropsychological Functioning and Recovery After Mild Head Injury in Collegiate Athletes", *39 Neurosurgery 3*, (**1996**);M.R. Lovell & M.W. Collins, "Neuropsychological Assessment of the College Football Player", *13 Journal of Head Injury and Rehabilitation 2, 9-26* (**1998**);The Pathology of Concussion", *2 British Medical Journal 887* (**1877**);J. Macpherson, "Vacuolation of Nerve Cell Nuclei in the Cortex in Two Cases of Cerebral Concussion," *The Lancet* (**1892**);C.M. H. Howell, "Trauma in Relation to Certain Aspects of Nervous Disease," *The Lancet* (**1914**);F. W. Mort, "The Lettsonian Lectures on The Effects of High Explosives Upon the Central Nervous System: Lecture I, " 1 *The Lancet 12*

13

(**1916**);F.W. Mott, "The Microscopic Examination of the Brains of Two Men Dead of Commotio Cerebri (Shell Shock) Without Visible External Injury," *2 British Medical Journal 2967* (**1917**);C.S.B. Cassas, "Multiple Traumatic Cerebral Hemorrhages", *24 Proceedings of the New York Pathological Society 01,* (**1924**);M.Osnarto & Gilberti, "Postconcussion Neurosis-Traumatic Encephalitis. A Conception of Post Concussion Phenomena," *18 Archives of Neurology and Psychiatry 2* (**1927**); H.S. Martland, "Punch Drunk," 91 JAMA 15, (**1928**);M.Osnato,"The Role of Trauma in Various Neuropsychiatric Conditions," *86 American Journal of Psychiatry 4* (**1990**);L.Strauss & Savitsky, "Head Injury: Neurologic and Psychiatric Aspects," *31 Archives of Neurology and Psychiatry 5,* 893-955 (**1934**);Walter L. Bruetsch and Murray Deamond, "The Parkinsonian Syndrome Due to Trauma: A Clinical-Anatomical Study of a Case." *81 The Journal of Nervous and Mental Disease 5* (**1935**); A.H. S. Holbourne, "Mechanics of Head Injuries," *242 The Lancet 6267* (**1943**);W.F. Windle & R.A. Broat, "Disappearance of nerve cells after concussion," 93 *The Anatomical Record 2,* (**1945**);S.J. Strich, "Diffuse Degeneration of the Cerebral While Matter in Severe Dementia Following Head Injury," *19 Journal of Neural, Neurosurgery and Psychiatry 3* (**1956**);M. Critchley, "Medical Aspects of Boxing, Particularly from a Neurological Standpoint," *1 British Medical Journal 5015* (**1957**); I.A. McCown, "Boxing Injuries," *98 American Journal of Surgery 3* (**1959**); C. Symonds, "Concussion and its Sequelae," 279 *The Lancet 7219* (**1962**);H.M. Miller, "Mental Sequelae of Head Injury," *59 Proceedings of the Royal Society of Medicine* (**1965**);W. R. Russell, "Comment," *59 Proceedings of the Royal Society of Medicine* (**1966**); D. R. Oppenheimer, "Microscopic Lesions in the Brain Following Head Injury," *Journal of Neurology , Neurosurgery, and Psychiatry 4* (**1968**);J.A. Corsellis et. al., "The aftermath of boxing," *3 Psychological Medicine* (**1973**); A. K. Ommaya & T.A. Gennareli,"Cerebral Concussion and Traumatic Unconsciousness: Correlation of

