## EXHIBIT A

```
                                                              Page 1

 1
 2               UNITED STATES DISTRICT COURT
 3      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 4
 5      KIMBERLY ARCHIE, et al.,    )
                                    )
 6                 Plaintiffs,      )
                                    )
 7           vs.                    )   No. 2:16-cv-06603-
                                    )        PSG-PLA
 8      POP WARNER LITTLE           )
        SCHOLARS, INC., et al.,     )
 9                                  )
                   Defendants.      )
10      ------------------------    )
11
12
13
14
15                    July 26, 2019
16                    10:12 a.m.
17
18          Deposition of ENRICO N. ESPOSITO, held
19      at the offices of Wilson Elser Moskowitz
20      Edelman & Dicker LLP, 150 East 42nd Street,
21      New York, New York, before Laurie A. Collins,
22      a Registered Professional Reporter and Notary
23      Public of the State of New York.
24
25      Job No. CS3473827
```

Page 7

1                      Esposito

2      Q.     What was your involvement with Pop
3 Warner?
4      A.     I was a coach for three years from '91
5 to '93, St. Bart's.
6      Q.     Where is that?
7      A.     East Brunswick, New Jersey.
8      Q.     What organization were you a coach for?
9      A.     St. Bart's.
10     Q.     Saints Bart's Pop Warner?
11     A.     Yeah.
12     Q.     What level or division of play were you
13 a coach for?
14     A.     I think it was 13- to 14-year-olds, the
15 highest group that we had at the time, yeah.
16     Q.     Do you recall the name that they used
17 for that division of play?
18     A.     No, I can't recall right now. It's
19 been a while.
20     Q.     Sure.
21            The names run along the lines of
22 Midgets and Phantoms and Peewees and things like
23 that.
24     A.     It was the highest so -- at that time.
25     Q.     The 13- or 14-year-olds, that was the

1        Esposito
2    Q.   That was the Dartfish software?
3    A.   Yeah.  Then they actually did go back
4    and make it more user friendly with various levels
5    to use, so like a young coach could use a low
6    level, you know, and then as you get higher,
7    there's more techniques to use it.
8    Q.   Were you trained to use the King-Devick
9    test?
10   A.   Yes.
11   Q.   Who trained you?
12   A.   Steve.
13   Q.   Steve?
14   A.   Devick.
15   Q.   Do you know who Chris Nowinski is?
16   A.   Yes.
17   Q.   Who is Chris Nowinski?
18   A.   He was part of the portion for the
19   Center of Injury Management, Injury whatever.
20   I've got it here.
21        He proposed in different hearings about
22   concussions, and he actually played football,
23   wrestling, at one time.  He's an advocate of
24   promoting and disseminating information for
25   concussions and brain injury in sport.  The

1                  Esposito

2  did have a slight, you know.

3      Q.    Sure.

4      A.    Then some kids don't report things and

5  are not observed in the midst of doing it, so

6  that's a big thing.

7      Q.    Got it.

8          Now, a little while ago you said

9  something about if we got a dinger we just sent

10 them back in, or something to that effect.

11     A.    Yeah, if they were fine, you know,

12 watch them for a couple minutes, he's fine, he's

13 all right.  That was -- there was no protocol.

14 There was no set protocol or anybody that gave

15 documentation or written this is what we should be

16 doing.

17     Q.    So this is in the 1991 to 1993 time

18 period?

19     A.    Right.

20     Q.    Had you coached any other sport before

21 that?

22     A.    Just training individual athletes, like

23 I said before.

24     Q.    Did your training of individual

25 athletes involve watching them play?

