# EXHIBIT A



Planet Depos
We Make It Happen™

# Transcript of James Merikangas, M.D.

**Date:** June 26, 2019
**Case:** Archie, et al. -v- Pop Warner Little Scholars, Inc., et al.

Planet Depos
Phone: 888.433.3767
Email: transcripts@planetdepos.com
planetdepos.com

Worldwide Court Reporting & Litigation Technology

```
 1   or rather, the substance of your opinions had not
 2   changed; is that correct?
 3         A.    Correct.
 4         Q.    Okay.  Are there any other versions of
 5   the report that you prepared in this case?
 6         A.    No.
 7         Q.    Did anyone, other than you, have input
 8   about the content of the report?
 9         A.    No.
10         Q.    Did you review materials in the
11   preparation of your report?
12         A.    I did.
13         Q.    What materials did you review?
14         A.    I see I don't have a list here.
15               I reviewed the death certificates of
16   Tyler Cornell and Paul Bright.  I reviewed their
17   pathology reports.  I reviewed -- for Mr. Cornell,
18   I reviewed treatment by Devin Callahan and Aurora
19   Behavioral Health and the University of California
20   San Diego Health.
21               I don't see that I've listed what I
22   reviewed for Paul Bright, but -- but it would have
23   been the same neuropathology report.
24         Q.    So when you say, the same neuropathology
25   report --
```

```
 1        Q.   As compared to Stage IV CTE?
 2        A.   Not as to the pathological precision of
 3   those stages.
 4        Q.   Okay.  So your report has a statement on
 5   page 2 that -- and I want to make sure I'm
 6   referring to the correct version of the report.
 7             In the first full paragraph -- or the
 8   second full paragraph, rather, "Both Mr. Cornell
 9   and Bright had autopsy-proven chronic traumatic
10   encephalopathy (CTE) as a result of repetitive head
11   trauma."
12             You see that?
13        A.   Yes.
14        Q.   What's that statement based on?
15        A.   The pathology reports that said they had
16   chronic traumatic encephalopathy, and my opinion
17   that it was the result of repetitive head trauma.
18        Q.   Okay.  And the autopsy reports you're
19   referring to are the ones from Boston University?
20        A.   Yes.
21        Q.   Are you aware of the autopsy report from
22   the L.A. Coroner's Office with respect to
23   Tyler Cornell?
24        A.   Yes.
25        Q.   Did you read it?
```

1       A.   Yes.
2       Q.   And what did that report say with respect
3  to CTE?
4       A.   It didn't say he had it.
5       Q.   It said that there was no evidence of it,
6  did it not?
7       A.   Yes.
8       Q.   And do you recall who the author of that
9  report is?
10      A.   No.  But coroner, that's all I know.
11      Q.   If I referred you to Dr. Cho Lwin, would
12 that sound familiar?
13      A.   I wouldn't recall.
14      Q.   But you do recall that the author of that
15 report said he finds no evidence of CTE?
16      A.   Yes.
17      Q.   And you have no recollection, as you sit
18 here, as to the stage of CTE identified in the BU
19 pathology reports?
20      A.   I don't want to misstate anything, so
21 I -- I don't recall.
22      Q.   Okay.  Would it be significant for the
23 rendering of your opinion to know what stage of CTE
24 either of these gentlemen had?
25      A.   No.

| | | |
|---|---|---|
| 1 | Q. | Did you speak with his father? |
| 2 | A. | No. |
| 3 | Q. | Did you speak with any other family members? |
| 5 | A. | No. |
| 6 | Q. | Are you aware of his sports activity, aside from Pop Warner football? |
| 8 | A. | No. |
| 9 | Q. | Are you aware that he played football into high school? |
| 11 | A. | Not as I sit here today. I may have been aware of that when I read the other reports. |
| 13 | Q. | Are you aware that he wrestled? |
| 14 | A. | I recall that, yes. |
| 15 | Q. | Are you aware that he played hockey? |
| 16 | A. | Don't remember. |
| 17 | Q. | Okay. But you have awareness that he played football into high school? |
| 19 | A. | Yes. |
| 20 | Q. | And that he wrestled? |
| 21 | A. | Yes. |
| 22 | Q. | Do you have any knowledge about whether he got into fights? |
| 24 | A. | Don't recall. |
| 25 | Q. | Do you have any knowledge about his use |

```
 1  never had a concussion in Pop Warner football?
 2       A.    If that were true?
 3       Q.    Yes.
 4       A.    Yes?  Is that a question?
 5       Q.    Would it be significant --
 6       A.    Oh.
 7       Q.    -- if he, in fact, never had a concussion
 8  in Pop Warner football?
 9             MS. McCLINTOCK:  Assumes facts not in
10  evidence.
11       A.    I think it would depend on who's calling
12  what a concussion.  Blows to the head can be
13  concussions with no one knowing it, so it would be
14  significant as how you're measuring and defining
15  that; whether you've had a ding, whether you've
16  been dazed, whether you bumped your head.  I have
17  trouble interpreting that statement.
18       Q.    If someone who claims to be an expert in
19  identifying concussions said he never had a
20  concussion during the course of playing youth
21  football, would that be significant to you?
22       A.    If that person witnessed every time he
23  played youth football and examined him for each
24  time, that would be significant.
25       Q.    Okay.  What's the basis of your statement
```

```
 1   that you reviewed with respect to Tyler Cornell.
 2        A.    Let's see.
 3              I don't recall.
 4        Q.    More specifically, do you recall whether
 5   he was diagnosed with bipolar disorder?
 6        A.    Yes.
 7        Q.    And was he?
 8        A.    Yes.
 9        Q.    Would that be a factor for suicide?
10        A.    Yes.
11        Q.    And you can develop bipolar disorder
12   independent of sports activity, correct?
13        A.    Yes.
14        Q.    And do you recall what the BU report said
15   about Tyler Cornell's primary clinical diagnosis?
16        A.    No.
17        Q.    If I told you that the BU report said his
18   primary clinical diagnosis was bipolar disorder,
19   would that sound correct to you?
20        A.    I believe that is correct.  That's not
21   the pathological diagnosis, that's the clinical
22   diagnosis.
23        Q.    Okay.  Did you read the BU report with
24   respect to Paul Bright, Jr.?
25        A.    Yes.
```

