Boris Treyzon, Esq. (SBN 188893)
*btreyzon@actslaw.com*
Joseph Finnerty, Esq. (SBN 298678)
*jfinnerty@actslaw.com*
Michael Kelly, Esq. (SBN 311045)
*mkelly@actslaw.com*
**ABIR COHEN TREYZON SALO, LLP**
16001 Ventura Blvd, Suite 200
Encino, California 91436
Telephone: (424) 288-4367 | Fax: (424) 288-4368

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KIMBERLY ARCHIE, et al.<br><br>                Plaintiff,<br><br>vs.<br><br>POP WARNER LITTLE SCHOLARS, INC., a nonprofit corporation; and DOES 1 through 50, inclusive,<br><br>                Defendants. | Case No.: 2:16-CV-06603-PSG-PLA<br><br>*Assigned to: Honorable Philip Gutierrez, Courtroom 6A, 6th Floor*<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>*Action Filed:*   September 1, 2016<br>*Trial Date:*     January 14, 2020 |

This opposition will be upon the grounds that:

1. Pop Warner Little Scholars, Inc. owed a duty to Paul Bright Jr. and Tyler Cornell.

2. Pop Warner Little Scholars, Inc. breached their duty to Paul Bright Jr. and Tyler Cornell.

3. Plaintiffs' experts conclude that defendant's acts and omissions were a substantial factor in Paul Bright Jr. and Tyler Cornell's acquired brain damage from Pop Warner Little Scholars, Inc. youth football and proximate cause of their subsequent deaths as triable issue of fact.

4. Defendant failed to meet its initial burden.

5. Pop Warner Little Scholars, Inc. negligently increased the risk of injury to Paul Bright Jr. and Tyler Cornell and the dangers of Pop Warner Little Scholars, Inc. youth football were foreseeable.

6. Pop Warner Little Scholars, Inc. misrepresented safety as its top priority, and that it provided an atmosphere conducive for development of "sound mind and body" for Paul Bright Jr. and Tyler Cornell in its name, brand, image and advertisements directed by National Pop Warner to Associations, Leagues, and Teams.

8. Jo Cornell's claim as to her son Tyler Cornell is not time barred.

9. Material issues of fact exist regarding the defendants' gross negligence and failure to provide appropriate risk management, equipment and rules for safety that were age appropriate. The jury will determine liability in accordance with comparative negligence law.

10. Defendants have not otherwise shown as a matter of law that plaintiffs cannot establish liability at trial.

PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................1

II.    FACTUAL BACKGROUND......................................................2

    A. Pop Warner ………………………………………………2
    B. Youth Football and Brain Injuries …………………………
      4
    C. Paul Bright ……………………….........................................5
    D. Tyler Cornell…………………………….. ......................8

III.    LEGAL ARGUMENT……………………………………………
    11

    A. Pop Warner Failed to Carry its Burden…………….. ..........11
    B. Dangers Caused by Repetitive Brain Injuries/Trauma Were
      Foreseeable…………………………………….. ...............11
    C. Trial Issues of Fact For Causation………………….........14
    D. Specific Causation…………………………… ...........15
    E. Defendant's reliance on McCullough is misguided……….19
    F. Delayed Discovery…………………….......................19

IV.    CONCLUSION ........................................................................20

PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR

1
2
3
4

**TABLE OF AUTHORITIES**

5

**CASES**

6
7

*Chavez v. Glock, Inc.*, 207 Cal.App.4th 1283, 1301 (2012)…………
        10

8
9

*Cooper v. Takeda Pharmaceuticals America, Inc.*,
239 Cal.App.4th 555, 578 (2015)………………………………..16

10
11
12

*Davis v. Honeywell Internat. Inc.*,
245 Cal.App.4th 477, 487 (2016)… ................................................18

13
14

*Hanford Nuclear Reservation Litig,*
292 F.3d 1124, 1133 (9th Cir. 2002)…………………………….14

15
16
17

*Hendrix v. Novartis Pharm. Corp.*, 975 F.Supp 2d 1100, 1107
(C.D.Cal. 2013), aff'd, 647 F.App'x 749 (9th Cir. 2016)………… .19

18

*Johnson & Johnson Talcum Powder Cases*, 37 Cal.App.5th 292, 328 (2019).

19

*Kesner v. Superior Court*, 1 Cal.5th 1132, 1145 (2016)……………………..11, 12

20
21

*Lawrence v. La Jolla Beach & Tennis Club.,Inc.*,
231 Cal.App.4th 11, 24 (2014)………………………………….. 12, 16

22
23

*McCullough v. World Wide Wrestling Entertainment, Inc.*,
a District Court of Connecticut opinion…………………………………..18

24
25

*Messick v. Novartis Pharmaceuticals Corp.*,
747 F.3d 1193, 1196 (9th Cir. 2014)…………………………………..15

26
27

*National Football League Players Concussion Injury Litigation*,
821 F.3d 410, 443 (3rd Cir. 2016). …………………………………..14

28

PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR

*Neel v. Magana, Olney, Levy, Cathcart & Gelfand*,
6 Cal.3d 176, 179 (1971)…………………………………………………….. 19

*Nogart v. Upjohn Co.*, 21 Cal.4th 383, 397 (1999)……………………………19

*Onyshko v. NCAA*, No. C-63-CV-201403620
(Wash. Cty. Ct. Comm. Pleas, PA)………………………………………..13, 19

*Robison v. Six Flags Theme Parks, Inc.*,
64 Cal.App.4th 1294, 1297 (1998)…………………………………………..  19

*Southern California Gas Leak Cases*, 7 Cal.5th 391, 398 (2019)…………..  11

*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227  …………………………. 15

*Whiteley v. Philip Morris Inc.*,
227 Cal.App. 4th 635, 694 (2004)…………………………………………..  15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR

