1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5    KIMBERLY ARCHIE, et al.,              )
                                           )
6                    Plaintiffs,           ) CASE NO.
                                           ) 2:16-CV-06603-PSG
7         vs.                              )
                                           )
8    POP WARNER LITTLE SCHOLARS, INC.; a   )
     nonprofit corporation; and DOES      )
9    1-50, inclusive,                      )
                                           )
10                   Defendants.           )
     _____)
11

12

13

14

               REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                  MONDAY, DECEMBER 23, 2019
16
                        1:37 P.M.
17
                  LOS ANGELES, CALIFORNIA
18

19

20

21

22   _____

23            MAREA WOOLRICH, CSR 12698, CCRR
              FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, SUITE 4311
             LOS ANGELES, CALIFORNIA 90012
25               mareawoolrich@aol.com

                    UNITED STATES DISTRICT COURT

1                          **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFFS:**

4        Law Offices of Robert Finnerty
         By:  Robert Finnerty
5        Joseph Finnerty
         16001 Ventura Boulevard, Suite 200
6        Encino, CA 91436

7        Abir Cohen Treyzon Salo LLP
         By:  Michael Kelly
8        16001 Ventura Boulevard, Suite 200
         Encino, CA 91436

9

10   **FOR DEFENDANT:**

11       Lewis Brisbois Bisgaard & Smith LLP
         By:  Hellar-Ann Hancock
12       633 West 5th Street, Suite 4000
         Los Angeles, CA 90071
13
         Wilson Elser Moskowitz Edelman & Dicker LLP
14       By:  Anthony Corleto
         1010 Washington Boulevard
15       Stanford, CT 06901

16       Wilson Elser Moskowitz Edelman & Dicker LLP
         By:  Ian Stewart
17       555 South Flower Street, Suite 2900
         Los Angeles, CA 90071
18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                 LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 23, 2019

 2                               1:37 P.M.

 3                                -oOo-

 4

 5            THE CLERK:  Calling Item No. 3, Case Number

 6    CV 16-6603, Kimberly Archie, et al. versus Pop Warner Little

 7    Scholars Incorporated, et al.

 8            Counsel, please state your appearance.

 9            MR. BOB FINNERTY:  Good afternoon, Your Honor.

10    Bob Finnerty for the plaintiffs.

11            MR. JOSEPH FINNERTY:  Good afternoon, Your Honor.

12    Joseph Finnerty for the plaintiffs.

13            MR. KELLY:  Good afternoon, Your Honor.  Michael

14    Kelly for the plaintiffs.

15            THE COURT:  Good afternoon.

16            MS. HANCOCK:  Good afternoon, Your Honor.

17    Hellar-Ann Hancock, Lewis Brisbois, on behalf of the defendant.

18            MR. CORLETO:  Good afternoon, Your Honor.  Tony

19    Corleto from Wilson Elser on behalf of the defendant.

20            MR. STEWART:  Good afternoon.  Ian Stewart on behalf

21    of the defendant.

22            THE COURT:  Good afternoon.

23            I'd like to hear first from the moving defendants at

24    the lectern, please.