14

Experimental and Clinical Observations on Blunt Head Injuries," *97 Brain 1* (**1974**);D. Gronwall & P. Wrightson, "Cumulative Effect of Concussion," *306 The Lancet 7943* (1975);R.W. Rimel et. al., "Disability Caused by Minor Head Injury," *9 Neurosurgery 3* (**1981**); A.K. Ommaya, "The Head: Kinematics and Brain Injury Mechanisms" in the Biomechanics of Impact Trauma (**1984**);A. Heyman et. al., "Alzheimer's Disease: A Study of Epidemiological Aspects," *15 Annals of Neurology* (**1984**);T.A. Gennarelli, "Mechanisms and pathophysiology of cerebral concussion," *1 Journal of Head Trauma and Rehabilitation 2* (**1986**); J.A. Corsellis, "Boxing and the Brain," *298 British Medical Journal 666* (**1989**);G.W. Roberts et al. "Dementia in a Punch-Drunk Wife," *335 The Lancet* (**1990**);J.F. Geddes et al, "Neurofibrillary Tangles, but not Alzheimer-type Pathology, in a Young Boxer," *22 Neuropathology & Applied Neurobiology 1* (**1996**);J.F. Geddes et al., "Neuronal cytoskeletal changes are an early consequence of repetitive head injury," *98 Acta Neuropathology 2* (**1999**);"The Football Accident Season" *2 British Medical Journal 1353* (**1886**);The Perils of Football," *The Lancet* (**1894**);"The Knock-Out Blow," *2 British Medical Journal 1* (**1894**);Pearce Bailey, Accident and Injury: Their Relations to Diseases of the Nervous System (*New York: Appleton and Company, 1898*); The Question of Football," *The Lancet* (**1905**);E.H. Nichols & H.B. Smith, "The Physical Aspect of American Football," *154 Boston Medical and Surgical Journal 1* (**1906**); H.L. Parker, "Traumatic Encephalopathy ("Punch Drunk") of Professional Pugilists," *15 Journal of Neurology and Psychopathology 57* (**1934**);L. Strauss & N. Svitsky, "Head Injury: Neurologic and Psychiatric Aspects," *31 Archives of Neurology and Psychiatry S., 893-955* (**1934**); E. Carroll, Punch-Drunk, " *191 American Journal of Medical Sciences 5* (**1936**); National Collegiate Athletic Association Medical Handbook for Schools and Colleges: Prevention and Care of Athletic Injuries Recommendations for Medical Examination, Pre-Season Conditioning, Methods of Training, Diagnosis and

15

Treatment of Injuries (*Princeton University Press, 1933*); A. Thorndike, "Serious Recurrent Injuries of Athletes: Contraindications to Further Competitive Participation, " *247 New England Journal of Medicine 15*, (**1952**);G. McLatchie & B. Jennett, Head Injury in Sport,*308 British Medical Journal 6944* (**1994**); P. McCrory, When to retire after concussion? *35 British Journal of Sports Medicine 6* (**2001**); A.G. Gross," A New Theory on the Dynamics of Brain Concussion and Brain Injury," *15 Journal of Neurosurgery* (**1958**); "Head injuries", *The Lancet* (**1941**); C. Symonds, "Concussion and its Sequelae," *279 The Lancet 7219* (**1962**); Richard C. Schneider, Head and Neck Injuries in Football: Mechanism, Treatment, and Prevention [Baltimore: Williams & Wilkin, **1973**); P.R. Yarnell & S. Lynch, "The "Ding": Amnestic States in Football Trauma," *23 Neurology* (**1973**);T.A. Gennareli,"Mechanism and pathophysiology of cerebral concussion," *1 Journal of Head Trauma Rehabilitation* 2 (**1986**); Sub Committee, Report of the quality Standards, Practice Parameter: The Management of Concussion in Sports (Summary Statement), *48 Neurology 3* (**1997**); M.I. Clayton, et al., "Football:The pre-season examination ," *1 Journal of Sports Medicine 4* (**1973**);Round Table: Concussion and Head Injuries, The Physician and Sports Medicine (October **1974**)D. Gronwall & P. Wrightson, "Cumulative Effect of Concussion," *306 The Lancet 7943* (**1975**); "Memory and Information Processing Capacity After Closed Head Injury," *44 Journal of Neurology, Neurosurgery & Psychiatry 10* (**1981**)Nicholas A. Vick Grinker's Neurology 7th edition (Springfield: Charles C. Thomas, **1976**); D.D. Gronwall & P. Wrightson, "Cumulative Effect of Concussion," *306 The Lancet 7943* (**1975**); I.D. Adams & J. Potter, "Brain Damage in Sport," *307 The Lancet 7959 (1976)*; K.W. Lindsay et. al. "Serious Head Injury in Sport," 281 British Medical Journal 6243 (**1980**); *Sports Medicine Committee of the Colorado Medical Society, Guidelines for the Management of Concussion in*

1  *Sports, Colorado Medical Society 1* (June **1991**) as well as other sources he
2  mentioned or inferred from in his deposition testimony.

3      Plainly, in addition to secondary resources relating to the period in question
4  or that help place primary sources in context, Dr. Casper's report explicitly
5  references primary resources which reflect the peer-reviewed, evolving, and high
6  state of knowledge available to Pop Warner prior to the time Bright and Cornell
7  played Pop Warner football. Pop Warner's argument that Dr. Casper's opinions
8  were not based upon reliable data is unsupported by the record.