1                         Esposito
2      for that reason.
3                MR. CORLETO:  Why don't we do this:
4         Let's take a ten-minute break.
5                (Recess taken from 11:24 to 11:42.)
6                (Doug Rochen joins proceedings.)
7                (Esposito Exhibit 2, expert report and
8         CV of Esposito, marked for identification.)
9          Q.    Dr. Esposito, we've marked your report
10     and CV as Exhibit 2.  If you need to refer to it
11     at any time, please do.  Just let us know what
12     you're referring to.
13               MR. CORLETO:  Can you read back the
14        last couple of questions and answers.
15               (Record read.)
16         Q.    During the time you were a Pop Warner
17     coach, did you have an opportunity to review any
18     materials from Pop Warner?
19               MR. TREYZON:  Objection, form.
20         A.    No.
21         Q.    Did you ever read the rule book?
22         A.    Yes.
23         Q.    Did you do that before you became a
24     coach or after you became a coach?
25         A.    When I first became a coach, they gave

1                             Esposito
2     us a copy of it.
3          Q.   Did you have your own copy?
4          A.   Yeah.
5          Q.   And did you review it from time to time
6     or just once and never again?
7          A.   Probably just once.
8          Q.   Was there ever a discussion about the
9     rules?
10         A.   No, not really.
11              MR. TREYZON:  Objection to form.
12         A.   No, not really.
13         Q.   Nobody gave you a rundown of here's the
14    rules relative to how we do things?
15         A.   No.
16         Q.   When you read the rule book, did you
17    read the entire rule book?
18         A.   Most of it.  I'll say most of it.
19         Q.   You read the part pertaining to 11-man
20    football?
21         A.   I don't recall, to be honest with you.
22         Q.   Was there anything in it that you
23    didn't understand?
24         A.   No, pretty much it was general
25    knowledge, and content was angled to be read by a

1           Esposito
2      A.   Where are you reading?
3      Q.   That's the rest of paragraph 8.  We
4   focused on the first part of it.
5      A.   I'm familiar -- okay, as well as the
6   standard and care in the community applicable to
7   the supervision and coaching, Pop Warner football.
8           I was involved with that:  supervision,
9   taking care of the athletes, within the program,
10  within the structured standard program, as much as
11  I knew it to be structured back then at that time.
12     Q.   What was the standard of care during
13  the time you were a Pop Warner coach?
14          MR. TREYZON:  Objection to form, calls
15      for a legal conclusion too.
16     A.   Know the sport, understand the
17  developmental -- understand the health care of the
18  athlete, knowing the equipment and how it's
19  supposed to be used properly, supervise them as
20  far as taking care of them and being around them
21  visibly at all times, basic general standard of
22  care of a child under your care, responsibilities.
23     Q.   Does that pretty much sum it up?
24     A.   Be able to take care of them in case
25  something happens as far as any kind of health

1                         Esposito
2      Q.    You told us during the time you coached
3   Pop Warner football if a kid got a ding you would
4   put them back in; correct?
5      A.    I want to make this worded right.
6   Okay?
7      Q.    I'm not trying to accuse you of
8   anything.  I wanted to make sure I got your
9   testimony.
10     A.    At the time we looked at him, if he was
11  okay, his eyes, he's okay, at that time -- at that
12  time if you had a concussion or you had a brain
13  injury, back -- keep calling it a concussion,
14  okay -- you had to lose consciousness.  Okay.  We
15  now know that's not true right now.
16     Q.    I'm focusing on back then.
17     A.    Okay.  They went back in the game.  And
18  probably some kids never even reported that they
19  were even hurt.  I don't know.
20     Q.    Let's work with the kid who gets dinged
21  back then.
22     A.    Okay.
23     Q.    He's a little fazed, a little woozy.
24  You look in his eyes.  He clears.  You send him
25  back in.

```
                                                     Page 79
 1                        Esposito
 2        A.    Keep him out a couple of plays, see if
 3   he comes to, whatever, and it was known to put him
 4   back in.
 5        Q.    Was that the standard of care then?
 6              MR. TREYZON:  Objection to form.
 7        A.    At that time?  I guess it was.  Did we
 8   know better back then?  We don't know.
 9        Q.    But that was the standard of care back
10   then?
11              MR. TREYZON:  Objection to form.
12        A.    The standard of care -- not in my mind,
13   because I was always safety conscious when I was
14   there.
15        Q.    Did you ever send a kid back into a
16   game after a dinger?
17              MR. TREYZON:  Objection to form.
18        A.    No, but I did keep a kid out, I mean,
19   saying I think he should sit out.  It was good.
20   But did I put a kid back in, me personally?
21   Probably not.
22        Q.    Other coaches?
23        A.    Probably.
24              MR. TREYZON:  Objection to form.
25        Q.    And that was standard back then;
```