1    Q.   And how do you differentiate the years
2  that Tyler Cornell played youth football as a
3  substantial contributing factor from his diagnosed
4  bipolar disorder and the other conditions that he
5  was reported to have?
6         MS. McCLINTOCK:  Same objections.
7    A.   That's a false distinction.  You can't
8  make that distinction.  Most people with bipolar
9  don't kill themselves.  There's some other
10 substantial contributing factor.  It could be lots
11 of things.
12   Q.   Most people that play football don't kill
13 themselves either, correct?
14   A.   That's a matter of debate.
15   Q.   You think most people that play football
16 kill themselves?
17   A.   Well, they die sooner than other people
18 and it's a question of, did you kill yourself by
19 smoking all those cigarettes, or did you do it
20 intentionally?  There's a difference.
21   Q.   What's your authority for the basis of
22 your statement -- withdraw that.
23        What's your authority for the statement
24 that most people that play football die sooner?
25   A.   I can't cite it right now, but I think if

1    A.   I don't remember.
2    Q.   Did you review the deposition testimony
3  of Craig Cornell?
4    A.   Don't remember.
5    Q.   Did you review the deposition testimony
6  of Paul Bright, Sr.?
7    A.   I don't recall.
8    Q.   Did you review the deposition testimony
9  of Kimberly Archie?
10   A.   I don't remember.
11   Q.   Do you intend to review any of those
12 deposition transcripts before trial?
13       MS. McCLINTOCK:  Calls for speculation.
14   A.   I would like to.
15   Q.   As you sit here today, do you have an
16 intent to do that?
17       MS. McCLINTOCK:  Calls for speculation.
18   A.   What do you mean by, intent?
19   Q.   Well, let me ask you this way:  Would
20 that be part of your normal trial preparation?
21   A.   Yes.
22   Q.   And how far in advance of trial would you
23 review those?
24   A.   Up to the day before.
25   Q.   Did you review the police report

```
 1   attending Paul Bright, Jr.'s motorcycle accident?
 2        A.    I believe I did.
 3        Q.    Okay.  But when I asked you earlier, you
 4   didn't recall whether it was a one-vehicle accident
 5   or a multi-vehicle accident.
 6        A.    That's right.
 7        Q.    And you didn't recall anything about skid
 8   marks?
 9        A.    Did not.
10        Q.    Did you review the toxicology report for
11   Paul Bright, Jr.?
12        A.    I believe it showed marijuana.
13        Q.    Do you recall anything more specific than
14   what it showed about marijuana?
15        A.    No.
16        Q.    Did that particular observation have any
17   bearing on your opinions in this case?
18        A.    Any bearing?
19        Q.    Yes.
20        A.    It had some bearing.
21        Q.    In what respect?
22        A.    I can't give you a percentage or
23   quantification of that.
24        Q.    Well, what significance is it that his
25   blood tested positive for TCH [sic]?
```

1	A.	That disturbed young people often are
2	taking marijuana.
3	Q.	A number of the officers who were present
4	at the scene of that accident have been deposed.
5	Did you review any of those depositions?
6	A.	No.
7	Q.	Why not?
8	A.	I haven't seen them.
9	Q.	Is that something that you intend to do
10	before testifying at trial?
11	A.	I have no intent.  If I'm provided with
12	them, I'll review them.
13	Q.	What, specifically, is the basis for your
14	opinion -- withdraw that.
15		Just so we're clear, please identify
16	every opinion expressed in this report.
17	A.	The last paragraph represents all of my
18	opinions in this report.
19	Q.	The one that begins with, "It is my
20	opinion, to a reasonable degree of medical
21	certainty"?
22	A.	Yes.
23	Q.	And how do you know that each of these
24	men suffered chronic traumatic encephalopathy from
25	head trauma, playing Pop Warner football?

```
 1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
 2              I, STEPHANIE HUMMON, Registered
 3   Professional Reporter and Notary Public, the
 4   officer before whom the foregoing deposition was
 5   taken, do hereby certify that the foregoing
 6   transcript is a true and correct record of the
 7   proceedings; that said testimony was taken by me
 8   stenographically and thereafter reduced to
 9   typewriting under my supervision; and that I am
10   neither counsel for or related to, nor employed by
11   any of the parties to this case and have no
12   interest, financial or otherwise, in its outcome.
13              IN WITNESS WHEREOF, I have hereunto set
14   my hand and affixed my notarial seal this 30th day
15   of June, 2019.
16   My commission expires July 6, 2023.
17
18
19
20   _____
21   NOTARY PUBLIC IN AND FOR
22   THE STATE OF MARYLAND
23
24
25
```