## I.    **INTRODUCTION**

This is a case about an organization profiting off of endangering the lives of children by lowering the age of entry so that Pop Warner football could expand their customer base.   Pop Warner did so despite direct recommendations from the medical community that young children should not play tackle football.   For years, Defendant Pop Warner Little Scholars has concealed the risks associated with playing youth tackle football from the general public.   This is not hyperbolic advocacy. Pop Warner has actively encouraged, if not mandated, its league organizers to mislead the parents of youth participants about the risks associated with youth tackle football.  This is true despite the fact that California law mandates that a defendant must exercise greater caution than when dealing with a minor. Despite this mandate, Pop Warner's own internal documents state "The duty to warn discussed in Chapter 6 is a challenge to your public relations acumen. It is difficult to warn and, at the same time, convince a parent to grant permission for his child to play!" Pop Warner preached that it cared about youth safety. Pop Warner's conduct caused harm to millions of young children across the country. The harms are so great and widespread, that their true impact may not be fully known, even decades from now.  Pop Warner must be held accountable for its conduct.

Now, Pop Warner moves for summary judgment.  In its Motion, it essentially makes two arguments: (1) that the harms suffered by Paul Bright and Tyler Cornell were not foreseeable; and (2) that Plaintiffs cannot show causation.  Pop Warner's Warner's arguments demonstrate a misunderstanding of this case.  First, Plaintiffs allege that their sons suffered brain damage, which resulted in CTE, as a result of Pop Warner's conduct.  The knowledge that repetitive hits to the head could cause brain damage has been known for hundreds of years.  Therefore, the harms that Paul and Tyler suffered were foreseeable.

Second, Plaintiffs retained experts have opined that Paul and Tyler's brain damage, which developed into CTE was caused by repetitive hits to the head that

1   Paul and Tyler suffered while playing Pop Warner football were substantial factors

2   in the death of Paul and Tyler.  Therefore, Plaintiffs present triable issues of fact to

3   preclude the granting of summary judgment.

4      **II.    FACTUAL BACKGROUND**

5         **A. Pop Warner**

6         Pop Warner was founded in 1929.  From its inception, Pop Warner advertised

7   itself as a safety-first organization that created, "sound minds". Plaintiff Separate

8   Statement of Facts ("PSSUF") 1. Pop Warner has advertised that it seeks to develop

9   well-rounded young men and women who learn not only the fundamentals of

10  football…, but also the importance of education in an atmosphere conductive to

11  developing sound mind, body, and character while having a good time along the

12  way!  It is quite telling that Pop Warner's current website has removed the "sound

13  mind" and body.  This is why Pop Warner created the name Pop Warner Little

14  Scholars, Inc.  Unfortunately, these advertisements, and Pop Warner's misleading

15  name could not be further from the truth.

16        As early as 1928 historical records have shown a clear association between

17  repeated blows to the head in sports and pathological changes leading to long term,

18  permanent, life-altering and sometimes neurodegenerative disease. PSSUF 6.

19  Indeed, in 1933, the NCAA published an article entitled Prevention and Care of

20  Athletic  Injuries  Recommendation  for:  Medical  Examination,  Pre-Season

21  Condition, Methods of Training, Diagnosis of Treatment of Injuries.  The NCAA

22  publication stressed that "Head injuries are in a category by themselves and warrant

23  special attention."  The publication stressed the importance of monitoring brain

24  injuries in football, and closely monitoring players who have suffered brain injuries.

25  Moreover, the publication recommended that if a player exhibits symptoms of a

26  concussion for more than forty-eight (48) hours, the player should be held out of

27  competition for twenty-one (21), days. SSUF 48

28        The  American  Academy  of  Pediatrics  ("AAP")  is  an  organization  of

1   pediatrics that is dedicated to the health of children.  Since the 1950's, the AAP has
2   published policies for the participation of children in various sports.  These
3   guidelines set the industry standard of care.

4       By the early 1950's, Joe Tomlin, the founder of Pop Warner football, sought
5   to expand youth football.  To do so, he spoke at the 1953 "Sports for Youth"
6   symposium.  The audience of the symposium included members of the American
7   Medical Association and American Association of Pediatrics.  Tomlin, however,
8   got booed off the stage.  The symposium members voted to ban "kid football" by a
9   43-to-1 vote, with Tomlin as the lone holdout.

10      In 1957, the AAP published its collective, consensus opinion on youth tackle
11  football.  The statement specifically stated that "Body-contact sports, particularly
12  tackle football and boxing, are considered to have no place in programs for
13  children" age twelve (12) and under.  SSUF 23

14      In 1981, the AAP published an article entitled Competitive Athletics for
15  Children of Elementary School Age.  The article stressed that "Young children are
16  not miniature adults; they are boys and girls in the process of maturing into adults."
17  That is why "Unless a school or community can provide proper supervision, medical
18  and educational, it should not undertake a program of competitive sports, especially
19  collision sports, at the preadolescent level ."

20      Pop Warner attempts to recruit players by advertising that its first priority is
21  "the safety of the kids."  To induce parents to allow their children to play tackle
22  football, Pop Warner mandates the use of helmets that "Meets NOCSAE
23  standards."  NOCSAE, however, has never made a youth football helmet standard,
24  never mandated helmets that had ever even been tested for children until after the
25  plaintiffs' deaths. It is well known that "youth" helmet shells are made with ABS
26  plastic, while adult models are made with polycarbonate, which is a more expensive
27  material with different properties than the youth model. In fact, NOCSAE has not
28  made any effort to test whether helmets that meet NOCSAE standards are safe for

children to use. All NOCSAE testing and standards are based on adult anatomy and physiology. Pop Warner, however, never communicated this information to the parents of Pop Warner participants.