25            MR. CORLETO:  Sure, Your Honor.  Which one are we
```

1    proceeding with?  We have a number of *Daubert* motions on and a

2    motion for summary judgment.

3            THE COURT:  All I want to discuss today is the

4    motion for summary judgment, specifically the issue of

5    causation, and then experts as they relate to the issue of

6    causation.  And then once we address that issue, then I'll

7    leave a few minutes to discuss anything else that the parties

8    want to bring to my attention.

9            But so what I would like to discuss preliminarily

10   and most thoroughly is the issue of causation, general and

11   specific, and then the experts relating to causation.

12           MR. CORLETO:  Sure, Your Honor.  Thank you.

13           In a nutshell, Your Honor, there is nothing to prove

14   causation.  The case is based on a generalized notion that, if

15   you play youth football, you are going to suffer some form of

16   trauma, head trauma, and it's going to cause something known as

17   CTE which is going to lead to some degenerative process.

18           And in this case, the claim is that it caused one

19   young man to die in a motorcycle accident and another to shoot

20   himself.  What we are talking about here are two unfortunate

21   deaths, a young man who dies in a motorcycle accident and one

22   who dies from a self-inflicted gunshot wound.

23           The link that they've got to anything at all are

24   post-mortem autopsies done at Boston University which show

25   after a very vigorous search in pathology traces of

1   phosphorylated tau protein which are characterized at Boston

2   University as Phase 1 CT or Stage 1 CTE, chronic traumatic

3   encephalopathy.

4           And there's two clinical reports.  The clinical

5   report for Paul Bright Jr., the young man who dies in a

6   motorcycle accident, simply says that generalized anxiety

7   disorder caused his death.  In other words, they are not

8   playing into the notion that chronic traumatic encephalopathy

9   drove him to some abnormal behavior which put him in the

10  motorcycle accident.

11          The clinical report for Craig Cornell -- Tyler

12  Cornell states that he had some psycho-affective disorder.  He

13  was bipolar and that caused his death.  They said that CTE and

14  I forget if it was generalized anxiety disorder or some other

15  disorder in his case may have been contributing factors.

16          And that's where they come up with the notion that

17  playing four years of Pop Warner football caused this finding

18  in the brains of these two young men.  And the claim is that

19  somehow to the exclusion of anything else that happened in

20  their lives, 10 years later, 15 years later, one dies in a

21  motorcycle accident and the other shoots himself.

22          THE COURT:  All right.  Anything with regard to the

23  experts as they relate to causation?

24          MR. CORLETO:  Sure, Your Honor.  We can cut right to

25  the chase.  The neuropathologist that the plaintiffs retained,

1   Brent Harris, says quite clearly and distinctly, and we've got

2   this in our statement of uncontested facts, that you cannot tie

3   a finding of CTE to any particular activity in either young

4   man's life.  And I can find that for you if you just give me

5   one second.  So --

6            THE COURT:  I think at some point in the papers

7   there's no reason to believe that Bright's death was nothing

8   but an accident.

9            MR. CORLETO:  Correct, Your Honor.

10           THE COURT:  And he cannot opine whether CTE was a

11  cause.

12           MR. CORLETO:  That's correct, Your Honor.

13           And the same with respect to Tyler Cornell.  He

14  can't opine that CTE caused him to shoot himself some ten or so

15  years after he last played youth football.

16           THE COURT:  All right.  Let me hear from plaintiffs

17  on causation and the experts related to causation, and then

18  I'll get back.

19           MR. BOB FINNERTY:  Thanks, Your Honor.

20           It's interesting that the defendants rely upon

21  Harris as their one expert to negate causation when, in fact,

22  Harris states in his declaration and his reports that he was

23  not asked to opine on that.  He is simply the neuropathologist.

24  He's offered up to show that these two young men suffered from

25  CTE.

```
 1              CTE happens only as a result of repetitive trauma to

 2    the brain.  We've offered plenty of evidence to indicate that

 3    by participating in Pop Warner football, these young men did,

 4    in fact, suffer repetitive trauma to the brain simply by

 5    participation.

 6              The defendants want to --

 7              THE COURT:  That would relate to the general

 8    causation.  Now let's talk about specific.

 9              MR. BOB FINNERTY:  Well, specific causation we've

10    offered up Dr. Merikangas who is more than qualified.  He's

11    testified in hundreds of trials with respect to the emotional

12    results of various traumas to the brain.  And he's indicated

13    that, in fact, these types of traumas will result in neurologic

14    changes which will result in erratic or reckless behavior

15    including suicidal behavior.

16              So the defendants haven't done anything to meet

17    their burden of doing away with any of our causes of action.