9      With respect to Dr. Casper's opinion testimony concerning to Pop Warner's
10  disinformation campaign, Pop Warner argues that Dr. Casper's partial reliance on
11  the Fainaru article and Archie's book "Brain Damaged," supports exclusion of his
12  opinion testimony.[18] However, in his lengthy deposition, Dr. Casper testified that
13  had not actually read Archie's book beyond a cursory glance and that his opinions
14  regarding the disinformation campaign were not only based upon ESPN's
15  investigative journalism, which he found persuasive, but also other resources in
16  light of the loss of Pop Warner's archive, including the John Butler deposition, the
17  absence of available information concerning the risks of playing football in Pop
18  Warner's administrative handbook, and Pop Warner's decision to make Brain
19  Armor the official health supplement of Pop Warner Little Scholars.[19] In these
20  sources, Dr Casper testified that he saw an unmistakable pattern of obliviousness in
21  Pop Warner's conduct. An expert who "reasonably relies upon" inadmissible
22  information may be *cross-examined* about that information. *Ratliff v. Schiber Truck*
23  *Co., Inc. 150 F.3d 949, 955* (8th Cir. 1998).

24      Moreover, Pop Warner's criticisms to the conclusions drawn by Dr. Casper
25  are not appropriate grounds for exclusion. Indeed, the focus on the "district Court's"

26

27  [18] Moving Papers 13:4-20
28  [19] Exhibit "B" to Treyzon Declaration; 218:11-232:15; Report p. 93.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE OR LIMIT THE OPINONS OF PLAINTIFFS' EXPERT, STEPHEN T. CASPER PH.D.; DECLARATION
OF BORIS TREYZON

analysis 'must be solely on principles and methodology, not the conclusions that they generate.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d at 1232 citing *Daubert,* 509 U.S. at 595.  Here, Pop Warner is free to cross-examine Dr. Casper about the information which he relied upon in forming his opinion. However, on this record, Pop Warner has not established a basis to exclude such opinion testimony.

## VII.   POP WARNER'S ADDITIONAL CRITIQUES OF DR. CASPER ARE UNPERSUASIVE AND DO NOT PROVIDE A GROUNDS FOR EXCLUSION

Pop Warner also argues that Dr. Casper' opinion testimony should be excluded because it was not developed independently.  First, this statement is incorrect. Dr Casper has been researching a book on the history of concussions for the last four years and has published several peer-reviewed studies as part of that book project.  Dr. Casper also wrote and published a 288-page book title *The Neurologists: A history of a medical specialty in modern Britain, C. 1789-2000* in 2014 which further highlights his deep expertise on these issues: This was five years before he was retained in this action. The fact that Dr. Casper looked at his report that he drafted for another brain damage case does not mean that his work as a historian was done solely for litigation. Moreover, in the absence of Pop Warner's records, it is hard to see how it would be possible for an historian's report to be too materially different from any previous report since it is obviously the case that historical record does not change. If the Court were to accept Pop Warner's positions that opinions drafted in a report were grounds for exclusion, all experts who draft written reports for litigation would be excluded.  This is not the rule.

Moreover, even if a very few of his opinions were not developed independently (and he categorically denies this), that would not afford grounds for exclusion in this case. As explained in *Wendell v. GlaxoSmithKline LLC* F. 3d 1227, "While independent research into the topic at issue is helpful to establish reliability,

1   its absence does not mean the experts' methods were unreliable. Where "the

2   proffered expert testimony is not based on independent research," the experts can

3   instead present "other objective, verifiable evidence that the testimony is based on

4   'scientifically valid principles.'" [citing *Daubert II* 43 F. 3d at 1317-18]. It is

5   noteworthy that no expert in this case, other than Dr Casper, has the formal history

6   training necessary even to opine on whether his methods are reliable or not or

7   whether his research can be judged independent or not.

8   In the case at bar, Dr. Casper's opinion are supported by his two decades of

9   expertise as an historian of the mind and brain sciences, neurology, psychiatry,

10  psychology, and neurological patients, as well as four years of reading specifically

11  primary sources on brain injury from 1870 to 2012 and a methodology that would

12  be recognized as proper by any historian – and indeed has been several times in

13  peer-reviewed articles. As such Pop Warner's critique of Dr. Casper is unpersuasive

14  and should be rejected by this court.

15  **VIII. CONCLUSION**

16  Based upon the foregoing, this court should deny Pop Warner's motion to exclude

17  Dr. Casper's opinion testimony in its entirety.

18

19

20  Dated: December 2, 2019          **ABIR COHEN TREYZON SALO, LLP**

21                                             /s/ Boris Treyzon

22                                    By: _____

23                                          Boris Treyzon, Esq.
                                            Slav Kasreliovich, Esq.
24                                          Joseph Finnerty, Esq
                                            Michael P. Kelly, Esq.
25                                          Attorneys for Plaintiff

26

27

28                                          19