Page 122

Esposito

started green or gold, and I used to put a good player, a mediocre player, a good player on my offensive line. So no matter who played, they all played as a team. So I was able to start -- I could start gold, I could start green, whatever.

My head coach thought I was crazy doing that, but actually it worked out and each player got better because of that. So to me I won it over with the parents too. Every kid played. So, you know, to me that's the way to do it at that level.

Q. Every kid should play?

A. Yeah, every kid should play. You only get better by playing against somebody better than you.

Q. Are you aware of what Pop Warner's rules and requirements were to become a coach?

A. There was nothing back then. I told you, it was you want to be a volunteer, you could do it, great. The biggest thing they asked you: Did you play before? Most of us did. Most of us played high school, and some of us played college. So, I mean, there was some background as to that player. I think the biggest requirement is you

Page 123

Esposito

played the game.

Q. Are you aware whether there was an age requirement?

A. At that time, no.

Q. Are you aware about whether there was an age requirement during the years that Paul Bright, Jr., and Tyler --

A. No, I have no idea if there was an age --

Q. Let me finish.

A. Oh, I'm sorry.

Q. Are you aware of whether there was an age requirement during the years that Paul Bright, Jr., and Tyler Cornell participated in Pop Warner football?

A. No.

Q. Are you aware about Pop Warner's requirements with respect to first aid or medical personnel?

A. No, and I'll tell you, it depends on some states. There's no athletic -- some states don't have athletic training requirements at all, like anybody could be in athletic training in certain states, like California.

```
                                              Page 166
                        Esposito
```

1                Esposito

2   preceding the time that these players have

3   played --

4        A.    I have plenty.

5        Q.    Hold on.

6        A.    Yes.

7        Q.    Let's do this again.

8             Doctor, are you aware of any literature

9   that preceded the time when these two individuals

10  have played that in your opinion should have put

11  Pop Warner Little Scholars on notice to the risk

12  of players of subconcussive blows?

13          MR. CORLETO:  Objection to form.

14       A.    Yes.

15       Q.    And have you seen such literature?

16       A.    Yes.

17          MR. TREYZON:  No further questions.

18  EXAMINATION CONTINUED BY

19  MR. CORLETO:

20       Q.    Now I need to follow up.  What

21  literature are you referring to?

22       A.    I'm talking about, one, the American

23  Academy of Pediatrics' literature.  I'm talking

24  about Martland's study on boxing 1928.  I'm

25  talking about neurodegenerative studies on boxers

Page 175

```
 1
 2                    C E R T I F I C A T E
 3     STATE OF NEW YORK    )
 4                          : ss.
 5     COUNTY OF NEW YORK   )
 6
 7            I, LAURIE A. COLLINS, a Registered
 8     Professional Reporter and Notary Public
 9     within and for the State of New York, do
10     hereby certify:
11            That ENRICO N. ESPOSITO, the witness
12     whose deposition is hereinbefore set forth,
13     was duly sworn by me and that such
14     deposition is a true record of the
15     testimony given by the witness.
16            I further certify that I am not
17     related to any of the parties to this
18     action by blood or marriage and that I am
19     in no way interested in the outcome of this
20     matter.
21            IN WITNESS WHEREOF, I have hereunto
22     set my hand this 6th day of August 2019.
23
24                            _____
25                            LAURIE A. COLLINS, RPR
```