Pop Warner went even further and  ignored industry recommendations for implementing safety standards for youth football participation. Pop Warner Little Scholars did not employ anyone with a medical background, athletic training background, or a biomechanical engineering background to ensure the safety of the children playing Pop Warner youth tackle football.  This is because Pop Warner actively encouraged its staff to mislead parents about the safety of youth tackle football. This is true despite the fact that Pop Warner's own experts have referred to football players "as boxers in helmets."

Moreover, Pop Warner did not have any limitations on number of hits a child athlete could sustain in a practice, game, week or season, or a brain injury protocol during the time that Paul Bright and Tyler Cornell played.  Instead, Pop Warner put the diagnosis of serious brain injuries in the hands of untrained volunteer coaches. Pop Warner never trained these coaches to identify injuries nor did they create any hit counts of limits.  Pop Warner delayed implementing a coach education program because it was afraid of losing youth participants, as stated in the deposition testimony of Jon Butler.

**B. Youth Football and Brain Injuries**

Football is a high-impact, collision sport that causes a 100% risk exposure to blunt force trauma of the body, head and brain.  In football the head often initiates contact with blocking and tackling, which produces head injuries.  This is true today, and more so in 1997.  The play of football involves blows to the body and head as part of the play.  In just one game of football, a child may be exposed to tens of blows to the head.  In just one season of football a child may be exposed to hundreds to thousands of blows to the head and body.  Blows to the body and head cause sub-concussive and concussive injuries to the brain including cellular

1   cytoskeletal injuries, microvascular injuries and membrane injuries of the brain.  A

2   child may suffer permanent brain damage only after one season of playing football.

3   The greater the duration and intensity of exposure, the greater the risk of permanent

4   and irreversible brain damage.

5        While football players wear helmets, it is pertinent to note that helmets do

6   not prevent sub-concussive or concussive injuries of the human brain.  In fact, the

7   design of hard-shell helmets increases the risk of suffering from sub-concussive and

8   traumatic brain injuries while playing football.

9        This is especially true for children because of the physiological differences

10  between children and adults. Children are more vulnerable to head, neck, and brain

11  injuries than adults.  The reasons for this additional vulnerability include the fact

12  that children's brains and heads are disproportionately large compared to the rest of

13  the body.  Children also typically have weak necks compared to adults.  The extra

14  size and weight of the head coupled with a child's weaker neck results in less ability

15  to limit the degree to which the head will be subject to rotational forces in a

16  collision. Rotational forces will be greater for a child, proportional to the severity

17  of the impact.  The weight of the helmet adds additional weight to the issues of the

18  head being disproportionately large, and thus, increases the risk of a brain injury to

19  a child.   The myelination mayor development period occurs between ages of ten

20  and twelve, in most children. Exposure to repetitive hits alone increases the chance

21  of disruption of this biological process.

22      **C. Paul Bright**

23      Paul Bright, Jr. was born on July 28, 1990.  He started Pop Warner football

24  in first grade at the age of 7.  He continued to play Pop Warner every year, expect

25  one, until his freshman year of high school.  Paul dreamed of one day making it to

26  the NFL.  He certainly was never the biggest player on the field but played with the

27  biggest heart.  Paul left everything he had on the field every time he played the

28  game.  At seven and eight years old, Paul played nose tackle as the smallest child

1   on his team.

2      After Pop Warner, Paul continued his football career in high school.  As a

3   freshman, however, Paul stood a mere 5-feet-2 and weighed 108 pounds.  Paul was

4   at least a head shorter than the rest of the players on his high school team.  After a

5   year of rarely playing in high school, Paul quit the team.

6      After high school, Paul found a job as a supervisor of a deli in Sherman Oaks.

7   He loved his job and was a hard worker. He worked at the deli until the owners

8   hired him to join their new catering company, Humble Pie.  Paul worked his way

9   up from the bottom of the company to assistant chef. As an adult, he took the passion

10   once had for football and put it into his new goal of owning his own restaurant, just

11   like his maternal grandmother and his aunt once had.

12      Football took a tool on Paul's body. Paul began suffering migraines in middle

13   school. He had pain in his back and knees from middle school until he died.  He

14   would often ask his mother to walk on his back to relieve the pain. He struggled to

15   fall asleep and would often wake up in the middle of the night.

16      Paul also began to lose his ability to manage his emotions.  Normal routine

17   arguments with his parents would escalate to full on meltdowns. For example, Paul

18   would lose control over small things like wanting to take the next upgrade on his

19   mother's cell phone plan.  If he didn't get the next upgrade, he would have a

20   meltdown like a toddler.  This did not seem normal for a twenty-four-year-old.

21      Paul's difficulty managing his emotions lead to erratic behavior.   Paul was

22   cited with reckless driving and driving under the influence on his twenty-first

23   birthday. He later pled to just the reckless driving.  He was cited numerous times

24   for speeding, and repeatedly blew off his court ordered DUI classes.  It took him

25   almost three years to complete the six-two-hour, court ordered DUI classes.  This

26   led to a warrant for his arrest for a failure to comply with a court ordered.

27      Even more troubling, Paul bought a used motorcycle from a guy who was

28   selling the motorcycle because he had fallen off the bike.  Paul bought the

1   motorcycle despite the fact that he never got a motorcycle license and did not have
2   insurance for the motorcycle. Paul, however, was determined to buy the bike so he
3   could fix it himself.  He never told his mother about the motorcycle because she
4   always warned him of the dangers of riding a motorcycle. Paul had no experience
5   with motorcycles as a child or young man.