18    All they've offered up is, hey, football is a relatively

19    safe --

20              THE COURT:  Isn't Merikangas just basically saying

21    the general principle that repetitive head trauma can cause

22    CTE, but he doesn't really focus on these individual plaintiffs

23    in any meaningful and reliable way, does he?  He doesn't talk

24    about any specific documentation as it to relates to either

25    plaintiff.  He has no information that, in fact, other than the
```

general statement that people that play Pop Warner football
have repetitive trauma.  He doesn't opine that this is somehow
tied into football.  He just speaks generally.  Am I mistaken?

And then he doesn't even consider any other
possible -- not that he only has to identify the only one.  He
doesn't have to do that.  But he doesn't even address the
possibility -- the -- any probability that the CTE or the -- I
should be more specific.  That either the motorcycle accident
or the suicide is a substantial factor in this particular case,
does he?

MR. BOB FINNERTY:  I think, in fact, he does,
Your Honor.  The defendants --

THE COURT:  Did he examine -- did he -- does he
know whether or not these specific plaintiffs had trauma during
Pop Warner football?

MR. BOB FINNERTY:  He referred to reports that
indicated all participants have trauma.

THE COURT:  What about these participants?  I mean,
what happens if they just sat on the sideline for four years?
Is there -- in fact, I think the parents testified that there
was never head trauma or visible head trauma as it relates to
these plaintiffs.

So how does it go from all -- that, I think, gets
you past general but what about specific?  He doesn't have any
information that these specific plaintiffs had any head trauma

1    in Pop Warner football for four years.  And then he doesn't

2    address the fact that one of the -- Mr. Bright, for example,

3    played football in high school, that he played wrestling in

4    high school, that he played basketball in high school.

5             How do you tie the CTE into somebody acting whatever

6    recklessly means on a motorcycle for a 24-year old to be

7    speeding?  I'm not following the specific causation.

8             MR. BOB FINNERTY:  Maybe you are not following it

9    because you are doing exactly what the defendants would like

10   you to do, and you are lumping in a lot of general ideas and

11   not focusing on what's happened.

12            THE COURT:  I am focusing on Merikangas.  He focuses

13   on CTE and makes a general -- that since everybody -- it's sort

14   of the asbestos argument but asbestos doesn't apply here.  That

15   everybody who plays youth football has had head trauma and that

16   head trauma can lead to all these things ten years later.  But

17   he doesn't consider -- he just deals with it generally.

18   There's no tying to these specific plaintiffs, is there?

19            MR. BOB FINNERTY:  Bear with me for a second,

20   Your Honor, because the very other activities that the defense

21   is suggesting could have, in fact, caused these deaths are

22   other sports which involve head trauma.  So they are not --

23   they are saying, hey, look, they participated in other things

24   in life.  Karate.  What is the result of participating in

25   karate potentially with respect to the relevance of our case?

1    It would be head trauma.

2            THE COURT:  Okay.  Then exclude head trauma.  Just

3    reckless behavior among 24-year-old males.

4            MR. BOB FINNERTY:  Well, Dr. Merikangas focuses on

5    it and says there is a high incidence of suicide in young

6    males, but --

7            THE COURT:  In the population generally; right?

8            MR. BOB FINNERTY:  Of course.  But they are talking

9    substantial factors.  So you add to that the repetitive head

10   trauma and the study after study that indicates that repetitive

11   head trauma can result in erratic behavior and suicidal

12   behavior.  So --

13           THE COURT:  The research doesn't deal with Stage 1

14   though, does it?

15           MR. BOB FINNERTY:  The research doesn't deal with

16   any of the stages.  The research says if you have CTE, it is

17   evidence of repeated head trauma.  You are not limited to the

18   stage directing what your behavior is.

19           It's much like when you get cancer.  The fact that

20   you have Stage 1 cancer is no different than Stage 4 except

21   potentially the ultimate outcome, you still have cancer.

22           These young men had brain trauma.  They had

23   behavioral changes as a result of that brain trauma.  And all

24   the defense has done is stood up and said, well, maybe they had

25   other things that contributed to this and they were the cause.

1  We are saying it doesn't matter and the Court was right.  We

2  are only here for a substantial factor.  We only need a

3  scintilla of evidence to tie that in.

4        THE COURT:  A scintilla, is it a reasonable --

5  doesn't it have to be reasonable?

6        MR. BOB FINNERTY:  The Court cited a substantial

7  factor.  In California, a substantial factor is a scintilla of

8  evidence.

9        So we are we are saying, yes, we agree that these

10  young men's life experience in participating in collision

11  sports did contribute to the cellular and molecular changes

12  which resulted in their erratic behavior.

13        And the defense hasn't offered any reliable evidence

14  to negate those claims.  They haven't offered one expert to say

15  anything other than, yes, they both had CTE and, yes, CTE is,

16  in fact, the result of repetitive trauma.  They tried to negate

17  that through our neuropathologist who says, well, I didn't look

18  into their clinical backgrounds.  But Dr. Merikangas did, and

19  Dr. Merikangas said that their deaths were, in fact, consistent

20  with their exposures and traumas in participating --

21        THE COURT:  So what you are saying if you play youth

22  football, that -- and you have CTE, that's basically a

23  substantial factor with anything that goes wrong with your

24  life?

25        MR. BOB FINNERTY:  It's certainly a substantial

1    factor if you commit suicide.

2              THE COURT:  When you are 24 or 25?

3              MR. BOB FINNERTY:  Of course.  The studies are

4    clear.  There's not one study that negates that.

5              THE COURT:  There's no studies; right?

6              MR. BOB FINNERTY:  Dr. Omalu referred to how many

7    studies in his report that indicates that the changes that

8    occur in your brain are consistent with behavioral changes that

9    result in reckless, erratic and suicidal behavior.

10             THE COURT:  And it couldn't be related to bipolar

11   disorder or other genetic factors?

12             MR. BOB FINNERTY:  It could be, but we are talking

13   substantial factor here.  We are talking it's another additive

14   effect.  It's much like the person who smokes and then gets

15   exposed to another human carcinogen.  It doesn't negate it.  It

16   adds to it.

17             THE COURT:  It's not substantial if the same harm

18   would have occurred without that conduct, that there's no

19   reasonable -- there's no room for reasonable differences of

20   opinion, that there has to be a reasonable probability as to a

21   medical certainty that there's -- that the mere possibility is

22   not -- is insufficient?

23             MR. BOB FINNERTY:  We haven't argued anything about

24   mere possibility.  The evidence that we've offered has

25   indicated to a reasonable degree of medical probability.  You

UNITED STATES DISTRICT COURT

1    don't rule out -- what we are talking about is additive

2    features that result that are a substantial factor, not

3    necessarily the factor.  It doesn't have be to the leading

4    factor.

5              THE COURT:  You are right.  It doesn't have to be

6    the factor.  Just a substantial factor.

7              MR. BOB FINNERTY:  A scintilla of evidence in that