6       On September 1, 2014, Paul got on his motorcycle to ride home after a shift
7   at work.  Paul was riding his motorcycle between 74-77 mph, in a 35 mph zone, on
8   Sherman Way when a 2004 Acura TSX attempted to turn left in front of him.  Due
9   to Paul's excessive speed, Paul collided with the rear of the vehicle, causing the
10  Acura to rotate approximately 140 degrees. Had been going even 60 mph the car
11  would have had time to pass through the intersection safely.

12      After the accident, Paul was transported to Northridge hospital, where he was
13  pronounced dead.  The cause of death was multiple blunt trauma.

14      Paul's brain was then procured and sent to Boston University for evaluation.
15  Dr. Thor Stein received Paul's full brain and performed an extensive
16  neuropathological workup focused to investigate for recent or remote traumatic
17  injury and/or neurodegenerative disease.  After a thorough examination, Dr. Stein
18  diagnosed Paul with brain damage including a thinned corpus callosum, enlarged
19  ventricle as well as Chronic Traumatic Encephalopathy: Stage 1/IV, and diffuse
20  hypoxic/ischemic injury.

21  **D. Tyler Cornell**

22      Jo Cornell's only child, Tyler Cornell was born on February 18, 1989, the
23  first minute on a new day.  When Tyler was four years old, his family moved from
24  La Crescenta to Carlsbad. Tyler loved the places with magical names like Moonlight
25  beach and Stagecoach Park.  When people would ask Tyler his name, he would
26  proudly respond "my name is Tyler Winston – Ghostbuster.  Tyler had a wonderful
27  imagination.

28      Tyler was also tall, athletic and passionate about team sports.  Tyler started

playing Pop Warner football when he was 8. Tyler was dedicated, disciplined, and driven to succeed both in Pop Warner and in school. Tyler's dedication paid off when he and his team, by virtue of their undefeated season, earned the right to play in Disney Sports Complex in Orlando, Florida for the right to play in the Pop Warner Superbowl.

Tyler excelled in football and was named to the first team San Diego Union Tribune's All-Palomar League squad as an offensive lineman in high school.  By Tyler's senior year, however, his behavior began to change.

There was a time when Tyler removed household mirrors or draped them so he wouldn't have to see himself at all. To this day, Tyler's bedroom mirror remains covered. Tyler suffered from terrible anxiety. To quell that anxiety, he used to rearrange paintings and decorations in his parent's home.  Jo and her husband would go out to dinner, come home, and items would be in completely different places. This was only the beginning of Tyler's instable behavior.

Once, on New Year's Eve, Tyler was getting ready to go out with his close friends.  Something, however, triggered Tyler that night.  He ended up leaving the house at 10:30 p.m. and walking 19 miles from his home, without his cell phone. Tyler finally called his mother from the guardhouse at the front of a gated community to come pick him up.

Tyler graduated high school in 2007, but never bothered to pick up his diploma.  That summer, he began expressing to his parents that he felt depressed.

When Tyler was in college, one of his Pop Warner friends, Richard Caldwell, was in a terrible motor vehicle accident in a residential neighborhood.  The accident left one of Tyler's Pop Warner friends, Charles Amaro, dead.

The news left Tyler deeply upset. When Tyler found out that Richard was convicted of gross vehicular manslaughter and sentenced to over four years in prison, something snapped inside of Tyler. He destroyed his off-campus apartment. After a night in the emergency room, Tyler was taken by ambulance to a San Diego

PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR

1  psychiatric hospital, Sharp Mesa Vista.

2  This began a seven-year period of psychologists, psychiatrists,
3  hospitalizations, meds, misdiagnoses, side effects, and self-medication with
4  marijuana. As Tyler's depression became deeper and more pervasive, it brought
5  him closer to the edge.

6  For seven long years Tyler attempted to treat his symptoms with a number of
7  medical professionals. Tyler was good about staying on his meds. He wanted to
8  get better. His mother knew he took his pills because she watched him like a hawk.
9  Tyler took these pills despite the terrible side effects, like weigh gain, tremors in his
10  fingers, and the occasional twitch of his eye. Despite his treatment, Tyler was still
11  losing control.

12  One day, Tyler impulsively boarded a train and stayed on it for 100 miles,
13  from Solana Beach to Los Angeles. He then paid for a 22-mile cab ride to his
14  grandmother's house in West Covina. That night, at a dinner with family and
15  friends, one of his cousin's friends jokingly says, "F your grandmother," and Tyler
16  snaps and punches him in the face. Tyler fled the scene, and the police could not
17  find him.

18  On another morning, Tyler was set on destroying the interior of his BMW.
19  He pulled out everything he could before driving to a local Bank of American and
20  asking random strangers if they wanted to fight him. One of the strangers called the
21  police, and Tyler left walking to the nearby Vons grocery store. At Vons, Tyler
22  began throwing golf balls in the parking lot. Someone else called the police, so
23  Tyler got into his trashed BMW and drove to a nearby gas station. At the gas station,
24  Tyler removed his shirt and lit it on fire. Later, Tyler told his mother that he stopped
25  short of lighting the car on fire because his late grandfather, Fred, would not have
26  approved. Tyler was arrested and faced a felony charge. Luckily, a judge sentenced
27  Tyler to 30 days of psychiatric residential treatment instead of jail.

28  On the final morning of his life, Tyler and Jo went on a hike above Tyler's

1   elementary school.  As they climbed, Jo told Tyler how much she loved him, and

2   reminded him of all of the family and friends who had his back and held him in their

3   hearts.  Tyler had an appointment with his psychologist that day.  Before he left the

4   house, he told Jo that he loved her.  She responded, "I love you Tyler."