8    regard.

9              THE COURT:  All right.

10             MR. BOB FINNERTY:  I'm still curious.  With respect

11   to the Court's concerns, I have not heard an expert negate

12   plaintiffs' claims yet.

13             THE COURT:  First you have to find those experts to

14   be reliable, don't you?

15             MR. BOB FINNERTY:  Their experts.

16             THE COURT:  Your experts.

17             MR. BOB FINNERTY:  Their experts have to negate --

18             THE COURT:  Your expert has to be reliable.

19             MR. BOB FINNERTY:  They have to proffer --

20             THE COURT:  I'm the gatekeeper.  Doesn't each expert

21   have to be reliable in their opinions?

22             MR. BOB FINNERTY:  Your Honor, we are talking about

23   the motion for summary judgment.  They have to negate a cause

24   of action.

25             THE COURT:  Right.  But if they say there's no

1    evidence because the experts aren't reliable.

2              MR. BOB FINNERTY:  Well, then they have to have

3    those hearings.  Have they had those hearings yet?

4              THE COURT:  Okay.

5              MR. BOB FINNERTY:  We are prepared -- we would

6    welcome the opportunity to put those experts on the stand and

7    have the Court determine for its own the reliability of those

8    experts.

9              But to come in and say, oh, CTE is a new phenomenon,

10   well, we are not necessarily talking about only CTE.  We are

11   talking about repetitive brain trauma that results in

12   behavioral changes.

13             THE COURT:  Is there any evidence in this case of

14   repetitive brain trauma?  There's no evidence of repetitive

15   brain trauma other than to say all kids that played Pop Warner

16   football have repetitive brain trauma.

17             MR. BOB FINNERTY:  We offered a declaration that

18   indicates that any child playing Pop Warner football --

19             THE COURT:  We are repeating the same thing.  Any

20   child.  So any child that plays Pop Warner football has --

21             MR. BOB FINNERTY:  Paul Bright was a nose guard.

22   His job was to headbutt the guy immediately opposite him for an

23   entire game of football which he did all through his Pop Warner

24   years.

25             Tyler was a star on his team that went to the state

1    and ultimate Superbowl of Pop Warner.  He too was a big hitter.

2              There's no doubt that these young men, as every

3    individual participating in Pop Warner, sustained some level of

4    trauma to the head in every game.  And they practice five days

5    a week.  There's nothing to negate that.  We've offered expert

6    testimony indicating that they hit heads a hundred to a

7    thousand times a week participating in football.

8              I mean, I don't understand how you would not

9    understand the concept of all you have to do is repetitive

10   injury results in ultimate changes which result in behavioral

11   changes leading to reckless and suicidal behavior.

12             THE COURT:  Okay.

13             MR. BOB FINNERTY:  It's pretty straightforward.

14             THE COURT:  Okay.

15             MR. CORLETO:  May I, Your Honor?

16             THE COURT:  Sure.

17             MR. CORLETO:  Thank you.

18             Your Honor, with all due respect, counsel has it

19   backwards.  It's his burden to show he has a case.  And the

20   scintilla that he's hoping the Court pays attention to really

21   is even less than that.  The defense can't prove a negative.

22   That's what he's asking us to do, and that's simply not the

23   standard.

24             So let's look at some of the things we just talked

25   about.  Dr. Merikangas, the neuropsychiatrist, says very

1  specifically in his deposition -- this is at page 58 of his

2  deposition.  I asked him the question:

3          "You have no specific basis to say that Tyler

4  Cornell suffered head trauma playing Pop Warner?

5          "ANSWER:  I do not."

6          That goes right to the question Your Honor was

7  asking, specific causation.

8          On page 59, line 1:

9          "You have no specific basis to say that Paul Bright

10  Jr. suffered head trauma playing Pop Warner football?

11          "ANSWER:  I do not."

12          So right there Dr. Merikangas gives us specific

13  causation.  He's got no basis to say that either young man

14  suffered head trauma playing Pop Warner football.  He hasn't

15  looked at it, hasn't studied it.  He's feeding into some

16  generalized notion that really has no basis here or

17  applicability.

18          He also gives up that he hasn't examined or

19  considered alternative causes for that behavior on the same

20  page.

21          "Have you examined and considered alternative causes

22  for the behavior that led to the death of these two young men?"

23          That's line 11.

24          Line 14:

25          "ANSWER:  No, not specifically.  We know that one

1    person suffered from diagnosed bipolar disorder and the other

2    one I'm not sure."

3              Line 17:

4              "QUESTION:  Have you eliminated other causes for the

5    behavior that led to the death of these two young men?

6              "ANSWER:  No."

7              So Dr. Merikangas does not establish specific

8    causation.  In fact, he goes quite the opposite.  He gives it

9    up.  He says he's got no basis for a specific causation.

10             Dr. Omalu really doesn't do a heck of a lot.

11   Dr. Omalu talks about his theories of CTE, and he's generally

12   credited as the pathologist that associated chronic traumatic

13   encephalopathy with football players.  And he first did that in

14   2002 when he autopsied the brain of Mike Webster, the former

15   Pittsburgh Steeler.  That study was published sometime around

16   2005.

17             These young men played Pop Warner football between

18   1997 and '02 or '04.  So if we are going to talk about, okay,

19   there's some generalized thought that this thing we identify as

20   CTE has some association with football at some level of

21   football, that generalized notion doesn't appear on the horizon

22   until after these two young men are done playing Pop Warner

23   football.  So it doesn't even feed into what a standard of care

24   should have been relative to this thing that they hang their

25   scintilla on.

 1           Dr. Omalu only addressed Paul Bright Jr.  And one

 2    has to question why is he only addressing Paul Bright Jr.?

 3    Well, the reason is very simple.  If you look back at the

 4    reports from Boston University, which each of our experts

 5    looked at, the report for Paul Bright Jr., the clinical report

 6    by Dr. Jesse Mez doesn't say anything about CTE as a factor in

 7    the death of Paul Bright Jr.  So they need Dr. Omalu after the

 8    fact, after expert disclosure is done, after these motions are

 9    all teed up to come in and say something.

10           And all Dr. Omalu does is parrot what he has said

11    everywhere else with respect to his findings of CTE in

12    Mike Webster's brain, the studies he's done since then, and

13    repeats the pathology from Boston University.

14           And he draws the general conclusion that, of course,

15    these men played Pop Warner football, of course they banged

16    their heads, of course they had trauma, of course they got CTE,

17    and of course the CTE led to him dying in a motorcycle accident

18    some ten years or so after he last played Pop Warner football.

19           The fact is that Kimberly Archie testified that she

20    never saw him have brain injury, suffer any kind of concussion

21    during his Pop Warner days.  The same thing with Ms. Cornell.

22    The only potential evidence we've got of any kind of a head hit

23    for Tyler Cornell comes from his father who says he thinks his

24    son suffered some kind of a violent hit at one point in time

25    but he wasn't pulled out of that practice and he played the