5        Tyler went to his psychologist appointment that day, and even made a follow-

6   up appointment.  One of the songs he heard, upon getting back in his car, was a

7   Christian hymn called "Going Home."  But Tyler didn't drive home.  Instead, he

8   went to his grandmother's home in West Covina, let himself in, and took his own

9   life via a gunshot to his head.  Tyler's struggle was finally over.  He was only

10   twenty-five years old.

11        After his death, cut brain fragments of Tyler's brain were sent to Boston

12   University.  Dr. Thor Stein examined the fragments and diagnosed Tyler with CTE

13   Stage I/IV and diffuse hypoxic/ischemic injury.

14       **III.   LEGAL ARGUMENT**

15          **A. Pop Warner Failed to Carry its Burden**

16        When a defendant moves for summary judgment it "may, but need not,

17   present evidence that conclusively negates an element of the plaintiff's cause of

18   action." *Chavez v. Glock, Inc.*, 207 Cal.App.4th 1283, 1301 (2012).  "As an

19   alternative to the difficult task of negating an element, the defendant may present

20   evidence to 'show that one or more elements of the cause of action…cannot be

21   established' by the plaintiff." *Id*.  "A defendant 'has shown that the plaintiff cannot

22   establish at least one element of the cause of action by showing that the plaintiff

23   *does not posses* needed evidence, because otherwise the plaintiff might be able to

24   establish the elements of the cause of action; the defendant must also show that the

25   plaintiff *cannot reasonably obtain* needed evidence because the plaintiff must be

26   allowed a reasonable opportunity to oppose the motion…'" *Id*, at 1302.  "Only after

27   the defendant's initial burden has been met does the burden shift to the plaintiff to

28   demonstrates, by reference to specific facts…there is a triable issue of material fact

1   as to the cause of action." *Id*.  Defendant failed to meet its initial burden because it

2   has not shown that plaintiff cannot reasonably obtain the needed evidence.

3   Therefore, Defendant's motion must be denied.

**B. The Dangers Caused by Repetitive Brain Injuries/Trauma Were Foreseeable**

6   "In California, the 'general rule' is that people owe a duty of care to avoid

7   causing harm to others and that they are thus usually liable for injuries their

8   negligence inflicts." *Southern California Gas Leak Cases*, 7 Cal.5th 391, 398

9   (2019).  In cases "involving traditionally compensable forms of injury – like

10  physical harm to person or property – we presume the defendant owed the plaintiff

11  a duty of care and then ask whether the circumstances 'justify a departure' from that

12  usual presumption." *Id*.

13  Here, Defendant argues for a departure from the general rule based on lack

14  of foreseeability.  Pop Warner argues that "Knowledge about concussion, sub-

15  concussive impacts and CTE in the years Bright and Cornell played youth football

16  was largely unknown and undocumented." Motion p. 9. Defendant's argument,

17  however, is contradicted by a multitude of historical and medical literature.

18  In evaluating the scope of a duty, the appropriate focus is on the

19  "foreseeability of a harmful event in a general sense." *Robison v. Six Flags Theme*

20  *Parks, Inc*., 64 Cal.App.4th 1294, 1297 (1998). 'As to foreseeability,…the court's

21  task in determining duty is not to decide whether a *particular* plaintiff's injury was

22  reasonably foreseeable in light of a *particular* defendant's conduct, but rather to

23  evaluate more generally whether the category of negligent conduct at issue is

24  sufficiently likely to result in the kind of harm experienced that liability may

25  appropriately be imposed.' *Kesner v. Superior Court*, 1 Cal.5th 1132, 1145 (2016)

26  "For purposes of duty analysis, 'foreseeability is not to be measured by what

27  is more probable than not, but includes whatever is likely enough in the setting of

28  modern life that a reasonably thoughtful person would take account of it in guiding

1   practical conduct.  It is settled that what is required to be foreseeable is the general

2   character of the event or harm…not its precise nature or manner of occurrence."

3   *Kesner v. Superior Court*, 1 Cal.5th at 1146. Additionally, the "determination of the

4   scope of foreseeable perils to children must take into consideration the known

5   propensity of children to intermeddle." *Lawrence v. La Jolla Beach & Tennis*

6   *Club.,Inc.*, 231 Cal.App.4th 11, 24 (2014). In fact, California mandates that 'a

7   greater degree of care us generally owed to children because of their lack of capacity

8   to appreciate risks and to avoid danger.' Id.

9       A reasonably thoughtful person allowing children to play tackle football at

10   the time periods at issue in this case, between 1997-2004, would take into the

11   account the possibility that children could suffer brain damage from repetitive blows

12   to the head. "Football has long been known to result in brain damage of varying

13   severity.   The scientific and clinical historical sources record the association

14   between concussive and subconcussive blows to the head with brain injury as well

15   as the risk of negative, long term neurological effects since the nineteenth century.

16   At that time, medical authorities have observed that repeated blows to the head

17   heighten risks of the associated effects of brain injuries." Indeed, "Since at least the

18   1950s, it has been well recognized that CTE is progressive degenerative disease that

19   results from overall exposure to blunt force trauma to the head, including

20   subconcussive to concussive blows that are routine in collision sports."

21       In 1957, the AAP stated that "Body-contact sports, particularly tackle football

22   and boxing, are considered to have no place in programs for children" age twelve

23   (12) and under.   In 1981, the AAP again stated that "Young children are not

24   miniature adults; they are boys and girls in the process of maturing into adults."