```
1   next game within a week.  Didn't seek medical attention.
2   Didn't see a need to.  So we've got no evidence for either of
3   these young men suffering any kind of head trauma in Pop Warner
4   football.
5           I think Your Honor is pretty familiar with the
6   experts that have been offered up in the case.  I'm happy to
7   review any of them.  But if we want to get to some specifics,
8   we've offered up declarations from a number of experts.  I can
9   start with William Barr, the neuropsychologist, who points out
10  that statistically the incidence of suicide in young men
11  Tyler Cornell's age is rather high.  And the fact that he had
12  bipolar disorder and he fell into that general population that
13  are at risk for suicide is more likely a factor and the cause
14  of his suicide.
15          He also points to statistics that show how young men
16  the age of Paul Bright Jr. are prone to engage in reckless
17  behavior.  And he's more likely a victim of his own reckless
18  behavior than anything that happened in Pop Warner football.
19          THE COURT:  Okay.
20          MR. CORLETO:  We've got a neuropathologist, Rudy
21  Castellani, who has given a declaration.  Dr. Castellani
22  reviewed the pathology in detail, and he explains the pathology
23  from Boston University.  And he explains what we know about CTE
24  as a pathology finding and how it's found in these two young
25  men.
```

1    And what he says is that what's found here is very,
2    very trace minimal amounts of CTE, that there is no consensus
3    about in the medical and scientific communities.  He's very
4    clear on that.
5    He's also very clear that there's no way at this
6    point in time to say that what was found in Tyler Cornell's
7    brain or Paul Bright Jr.'s brain by Boston University
8    progresses to anything in any particular time frame.  We just
9    don't know that.
10    So to the extent that the defense has any burden of
11    proof, we've pretty well shown that there is no specific
12    causation here.  There's no way to tie the findings of CTE that
13    were made at Boston University to the behaviors that led to the
14    deaths of these two young men.
15    THE COURT:  All right.  On the causation, last word
16    to the plaintiff.  Anything else to add?
17    MR. BOB FINNERTY:  Thank you, Your Honor.
18    I think maybe we need to backtrack for a moment
19    because it appears that the Court's concern is is there
20    sufficient evidence to indicate that these young men, in fact,
21    suffered brain trauma.  And the Court seems to be relying upon
22    the fact that we don't have any medical evidence during their
23    playing years to show that either one suffered a concussive
24    event; right?
25    But we do know one thing, and it's direct evidence