25   That is why "Unless a school or community can provide proper supervision, medical

26   and educational, it should not undertake a program of competitive sports, especially

27   collision sports, at the preadolescent level." In 1997, the AAP stated that it "opposes

28   the sport of boxing" because it "deliberately exposes boxing participants to

1  potentially devastating neurologic and ocular injuries."  The AAP went on to say

2  that "Participants in boxing are at risk for dementia puglistica, a chronic

3  encephalopathy caused by the cumulative effects of multiple subconcussive blows

4  to the head."  The AAP opposed youth boxing despite the fact that "The overall risk

5  of injury in amateur boxing is actually lower than in some other collision sports

6  such as football, rugby, and ice hockey."  SSUF 24-27

7  The AAP publications alone show that the medical and athletic community

8  was well aware of the dangers of subconcussive and concussive hits, brain injuries,

9  and brain damage associated with youth tackle football.  Indeed, the AAP warned

10  that an organization should not allow children to play collision sports unless it

11  provides proper medical supervision.  Pop Warner, however, did not even consult

12  anyone with a medical background when developing its medical portion of its

13  administrative manual, did not employ anyone with a medical background, and did

14  nothing to ensure that it was educated about the tremendous risks associated with

15  allowing children to play tackle football. SSUF 4 This is likely because no medical

16  personnel would ever recommend subjecting a child to hundreds, if not thousands,

17  of subconcussive blows in a single season. SSUF 2,3 Therefore, it was foreseeable

18  that Decedents Paul Bright and Tyler Cornell would suffer brain damage and/or

19  brain injuries while playing Pop Warner football.  See also *Onyshko v. NCAA*, No.

20  C-63-CV-201403620 (Wash. Cty. Ct. Comm. Pleas, PA).  (Finding that there were

21  triable issues of fact as to whether concussive and sub-concussive blows to the head

22  sustained while playing collegiate football caused the plaintiff, who played NCAA

23  football from 1999 to 2003, to develop ALS.

24  **C. Triable Issues of Fact For Causation**

25  General causation means "whether the substance at issue had the capacity to

26  cause the harm alleged." *In re Hanford Nuclear Reservation Litig,*, 292 F.3d 1124,

27  1133 (9th Cir. 2002)  In this case, general causation would ask the question, whether

28  repetitive blows to the head can cause brain injury/trauma and CTE.

1    Football has long been known to result in brain damage of varying severity.

2    CTE is a permanent and progressive neurodegenerative brain disease and brain

3    damage. Exposure to blunt force trauma of the brain is the most significant causal

4    risk factor for CTE including repetitive blunt force trauma. In just one game of

5    football a child may be exposed to tens of blows to the head. The greater the

6    duration and intensity of exposure the greater the risk of permanent and irreversible

7    brain damage, including CTE.

8    Pop Warner argues that CTE's "correlation with football has not been proven

9    scientifically." Motion p. 10. This argument is contrary to sworn testimony

10    provided by the National Football League, and admissions by Pop Warner's own

11    expert Julian Bailes. Indeed, "the NFL's Executive Vice President [has] cited the

12    research of Dr. McKee and agreed that there was a link between football and

13    degenerative brain disorders like CTE." *In re National Football League Players*

14    *Concussion Injury Litigation*, 821 F.3d 410, 443 (3rd Cir. 2016). "The sheer

15    number of deceased players with a post-mortem diagnosis of CTE supports the

16    unavoidable conclusion that there is a relationship, if not causal connection,

17    between a life in football and CTE." *Id*.

18    Furthermore, Dr. Bailes admitted in his deposition "CTE changes in the brain

19    can, in fact, be found in younger players." SSUF 49 Dr. Bailes also admitted that he

20    previously gave a quote stating that "you are a kid and you sign up to play football.

21    You realize that you can blow out your knee and you can even break your neck and

22    become paralyzed. These are known risks, but you don't sign up to become a brain

23    damaged young adult." SSUF 15 Dr. Bailes also testified that the only known cause

24    of CTE is "repetitive cranial impact." SSUF 45 Dr. Bailes also testified that the

25    "best predictor [of CTE] we have is probably exposure." He went onto agree that

26    "the numbers of head impacts are one of the main criteria to exposure." SSUF 50

27    Therefore, Plaintiffs can show, at minimum, a triable issue of fact as to general

28    causation.

1           **D. Specific Causation**

2           'Legal causation is generally a question of fact to be determined by the

3    jury…unless, as a matter of law, the facts admit of only one conclusion.' *Whiteley*

4    *v. Philip Morris Inc.*, 227 Cal.App. 4th 635, 694 (2004).  Specific causation refers

5    to whether a thing can cause the specific injury.  Here, Defendant essentially argue

6    that CTE was not a substantial contributing factor in the deaths of Paul Bright and

7    Tyler Cornell.   Defendant's argument, however, is contradicted by the expert

8    testimony of Dr. James Merikangas and Dr. Bennet Omalu.

9           The 9th Circuit mandates that "Rule 702 should be applied with a 'liberal

10   thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232

11   citing *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1196 (9th Cir.

12   2014).   "Under Ninth Circuit caselaw, doctors enjoy wide latitude in how they

13   practice their art when offering causation opinions."   *In re Roundup Products*

14   *Liability Litigation*, 358 F.Supp.3d 956, 960 (N.D. Cal. 2019).   Indeed, the Ninth

15   Circuit "consistently recognize(s) the difficulties in establishing certainty in the

16   medical sciences." *Messick v. Noravtis Pharmaceuticals Corp*, 747 F.3d at 1197-

17   98. ; See also *Wendell v. GlaxoSmithKline LLC*, 858 F.3d at 1237 ('The first several

18   victims of a new toxic tort should not be barred from having their day in court

19   simply because the medical literature, which will eventually show the connection

20   between the victims' condition and the toxic substance has not yet been

21   completed.').   Therefore, it is not necessary that "an expert be able to identify the

22   sole cause of a medical condition in order for his or her testimony to be reliable.  It

23   is enough that a medical condition be a substantial causative factor." *Id*, at 1199.