```
 1   of what we are talking about here.  Both young men had CTE.
 2   CTE only occurs as a result of repetitive brain trauma.  So we
 3   know both young men suffered brain trauma.
 4              THE COURT:  Okay.  So I'm with you on general
 5   causation.  I think you've just outlined the perfect argument
 6   for general causation.
 7              Then I just moved on to specific causation.  So we
 8   say so in this case did the CTE, as it relates to Mr. Bright,
 9   did that CTE result in him acting recklessly and then causing
10   his death in the motorcycle accident because he was acting
11   recklessly as it specifically relates to CTE.
12              And then specific causation -- again, I hear what
13   you are saying as it relates to general causation.  Then
14   specific causation or factual causation as it relates to
15   Mr. Cornell and that's does the CTE -- is it a substantial
16   factor in Mr. Cornell taking his own life.
17              MR. BOB FINNERTY:  We know CTE is the direct result
18   of repetitive brain trauma.
19              THE COURT:  I'm with you.
20              MR. BOB FINNERTY:  General causation.  Can brain
21   trauma cause changes in the brain which lead to erratic,
22   reckless and suicidal ideations or events?
23              Well, Dr. Merikangas indicates that, yes, in fact,
24   CTE or repetitive brain trauma, either one of them, can cause
25   changes in the brain which lead to erratic, reckless behavior.
```

1   And that's the specific causation here.

2           We don't need any study that says CTE causes

3   suicidal behavior.  We are learning that, and we will continue

4   to see study after study that comes out to support that.  But

5   for the purposes of our case, we just are limited to whether or

6   not brain trauma can result in erratic or reckless behavior.

7   And we have an expert, Dr. Merikangas, who has indicated that,

8   yes, in fact, that can happen.

9           Dr. Merikangas has testified in both civil and

10  criminal trials in almost every state in the land hundreds of

11  times with respect to the erratic or reckless behavior that

12  individuals demonstrate after suffering from brain trauma.

13          So the question is not is there a specific study

14  that says CTE caused it in these two young men.  It's simply is

15  CTE or brain trauma capable of causing it in these young men.

16  And that's where the substantial factor comes in.

17          So we don't need to negate or rule out any of those

18  other instances.  We can simply -- we can easily rule out the

19  karate argument because Paul Bright participated in karate

20  before he could actually engage in physical contact.  So there

21  was no physical contact at the time he was participating in

22  karate.

23          With respect to his one year of wrestling, what's

24  the trauma that's going to occur in wrestling to his brain?

25  Being thrown to the mat?  He did that every day in football.