24          The relevancy of an expert opinion is governed by California law. *Messick v.*

25   *Novartis Pharmaceuticals Corp.*, 747 F.3d at 1196-97. "California has adopted the

26   'substantial factor' test for cause-in-fact determinations." *Lawrence v. La Jolla*

27   *Beach & Tennis Club, Inc.*, 231 Cal.App.4th at 33. Under the substantial factors

28   test, a "defendant's negligent conduct may combine with another factor to cause

1    harm; if a defendant's negligence was a substantial factor in causing the plaintiff's

2    harm, then the defendant is responsible for the harm; a defendant cannot avoid

3    responsibility just because some other person, condition, or event was also a

4    substantial factor in causing the plaintiff's harm; but conduct is not a substantial

5    factor in causing harm if the same harm would have occurred without that conduct."

6    *Id*. 'Like breach of duty, causation also is also is ordinarily a question of fact which

7    cannot be resolved by summary judgment." Id.

8         "Under the applicable substantial factor test, it is not necessary for a plaintiff

9    to establish the negligence of the defendant as the proximate cause of injury with

10   absolute certainty so as to *exclude every other possible cause of a plaintiff's*

11   illness…" *Cooper v. Takeda Pharmaceuticals America, Inc.*, 239 Cal.App.4th 555,

12   578 (2015); See also *Johnson & Johnson Talcum Powder Cases*, 37 Cal.App.5th

13   292, 328 (2019). (internal quotes omitted). ('California has rejected the notion that

14   an expert must exclude all possibilities in reaching a specific causation opinion.

15   Bare conceivability of another possible cause does not defeat a claim; the relevant

16   question is whether there is substantial evidence of an alternative explanation for

17   the disease.') "A substantial factor in causing harm is a factor that a reasonable

18   person would consider to have contributed to the harm." *Id*, at 595.

19        Defendant contends that Plaintiffs cannot prove specific causation because

20   the medical records do not "support the conclusion that each had 'autopsy proven

21   Chronic Traumatic Encephalopathy (CTE) as a result of repetitive head trauma."

22   Motion p. 14.   This statement, however, is directly contradicted by the expert

23   opinions offered in this case, and the medical community at large.

24        CTE is a permanent and progressive neurodegenerative brain disease and

25   brain damage.  The only known cause of CTE is repetitive hits to the head.  In every

26   game of football, a child suffers multiple blows to the head, sometimes over fifty

27   blows per game.  Over the years, a child who plays football suffers hundreds to

28   thousands of blows to the head.  The effects of the repetitive blows are cumulative.

1  This means that each and every blow to the head contributes to the eventual brain
2  damage outcomes until a player reaches the threshold to develop CTE.  Each blow
3  is a substantial factors to eventual brain damage.

4      Children who play football suffer subconcussive hits and concussive hits to
5  the head, which cause subconcussive and concussive injuries of the brain.  A
6  subconcussion injury of the brain is brain damage.

7      Brain damage manifests as a broad spectrum of symptoms, disorders and
8  diseases. Symptoms of brain damage may begin to manifest over a wide spectrum
9  of temporal symptomatology.  Symptoms may begin to manifest immediately
10  during the exposure, remain permanent and progressive and worsen over time.  CTE
11  manifests with five major categories of symptoms, viz: mood disorders, behavioral
12  disorders, cognitive disorders, motor disorders and other somatic symptoms.  The
13  mood disorders may include, but are not limited to depression and anxiety disorders,
14  bipolar disorders, parasuicides and suicides among others.  The behavior disorders
15  may include impulsivity, poor judgment, criminality, recklessness, alcohol and drug
16  abuse, and other irrational high-risk behaviors.  Suffers of CTE have a significantly
17  increased risk of earlier death from violent causes and from self-destructive and
18  self-harm behaviors and suicides.

19      Plaintiffs have retained Dr. James Merikangas, Dr. Brent Harris, and Dr.
20  Bennet Omalu to testify as to specific causation.  Dr. Brent Harris reviewed Paul
21  and Tyler's Neuropathological reports from Boston Univeristy. Dr. Brent Harris
22  opined that "there is sufficient diagnostic evidence to support early chronic
23  traumatic encephalopathy as a neuropathological diagnosis for both" Paul and
24  Tyler's cases.

25      Dr. Merikangas is a medical doctor trained and Board Certified in both
26  Neurology and Psychiatry. Dr. Merikangas has over 45 years of experience treating
27  patients with mental illness and diseases and conditions affecting the nervous
28  system. PSSUF 6-10; 51-52

1     Dr. Merikangas and Dr. Omalu will offer opinions, to a reasonable degree of

2    medical certainty, that brain damage including CTE resulting from head trauma

3    playing Pop Warner football was a substantial contributing factor to the deaths of

4    Paul Bright and Tyler Cornell.[1]  Dr. Merikangas and Dr. Omalu will also opine that

5    each and every blow that a child suffers is a substantial factor in causing a

6    participant to develop brain damage and CTE.  See *Davis v. Honeywell Internat.*

7    *Inc.*, 245 Cal.App.4th 477, 487 (2016) ("it is not illogical to conclude that each

8    exposure – even a low dose exposure – when added to other exposures (including

9    other low exposures) could result in a cumulative exposure that is above the

10    threshold level, giving rise to the risk of developing mesothelioma.").