```
 1              So we have years of participating in football
 2    leading to the general causation aspect of brain injury due to
 3    the repetitive trauma.  And we get specific causation by the
 4    fact that Merikangas repeatedly tells us that, in fact, brain
 5    trauma can lead to erratic behavior and reckless behavior.
 6    There's been no negation of that.
 7              THE COURT:  Okay.  Thank you.
 8              Any other issues that you'd like to bring to my
 9    attention?
10              MR. BOB FINNERTY:  I think my son would like to
11    bring something to your attention if that's okay.
12              THE COURT:  I'm sorry.  I didn't hear.
13              MR. BOB FINNERTY:  I think my son would like to
14    bring something to the Court's attention if that's okay.
15              THE COURT:  That's fine.
16              MR. JOSEPH FINNERTY:  Do you want to go first?
17              MR. CORLETO:  Is it all on the same subject?
18              MR. JOSEPH FINNERTY:  It's about the motion --
19              MR. CORLETO:  It's my motion, correct.
20              THE COURT:  Just address the Court.  Go ahead.
21    Whatever -- I brought to the agenda what I wanted to talk
22    about, and now I've heard the parties talk about what I wanted
23    to talk about.  So just briefly is there something that wasn't
24    in the papers that you want to bring to my attention today?
25              MR. CORLETO:  Your Honor, all I wanted to do was
```