### E. Defendant's reliance on *McCullough* is misguided

12     Defendant also argues that "there is no basis to conclude that playing Pop

13    Warner Football was a substantial factor in the deaths of Cornell or Bright and no

14    basis to conclude that Pop Warner Football, to the exclusion of high school football,

15    other experiences, and social or biological factors was a substantial factor."  Motion

16    p. 15.  In support of this argument, Pop Warner cites *McCullough v. World Wide*

17    *Wrestling Entertainment, Inc.*, a District Court of Connecticut opinion.  Defendant

18    contends that *McCullough* is a "similar action," that was dismissed by the court for

19    "lack of a plausible causal connection" between the claimants' death and CTE.  In

20    *McCullough*, however, none of the claimants had a diagnosis of CTE.  Moreover,

21    the claimants made no effort to allege how their respective deaths were caused by

22    CTE.  7, 19.  Here, in contrast to *McCullough*, both Paul Bright and Tyler Cornell

23    had their brains, and confirmed diagnoses of CTE by Boston University.  Moreover,

24    Plaintiffs' experts have linked the manner of the Tyler and Paul's deaths with

25    symptoms associated with CTE.  Thus, Pop Warner's reliance on *McCullough* is

---

[1] Dr. Merikangas' opinion that Tyler suffered from a traumatic brain injury ("TBI") is supported by Defendant's own expert William Barr, who testified that the signs Tyler was exhibiting, would be similar to signs exhibited by someone who suffers from a TBI.

1  misplaced.

2  **F.  Delayed Discovery**

3      Pop Warner once again argues that Jo Cornell's claims are time barred.  This

4  argument has already been rejected by the Court.  See Dkt. 107.  Indeed, Plaintiffs

5  did not have any reason to suspect any injuries until they both received the brain

6  studies from Boston University.  The California discovery rule "postpones accrual

7  of a cause of action until the plaintiff discovers, or has reason to discover the cause

8  of action."  *Nogart v. Upjohn Co.*, 21 Cal.4th 383, 397 (1999); See also *Neel v.*

9  *Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 179 (1971); *Hendrix v.*

10 *Novartis Pharm. Corp.*, 975 F.Supp 2d 1100, 1107 (C.D.Cal. 2013), aff'd, 647

11 F.App'x 749 (9th Cir. 2016) [The discovery rule does not trigger accrual of a cause

12 of action unless the plaintiff has some reason to suspect wrongdoing; that is, when

13 a plaintiff, through reasonably diligent investigation, discovers only that he has been

14 injured, but not that the injury may have a wrongful cause, then the clock has not

15 yet begun to run.]

16     Tyler Cornell died on April 3, 2014.  After his death, Jo Cornell sent his brain

17 off for study – an act of diligence in ascertaining the cause of his suicide. Between

18 the time of Tyler's death and January 16, 2015, Boston University conducted a

19 thorough study of Tyler's brain which revealed that Tyler Cornell suffered from

20 CTE.  Jo Cornell used reasonable diligence in sending Tyler's brain to Boston

21 University to determine if Tyler suffered from CTE.  The results of the study were

22 not made available to Jo Cornell until January 16, 2015, when Jo Cornell discovered

23 that her son suffered from CTE.  Jo Cornell had no reason to suspect that Tyler

24 suffered from brain disease prior to death because CTE can only be diagnosed

25 posthumously. This is especially true because the LA county autopsy did not

26 performing any brain staining to determine if Tyler had CTE.   Therefore,

27 considering the light most favorable to Plaintiff, Jo Cornell is entitled to the benefit

28 of delayed discovery.  See *Onyshko v. NCAA* (holding that the discovery rule

PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR

1 precluded tolled the statute because "no medical provider had suggested that it was

2 possible that his medical condition was linked to playing collegiate football.").

3     Moreover, Paul Bright died on September 1, 2014. Kimberly Archie sent

4 Paul's brain to Boston University. Kimberly Archie did not receive the report until

5 April 9, 2015. Like Jo Cornell, Kimberly Archie did not have any reason to suspect

6 that Paul suffered from CTE until she received the results of the Boston University

7 Neuropathological exam. Therefore, none of the Plaintiffs' claims are time barred.

8 **IV.  CONCLUSION**

9     Pop Warner actively encouraged its employees to misrepresent the safety of

10 youth football. Pop Warner did so because it recognized that if it warned about the

11 risks of youth tackle football, parents would not allow their children to play. This

12 is evident by the fact that Pop Warner participation is now down approximately

13 30%. Pop Warner has caused harmed to millions of children across the United

14 States. This Court should not condone Pop Warner's conduct.

15

16

17 Dated: December 2, 2019     **ABIR COHEN TREYZON SALO, LLP**

18

19     By:   /s/ Joseph Finnerty

20         Joseph Finnerty
        Attorneys for Plaintiff

21         KIMBERLY ARCHIE, ET AL.

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR

**<u>CERTIFICATE OF SERVICE</u>**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

     At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California. My business address is 1901 Ave. of the Stars, Suite 935, Los Angeles, CA 90017-3012.

     On December 2, 2019, I served true copies of the following document(s) described as

     **1: PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC.'S MOTION FOR SUMMARY JUDGMENT.**
     **2: DECLARATION OF KIMBERLY ARCHIE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **3: DECLARATION OF JO CORNELL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **4: DECLARATION OF DR. RICHARD STALNAKER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **5: DECLARATION OF DR JAMES MERIKANGAS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **6: DECLARATION OF NATHAN ROSE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **7: DECLARATION OF BRENT HARRIS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **8: DECLARATION OF TIFFANI BRIGHT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **9: DECLARATION OF STEPHEN CASPER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **10: DECLARATION OF DR. MADELEINE SWORTWOOD IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **11: DECLARATION OF BRENT OMALU IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **12: DECLARATION OF JOSEPH FINNERTY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS, INC'S MOTION FOR SUMMARY JUDGMENT.**
     **13: DECLARATION of ENRICO ESPOSITO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT POP WARNER LITTLE SCHOLARS' MOTION FOR SUMMARY JUDGMENT.**

1       **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 2, 2019, at Los Angeles, California.


/s/ Shayan Sabeti
Shayan Sabeti