```
 1    just sum up that counsel very succinctly laid forth that their
 2    case is based on speculation.
 3             THE COURT:  No, I promised them the last word.  So
 4    I'll give them the last word.
 5             MR. JOSEPH FINNERTY:  Your Honor, we are talking an
 6    awful lot about --
 7             THE COURT:  Make sure you are by the microphone.  If
 8    you are not, I have trouble hearing.
 9             MR. JOSEPH FINNERTY:  I'm a little too tall for
10    these microphones, Your Honor.
11             THE COURT:  The wonders of automation.  The lectern
12    moves up.
13             MR. JOSEPH FINNERTY:  Your Honor, we are talking an
14    awful lot about experts today, and I want to bring the focus
15    back to one of the defendant's experts, Dr. Bailes, who they
16    designated.  Dr. Bailes testified throughout his deposition
17    that CTE is a form of brain damage.  CTE -- the only known
18    cause of CTE is repetitive head exposure which Dr. Omalu says
19    there's thousands, if not tens of thousands of repetitive head
20    exposures per year while playing Pop Warner football.
21             THE COURT:  I'm with you on general causation.
22             MR. JOSEPH FINNERTY:  And what Dr. Bailes further
23    explains in his deposition is that that suicidal ideation can
24    be one of the symptoms of the brain damage caused by repetitive
25    head traumas.
```

1          We've been talking an awful lot about

2    Dr. Merikangas.  Dr. Omalu was designated after the Court

3    allowed the defendant to designate a rebuttal expert to try to

4    testify that Paul Bright's car accident -- or motorcycle

5    accident was not caused by his brain damage.

6          Dr. Omalu's report directly contradicts that

7    statement and says that the brain damage which led to the CTE

8    is a substantial factor in the death of Paul Bright Jr.  He did

9    not testify as to Tyler Cornell because there wasn't a rebuttal

10   expert designated for Tyler Cornell.

11         Dr. Omalu's declaration and report is filled with

12   some of the symptoms that can be related to the brain damage

13   and the eventual CTE.  This includes reckless behavior,

14   suicidal ideation, mood changes, et cetera.  And these

15   symptoms, as Dr. Bailes confirms in his deposition, manifest

16   years after the repetitive head exposures.

17         And what Dr. Bailes also testifies in his deposition

18   is that these head exposures are kind of like a 3D printer with

19   layer after layer the changes start to occur until it reaches a

20   certain threshold when the brain damage and the CTE develop.

21   So that's what we are really looking at here is these symptoms

22   that can be linked to brain damage that were caused by the

23   repetitive head impacts through Pop Warner.

24         And we are in summary judgment.  So it's a triable

25   issue of fact.  If these experts create an issue of fact, it's

1   ultimately for the jury to decide whether or not there's

2   sufficient evidence of this causation.

3            THE COURT:  All right.  Thank you.

4            The matter will be submitted.  Thank you.

5            (At 2:08 p.m. the proceedings adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                          DATED THIS  14TH  DAY OF JANUARY, 2020.

16

17

18                          /S/ MAREA WOOLRICH

19                          _____
                            MAREA WOOLRICH, CSR NO. 12698, CCRR
20                          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```